UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| **SERGIO ESPINOSA SR. and** | ) | |
| **SERGIO ESPINOSA JR.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 21-cv-10356-DJC** |
| | ) | |
| **ANDREW C. METCALF d/b/a** | ) | |
| **JUDGMENT ACQUISITIONS UNLIMITED,** | ) | |
| **CHAMPION FUNDING, INC.,** | ) | |
| **EXPORT ENTERPRISES INC.,** | ) | |
| **MASSACHUSETTS CONSTABLE INC.** | ) | |
| **d/b/a MASSACHUSETTS CONSTABLES** | ) | |
| **OFFICE and BRIAN ABELLI,** | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

**<u>MEMORANDUM AND ORDER</u>**

**CASPER, J.**                                                                                          **July 25, 2022**

## I.      Introduction

Plaintiffs Sergio Espinosa Sr. and Sergio Espinosa Jr. (collectively, "Espinosas") have filed this lawsuit against Andrew C. Metcalf ("Metcalf") d/b/a Judgment Acquisitions Unlimited ("JAU"), Champion Funding, Inc. ("Champion"), Export Enterprises Inc. ("Export"), Massachusetts Constable Inc. d/b/a Massachusetts Constables Office ("MCO") and Brian Abelli ("Abelli") (collectively, "Defendants") alleging violations of the Fair Debt Collection Practices Act ("FDCPA") codified at 15 U.S.C. § 1692 *et seq.* (Counts I, II, III, IV, VI, VII and VIII), violations of Mass. Gen. L. c. 93 and 93A (Counts V and IX), conversion (Count X) and violation of 42 U.S.C. § 1983 (Count XI) arising from an attempted debt collection. D. 41. MCO and Abelli have moved to dismiss. D. 52. For the reasons stated below, the Court DENIES the motion.

1

## II.     Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court must determine if the facts alleged "plausibly narrate a claim for relief." Schatz v. Republican State Leadership Comm., 669 F.3d 50, 55 (1st Cir. 2012) (citation omitted). Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. Factual allegations must be accepted as true, while conclusory legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011) (citation omitted). In sum, the complaint must provide sufficient factual allegations for the Court to find the claim "plausible on its face." García-Catalán, 734 F.3d at 103 (citation omitted).

## III.    Factual Background

The Court draws the following factual allegations from the Espinosas' second amended complaint ("SAC"), D. 41, and accepts them as true for purposes of resolving MCO and Abelli's motion to dismiss.

In 2006, Champion obtained a judgment against Sergio Espinosa Sr. ("Senior") for a credit card debt he incurred for the purchase of personal and household items. Id. ¶¶ 33–35. At the time, Senior's son Sergio Espinosa Jr. ("Junior") was still a minor. Id. ¶ 38. Junior had no connection to the credit card debt or related judgment. Id. ¶ 37. At some point, Champion hired Metcalf and his company JAU to collect on the 2006 judgment. Id. ¶ 39. Champion, Metcalf and JAU then hired MCO and Abelli, the movants here, for their services. Id. ¶ 40. "Upon information and belief," MCO is "an organization of constables that regularly collects, or attempts to collect, debts

and judgments owed or due to third parties through property seizures and executions on judgments." Id. ¶ 25.  Also "[u]pon information and belief," Abelli does the same and allegedly markets himself as a "Massachusetts Constable" and as "Director/Chief" of MCO.  Id. ¶¶ 27, 29.  At Champion, Metcalf and JAU's request, MCO and Abelli directed Export to seize the Espinosas' vehicles to satisfy the 2006 judgment.  Id. ¶ 41.

Senior and Junior live together in Dracut, Massachusetts at a residence owned by Senior and rented in part by Junior ("Espinosa Residence").  Id. ¶¶ 42–43.  On September 22, 2020, at about 3:30 a.m., the Espinosas awoke to the sound of a truck in their driveway.  Id. ¶ 44.  Junior went outside and saw Defendants trying to tow his Mini Cooper vehicle from the driveway.  Id. ¶ 45.  As the person moving the vehicle was securing it, Junior confronted the individual— identified as an employee of Export—and advised him that he had no right to tow the vehicle.  Id. ¶¶ 46–47.  Abelli or another uniformed constable from MCO supervised the seizure.  Id. ¶¶ 72, 80.  Junior advised the constable that he was the sole owner of the Mini Cooper and provided his registration for the car reflecting same.  Id. ¶ 73.  Defendants claimed they had a right to seize the vehicle and drove off with it.  Id. ¶¶ 48, 74.  As alleged, Junior "felt physically intimidated by the presence of the uniformed [c]onstable and would have further resisted the Defendants' attempt to . . . seize his vehicle if the uniformed [c]onstable had not been present."  Id. ¶ 75.

The next day, Junior contacted JAU and spoke with Metcalf, advising him that they had no right to take his vehicle and that they had taken the wrong car since Junior had no connection to the 2006 judgment against Senior.  Id. ¶ 50.  Metcalf responded to Junior "you are lying," "I deal with liars everyday" and that the Mini Cooper was in fact registered to Senior.  Id. ¶ 51.  The Mini Cooper was, however, registered to Junior, not Senior, who leases a Honda Accord through Honda Financial.  Id. ¶¶ 52–53.

Even after being advised that they had seized the wrong vehicle, JAU and Metcalf told Junior that they would "settle" for $4,000 and that Junior would need to pay $3,000 of that sum within twenty-four hours if he wanted his Mini Cooper back.  Id. ¶ 54.  Further, Junior was advised that attorney Michael Zola ("Zola") was representing JAU in connection with the judgment enforcement proceedings.  Id. ¶ 55.  Junior spoke with Zola, who advised Junior to offer Metcalf $4,000 to resolve Senior's debt.  Id. ¶ 56.  Junior emailed Zola on September 24, 2020 to demand the immediate return of the Mini Cooper, stating that his vehicle was wrongfully taken, that he had no connection to Senior's debt and that he was only fifteen years old when the 2006 judgment entered against Senior.  Id. ¶ 57.  Junior further advised Zola that his ownership of the Mini Cooper could be verified through correspondence with the bank that provided him a loan for the vehicle, which Junior attached to the email, or by reference to the registration located in the vehicle's glove compartment.  Id. ¶¶ 57–58.

Champion, Metcalf, JAU and Export refused to return Junior's Mini Cooper over the next sixteen days.  Id. ¶ 59.  On October 9, 2020, Export returned Junior's car to the Espinosa Residence and immediately towed Senior's leased Honda Accord from the driveway.  Id. ¶ 63.  Abelli or another uniformed constable from MCO also supervised this seizure.  Id. ¶¶ 72, 80.  The Espinosas and Honda Financial repeatedly advised Defendants that they could not legally seize the Honda Accord since Senior does not own the vehicle but instead leases it and provided Defendants with a copy of the lease.  Id. ¶¶ 65–66.  Defendants refused to return Senior's vehicle unless he paid thousands of dollars in storage fees.  Id. ¶ 67.  Defendants continued to detain the Honda Accord until May 1, 2021.  Id. ¶ 68.  "Upon information and belief," MCO and Abelli advised Export that they should continue to charge Senior with the towing and storage fees associated with the seizures of Junior's Mini Cooper and Senior's leased Honda Accord—despite allegedly knowing that

Junior's vehicle was not owned by Senior and that Senior's vehicle was a lease that could not be seized to satisfy the 2006 judgment.  Id. ¶¶ 69–71.

## IV.    Procedural History

The Espinosas commenced this action on March 3, 2021, D. 1, and later filed an amended complaint, D. 13.  Export moved to dismiss, D. 18, and the Court allowed that motion in part, D. 31.  The Espinosas then filed the SAC, which added MCO and Abelli as Defendants.  D. 41.  MCO and Abelli now have moved to dismiss.  D. 52.  The Court heard the parties on the pending motion and took the matter under advisement.  D. 62.

## V.    Discussion

### A.    Senior Has Standing to Raise Claims as to the Seizure of Junior's Vehicle

MCO and Abelli argue that Counts VI, VII, VIII and IX should be dismissed in part because Senior lacks standing to raise claims as to the seizure of Junior's Mini Cooper.  D. 53 at 3; see D. 41 ¶¶ 139–96.  Specifically, MCO and Abelli contend that, assuming Senior does not own the Mini Cooper, he has suffered no injury sufficient to satisfy the standing requirements of Article III of the United States Constitution.  D. 53 at 3.

The "'irreducible constitutional minimum' of standing" requires:  (1) that the plaintiff has suffered an "injury in fact," that is, an invasion of a judicially cognizable interest; (2) that the injury be "fairly traceable" to the challenged action of the defendant and not the result of the independent action of a third party not before the court; and (3) that it be likely, not merely speculative, that the injury will be redressed by a favorable decision.  Bennett v. Spear, 520 U.S. 154, 167 (1997) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)).

The emotional harm allegedly suffered by Senior as a result of the seizure of Junior's vehicle satisfies Article III's injury requirement.  Emotional distress can constitute a concrete

injury for Article III purposes:  courts have held this in the FDCPA context, see Ben-Davies v. Blibaum & Assocs., P.A., 695 F. App'x 674, 676–77 (4th Cir. 2017), as well as when such distress derives from misconduct directed at a plaintiff's child, see Rideau v. Keller Indep. Sch. Dist., 819 F.3d 155, 168–69 (5th Cir. 2016) (stating that "[t]he emotional pain that results from seeing one's child abused seems to be a sufficiently concrete injury for standing purposes" and noting that "the number of causes of action in which a person may recover for emotional harm—from many common law claims including . . . intentional inflection of emotional distress to section 1983 claims that rely on common law remedies—supports the notion that emotional harm satisfies the 'injury in fact' requirement" (footnote omitted)).  The SAC, at minimum, adequately pleads that Senior suffered emotional distress due to the seizure of Junior's vehicle for Article III standing purposes.  See D. 41 ¶ 160 (alleging that Defendants' conduct "harmed Senior by causing him to suffer anger, anxiety, emotional distress, frustration and embarrassment, and by taking up Senior's time to address this disruption to his life").

Further, Senior has "statutory standing" under the FDCPA to raise claims related to the seizure of Junior's vehicle.  "Statutory standing . . . relates to whether the plaintiff has a cause of action under a particular statute."  United States v. Catala, 870 F.3d 6, 10 (1st Cir. 2017); see Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 128 (2014) (describing the inquiry as "whether [the plaintiff] falls within the class of plaintiffs whom Congress has authorized to sue under [the statute]").  The FDCPA provides a cause of action to recover damages for emotional distress arising from a violation of the statute.  See Minnifield v. Johnson & Freedman, LLC, 448 F. App'x 914, 916 (11th Cir. 2011) (stating that "[t]he FDCPA . . . allows a plaintiff to recover 'any actual damage sustained' as a result of a violation of the statute" and "[a]ctual damages under the FDCPA include damages for emotional distress" (quoting 15 U.S.C.

§ 1692k(a)(1)).  The act, moreover, contemplates that a debtor can sue for violations arising from a debt collector's conduct directed at a third party, such as the debtor's relative.  See, e.g., 15 U.S.C. § 1692c(b) (prohibiting a debt collector from communicating with any person regarding a debtor's debt other than "the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector"); Gardner v. Credit Mgmt. LP, 140 F. Supp. 3d 317, 321 (S.D.N.Y. 2015) (stating that "[t]he Act's particular concern that information not be shared with 'friends, neighbors, or an employer' suggests that the specific abuse to be remedied was that of collection agencies' targeted disclosures of a recipient's indebtedness as a means of harassment and embarrassment" and noting that, "[t]o that end, the Act seeks to prevent the personally damaging consequences that could flow from being identified as a debtor to those close to the recipient"); Arteaga v. Asset Acceptance, LLC, 733 F. Supp. 2d 1218, 1228 (E.D. Cal. 2010) (stating that "the practice of calling . . . the homes of a debtor's family and friends . . . can . . . constitute harassment" under the FDCPA).

Accordingly, Senior has standing to sue for the seizure of Junior's vehicle.[1]

### B.    MCO and Abelli Plausibly Constitute "Debt Collector[s]" under the FDCPA

MCO and Abelli also argue that Counts I and IV should be dismissed because they are excluded from the FDCPA's definition of "debt collector."  D. 53 at 4.  Section 1692a defines "debtor collector" as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another."  15 U.S.C. § 1692a(6).  Such definition excludes "any person while serving or

---

[1] MCO and Abelli had also disputed that Junior had statutory standing to sue under the FDCPA in their memorandum, D. 53 at 3–4, but withdrew that argument at the motion hearing, D. 62, so the Court need not address this now moot issue.

attempting to serve legal process on any other person in connection with the judicial enforcement of any debt." Id. § 1692a(6)(D). MCO and Abelli contend that they fall under this "legal process" exclusion because, at all relevant times, they acted "in connection with the judicial enforcement of the debt as ordered by the [e]xecution granted to [Champion] in 2006." D. 53 at 4.

As the Espinosas argue, D. 59 at 16–17, however, the "process server" exclusion does not apply because the SAC does not allege that MCO or Abelli attempted to serve process to the Espinosas. See generally D. 41; see also D. 31 at 13 (rejecting Export's motion to dismiss on this same basis because "nothing in the amended complaint . . . suggests that Export is a process server"). Further, to the extent the SAC alleges that MCO and Abelli attempted to collect on the 2006 judgment, see, e.g., D. 41 ¶¶ 71–72, such would disqualify them from the legal process server exclusion, even assuming they did serve process to the Espinosas. See Andrews v. S. Coast Legal Servs., Inc., 582 F. Supp. 2d 82, 88 (D. Mass. 2008) (stating that "a person who goes beyond being merely a messenger in serving legal process and engages in prohibited abusive or harassing activities to force an individual to repay a debt is no longer exempt under the legal process server exception" because "he steps beyond the bounds of the official duties inherent in serving process and takes on a secondary role of 'debt collector'" (citation omitted)).

Accordingly, MCO and Abelli plausible constitute "debt collector[s]" under the FDCPA.

**C.    The SAC Sufficiently Pleads a Violation of 15 U.S.C. § 1692d**

MCO and Abelli argue that Counts II and VII should be dismissed because the SAC lacks sufficient facts to suggest that MCO and Abelli violated 15 U.S.C. § 1692d. D. 53 at 5–6. Section 1692d provides that "[a] debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. According to MCO and Abelli, the Espinosas "do not provide any fact that

[Abelli] and MCO specifically engaged in any behavior that would harass, oppress or abuse the Plaintiffs.  Rather, [the Espinosas] generally state that [Abelli] or a uniformed constable from MCO was present during each seizure and that Junior felt intimidated by the presence of the uniformed Constable."  D. 53 at 6.

The statute provides "no bright-line rules as to what constitutes harassment."  Davis v. Diversified Consultants, Inc., 36 F. Supp. 3d 217, 228 (D. Mass. 2014).  Thus, whether conduct harasses, oppresses or abuses ordinarily will be a question of fact for the factfinder.  Hatuey v. IC Sys., Inc., No. 16-cv-12542-DPW, 2018 WL 5982020, at *2 (D. Mass. Nov. 14, 2018) (citing Jeter v. Credit Bureau, Inc., 760 F.2d 1168, 1179 (11th Cir. 1985)).  "In determining whether conduct has the natural consequence of 'harassing, oppressing, or abusing' the consumer, conduct 'is to be viewed from the perspective of the hypothetical unsophisticated consumer.'"  Id. at *3 (quoting Pollard v. Law Office of Mindy L. Spaulding, 766 F.3d 98, 103 (1st Cir. 2014)).

Here, the SAC sufficiently alleges harassing, oppressing or abusive conduct by MCO and Abelli.  As alleged, "[w]hen Abelli and the MCO arrived at the [Espinosas'] property to seize the Mini Cooper, Junior advised the constable that he was the sole owner of the Mini Cooper and provided his registration for the Mini Cooper reflecting that he was the sole owner of the vehicle."  D. 41 ¶ 73.  Defendants "nevertheless insisted that they were taking the vehicle."  Id. ¶ 74; see id. ¶ 75 (stating that "Junior felt physically intimidated by the presence of the uniformed Constable"), ¶ 80 (stating that Defendants "succeeded in taking Plaintiff's vehicle in the presence of, and with the active cooperation of, Abelli and the MCO").  The SAC, moreover, alleges that "MCO and Abelli . . . advised Export that they should continue to charge Senior with the towing and storage fees incurred both (1) by the illegal seizure of Junior's vehicle, and (2) by the illegal seizure of Senior's vehicle."  Id. ¶ 71.  Such alleged knowing misconduct plausibly qualifies as harassing,

oppressing or abusive under Section 1692d.  See Campbell v. Douglas Knights & Assocs., Inc., No. 21-cv-01667-JCS, 2021 WL 1734896, at *8 (N.D. Cal. May 3, 2021) (stating that "the allegation that a debt collector threatened to place a hold on an individual's driver's license if a debt was not paid would likely be sufficient to allege a violation of Section 1692d"); Keenan v. Wells Fargo Bank, N.A., 246 F. Supp. 3d 518, 525 (D. Mass. 2017) (denying motion to dismiss where "defendants were well aware that plaintiff was represented by counsel, yet they contacted him directly with respect to the money allegedly owed on the mortgage").  Given the allegations in the SAC and that whether conduct harasses, oppresses or abuses is usually a question of fact for the factfinder, Hatuey, 2018 WL 5982020, at *2, dismissal is not warranted here.  The SAC adequately pleads a violation of § 1692d.

### D.     The SAC Sufficiently Pleads a Violation of 15 U.S.C. § 1692e

MCO and Abelli also argue that Counts III and VII should be dismissed because the SAC lacks sufficient facts to suggest a violation of 15 U.S.C. § 1692e.  D. 53 at 6–7.  Section 1692e prohibits debt collectors from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C. § 1692e.  MCO and Abelli contend that the SAC's allegations regarding false, deceptive or misleading representations relate only to actions the Espinosas "specifically attribute to Metcalf and JAU."  D. 53 at 7.

The SAC, however, alleges that "Defendants" threatened to sell Senior's leased Honda Accord even after learning that he did not own the vehicle to induce him to pay thousands of dollars in storage fees.  See D. 41 ¶¶ 67, 191.  Such allegations encompass MCO and Abelli, see id. at 1 (defining "Defendants"), and, therefore, establish a reasonable inference that MCO and Abelli are liable for violating Section 1692e as to Senior.  See 15 U.S.C. § 1692e(5) (prohibiting "the threat to take any action that cannot legally be taken or that is not intended to be taken").

The SAC also alleges that, after Abelli and the MCO arrived at the Espinosa Residence to seize Junior's Mini Cooper, Junior advised them that he was the sole owner of that vehicle, but Defendants took the vehicle anyway, claiming that they had a right to seize it. See D. 41 ¶¶ 48, 73–74. This claim also plausibly constitutes a false, deceptive or misleading representation intended to induce Junior to allow Defendants to take his vehicle despite that they had no such right.

Accordingly, the SAC adequately pleads a violation of § 1692e.

E.      **MCO and Abelli Plausibly Are "Creditors" under Chapters 93 and 93A**

MCO and Abelli next argue that Counts V and IX should be dismissed because they are not "creditor[s]." D. 53 at 7–8. The Attorney General's debt collection regulations define "creditor" as "any person and his or her agents, servants, employees, or attorneys engaged in collecting a debt owed or alleged to be owed to him or her by a debtor and shall also include a buyer of delinquent debt who hires a third party or an attorney to collect such debt" but not "if his or her activities are solely for the purpose of serving legal process on another person in connection with the judicial enforcement of a debt." 940 C.M.R. § 7.03. MCO and Abelli contend that their conduct falls under the exception for "person[s]" whose "activities are solely for the purpose of serving legal process." D. 53 at 7–8.

As concluded above, however, nothing in the SAC suggests that either MCO or Abelli is a process server. See D. 41 ¶¶ 24–30. Further, the definition of "creditor" includes "agents" and "servants" of creditors, 940 C.M.R. § 7.03, which would encompass MCO and Abelli allegedly acting on behalf of Champion, Metcalf and JAU. See D. 41 ¶ 40 (alleging that "Champion, Metcalf and JAU . . . sought out the services of [MCO] and Abelli to execute on [the] 2006 judgment"); see Andrews, 582 F. Supp. 2d at 89 (denying motion to dismiss because plaintiff "alleged that the

11

defendants were acting as agents of [creditor] in collecting the judgment debt, and therefore, would qualify as creditors under the regulations").  Accordingly, MCO and Abelli plausibly qualify as "creditor[s]" and may be liable under Chapters 93 and 93A.

F.     **The SAC Sufficiently Pleads a Violation of Chapters 93 and 93A**

MCO and Abelli further argue that, even assuming they constitute "creditors" under the Attorney General's debt collection regulations, Count IX should be dismissed because the SAC fails to allege sufficient facts to suggest a violation of such regulations.  D. 53 at 8–9; see D. 41 ¶ 190 (citing 940 C.M.R. § 7.07(8), (10), (16), (18), (19)).

Section 7.07(8) prohibits "[a]ny false, deceptive, or misleading representation, communication, or means in connection with the collection of any debt."  940 C.M.R. § 7.07(8). Section 7.07(10) further prohibits "[a]ny false or misleading representation or implication that the debtor committed any crime or other conduct in order to disgrace the debtor."  Id. 7.07(10).  MCO and Abelli argue that the SAC fails to plead that either Defendant made any such communications. D. 53 at 8.  Such argument fails with respect to Section 7.07(8) for the reasons stated above relating to 15 U.S.C. § 1692e.  Nevertheless, the SAC does not appear to allege facts to support a claim against MCO or Abelli under Section 7.07(10).  See D. 31 at 13–14 (concluding same with respect to Export).

Section 7.07(16) prohibits "[t]he collection of any amount (including interest, fees, charges or expenses incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law."  940 C.M.R. § 7.07(16).  MCO and Abelli argue that the SAC fails to plead any facts to support a violation of this provision.  D. 53 at 9.  The SAC, however, alleges that Defendants demanded Senior pay thousands of dollars in storage fees for the months they held his leased vehicle, D. 41 ¶ 67, and, in particular, that MCO and Abelli

advised Export to continue demanding same, id. ¶ 71.  Such allegations suggest a plausible violation of Section 7.07(16), as the Court can reasonably infer that the storage fees were not expressly authorized by the agreement creating the underlying debt or otherwise permitted by law. See D. 31 at 14–15 (concluding that demand for payment of storage fees suggested a plausible violation of this subsection).

Section 7.07(18), in relevant part, prohibits "[t]aking or threatening to take any non-judicial action to effect dispossession or disablement of property if" "(d) the property is . . . exempt by law from such dispossession or disablement."  940 C.M.R. § 7.07(18).  Section 7.07(19) prohibits "[t]aking possession of . . . property that is exempt from seizure on execution because . . . the property is otherwise exempt by law from such dispossession or disablement." Id. 7.07(19).  MCO and Abelli argue that the Espinosas have failed to allege facts to suggest that the property taken was exempt by law from dispossession and, further, that MCO or Abelli "actually possessed the vehicles" rather than merely "supervis[ing]" the seizure.  D. 53 at 8–9.  MCO and Abelli's argument regarding Section 7.07(18) fails, as the SAC alleges several facts plausibly suggesting that both vehicles were exempt from dispossession.  See, e.g., D. 41 ¶ 91 (alleging that "Junior's vehicle was . . . exempt from dispossession as he is not responsible to pay for Senior's debt"), ¶ 157 (alleging that "because it was a leased vehicle, Senior's vehicle was . . . exempt from seizure or disablement"); see also D. 31 at 10, 15 (concluding same with respect to the Espinosas' first amended complaint).  Their argument regarding Section 7.07(19) also fails.  The SAC alleges that MCO and Abelli hired Export to seize the vehicles in question, D. 41 ¶ 41; were present in uniform during both seizures, id. ¶ 72; and insisted upon the seizures despite being advised that the vehicles could not be seized to satisfy Senior's debt, id. ¶¶ 64, 73–74.

Accordingly, the SAC adequately pleads various violations of Section 7.07, except as to Section 7.07(10).

      **G.**      **MCO and Abelli Plausibly Acted under Color of State Law**

Finally, MCO and Abelli argue that Count XI should be dismissed because the SAC fails to plead facts to suggest that MCO and Abelli acted under color of state law.  D. 53 at 9–11. "Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of 'any rights, privileges, or immunities secured by the Constitution and [federal] laws.'"  Gray v. Cummings, 917 F.3d 1, 7–8 (1st Cir. 2019) (alteration in original) (quoting 42 U.S.C. § 1983).  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)); see Monroe v. Pape, 365 U.S. 167, 187 (1961) (reaffirming rule articulated in Classic), overruled in part on other grounds by Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658 (1978).

The Supreme Court has also "made clear that if a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, 'that conduct [is] also action under color of state law and will support a suit under § 1983.'"  West, 487 U.S. at 49 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 935 (1982)); Cruz-Arce v. Mgmt. Admin. Servs. Corp., 19 F.4th 538, 543 (1st Cir. 2021) (stating that "Section 1983's 'under color of state law' requirement has long been regarded as functionally equivalent to the 'state action' requirement of the Fourteenth Amendment").  The Court has articulated three tests for determining when a private party may be characterized as a "state actor."  See Lugar, 457 U.S. at 939 (reserving on "[w]hether these different tests are actually different in operation or simply different ways of characterizing

the necessarily fact-bound inquiry that confronts the Court in such a situation"). First, under the "public function test," "a private party may be considered a state actor if it assumes a public function which, by tradition, is exclusively reserved to the state." Cruz-Arce, 19 F.4th at 544. Second, under the "state compulsion test," "a private party may be considered a state actor if its conduct is coerced or significantly encouraged by the state." Id. Third, under the "nexus/joint action test," "a private party may be considered a state actor if it and the state have entered into so symbiotic a relationship that they have become joint participants in the challenged conduct." Id.

"To defeat a motion to dismiss predicated on the 'under color of state law' requirement, a plaintiff need not specifically allege which of these three tests applies in her particular case." Id. "Determining whether a private party's conduct amounts to state action demands a fact-intensive and context-specific inquiry" into whether "the conduct of [the] private party can be 'fairly attributable to the State.'" Id. at 543–44 (quoting Lugar, 457 U.S. at 937); see Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295–96 (2001) (stating that "[w]hat is fairly attributable is a matter of normative judgment," "the criteria lack rigid simplicity," and "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient").

MCO and Abelli contend that the SAC fails plausibly to allege facts to satisfy any of the "state actor" tests. D. 53 at 9–11. The SAC, however, at minimum alleges sufficient facts to suggest that MCO and Abelli "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" See West, 487 U.S. at 49 (quoting Classic, 313 U.S. at 326). Court have held that a constable may be liable under § 1983 for violating a person's federal rights. See, e.g., Ruesch v. Purple Shovel, LLC, No. 4:18-cv-00028-DN, 2021 WL 1200368, at *7 (D. Utah Mar. 30, 2021); Horne v. Farrell, 560 F. Supp. 219,

224 (M.D. Pa. 1983) (citing <u>Monroe</u>, 365 U.S. 183–87) (denying motion to dismiss where "[t]he alleged actions of [the defendant constable], while he was in uniform and in the locale in which a person might expect to find a constable performing his functions, were taken under the color of state law"). <u>Ruesch</u>, for example, denied the defendant constables' motion for summary judgment in which they argued that they did not act under color of state law in executing a writ of execution on the plaintiffs. <u>Ruesch</u>, 2021 WL 1200368, at *6. In so doing, the court noted that constables in Utah "have authority to conduct official actions on behalf of a court," "must be certified as a special function peace officer in the [s]tate," and "must prominently display a badge or other credentials while performing official duties." <u>Id.</u> at *7 (citations omitted). Further, such constables "are appointed by cities and counties," "may have their positions revoked for cause or if their certification is suspended or revoked," and "are empowered to execute the orders of a judge and to serve and execute . . . writs issued by a [c]lerk of the [c]ourt." <u>Id.</u> (citations omitted).

Constables in Massachusetts likewise are appointed by cities and towns, <u>see</u> Mass. Gen. L. c. 41, §§ 1, 91–92, and hold many of the same powers as police officers. For instance, constables may arrest individuals for various offenses. <u>See, e.g.</u>, <u>id.</u> c. 56, § 57; <u>id.</u> c. 138, § 56. They may serve certain writs, warrants and processes and may require aid in the execution of their duties. <u>See id.</u> c. 41, § 94. They also have the power of entry with respect to certain businesses "for the purpose of enforcing any law." <u>Id.</u> c. 140, § 201. Further, the SAC here alleges that Abelli or another constable from MCO was present during each of the seizures in "uniform[]" to execute a judgment. D. 41 ¶ 72; <u>see also</u> <u>id.</u> ¶ 75. Thus, as alleged, the constable who facilitated the seizures of the Espinosas' vehicles—whether Abelli himself or another constable from MCO—exercised power conferred upon him by state law while "clothed with the authority of state law." <u>See</u> <u>West</u>,

487 U.S. at 49 (quoting <u>Classic</u>, 313 U.S. at 326).  The SAC, therefore, adequately pleads that

MCO and Abelli acted under color of state law for purposes of § 1983.[2]

**VI.     Conclusion**

For the foregoing reasons, the Court DENIES MCO and Abelli's motion to dismiss, D. 52.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

---

[2] MCO and Abelli initially had moved to dismiss Counts I and VI, contending it was inadequately pled that Junior and Senior's motor vehicles were exempt from dispossession under Section 1692f(6).  D. 53 at 4–5.  Since they withdrew this argument at the motion hearing, D. 62, the Court need not address this now moot issue.