Page 21

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
 2           Civil Case Number: 1:21-cv-10356-DJC
 3
    x ---------------------------- x
 4  SERGIO ESPINOSA, SR. and          CIVIL ACTION
    SERGIO ESPINOSA, JR.,             DEPOSITION OF:
 5                  Plaintiff,
                                      ANDREW C. METCALF
 6        -vs-                          (Via Zoom)
                                          Volume 2
 7  ANDREW C. METCALF d/b/a
    JUDGMENT ACQUISITIONS
 8  UNLIMITED, CHAMPION FUNDING,
    INC., EXPORT ENTERPRISES INC.,
 9  MASSACHUSETTS CONSTABLE INC.,
    d/b/a MASSACHUSETTS CONSTABLES
10  OFFICE and BRIAN ABELLI,
                    Defendants.
11  x ---------------------------- x
12
    C O M P U T E R I Z E D   T R A N S C R I P T
13  of the stenographic notes of the proceedings in the
    above-entitled matter as taken by and before
14  DONNA A. GROSIAK, a Certified Court Reporter, via
    Zoom, on Tuesday, May 31, 2022, commencing at 9:55
15  in the forenoon.
16
            A P P E A R A N C E S
17
    MARCUS & ZELMAN, LLC
18  BY:  YITZCHAK ZELMAN, ESQ.,
         701 Cookman Avenue,Unit 300
19       Asbury Park, New Jersey  07712
    For the Plaintiffs.
20
21  FLAVIN PITTS, P.C.
    BY:  BRENDAN R. PITTS, ESQ.,
22       424 Adams Street, Suite 100
         Milton, Massachusetts  02186
23  For the Defendants, Andrew C. Metcalf,
    Judgment Acquisitions Unlimited and Champion
24  Funding, Inc.
25
```

Page 22

```
 1  LAW OFFICE OF E. PAMELA SALPOGLOU
    BY:  E. PAMELA SALPOGLOU, ESQ.,
 2       1 Cabot Place
         Stoughton, Massachusetts  02072
 3  For the Defendant, Export Enterprises, Inc.
 4
    SIMONS LAW OFFICE
 5  BY:  NATALIE SRECA, ESQ.,
         10 Post Office Square, Suite 800
 6       Boston, Massachusetts  01209
    For the Defendants, Massachusetts Constable,
 7  Inc., d/b/a Massachusetts Constables
    Office and Brian Abelli.
 8
 9
10            I N D E X
    WITNESS    DIRECT   CROSS   REDIRECT   RECROSS
11
    ANDREW C. METCALF
12  BY:  MR. ZELMAN    23                     108
    BY:  MR. PITTS            106
13  BY:  MS. SALPOGLOU       110
14
15
16
17            E X H I B I T S
18  Number          Description            Id.
19  Plaintiff's   Policies & Procedures Manual
    Exhibit-A     of Judgment Acquisitions
20                Unlimited                 78
21  Plaintiff's   Huong Luu Complaint
    Exhibit-B                               96
22
            (Exhibits retained by counsel.)
23
24
25
```

Page 23

1  A N D R E W  C.  M E T C A L F, Previously

2  Sworn.

3  DIRECT EXAMINATION BY MR. ZELMAN:

4      Q    All right.  So, the last question we

5  had asked was if Mr. Abelli had seized more than

6  100 vehicles on behalf of Mr. Metcalf and his

7  companies, and I believe the answer was "I'm not

8  sure;" correct?  Mr. Metcalf, you're on mute.

9  A   Sorry.  Correct.

10      Q    Okay.  So, let's try to nail that

11  down a little bit better.

12      Do you -- has Mr. Abelli or the

13  constables who worked on your behalf, seized more

14  than 50 vehicles on behalf of your company or

15  yourself?

16  A   Yes.

17      Q    Okay.  More than 75?

18  A   Yes.  You're talking over the years; right?

19  Like, accumulation of my career?

20      Q    Sure.

21  A   Yeah.  Yeah.  Yes.

22      Q    What would you put your best estimate

23  as?

24  A   The amount of vehicles that were seized over

25  the years?

Page 24

1      MR. PITTS:  No.  Hold on.  The

2  question -- the question that he asked was how many

3  vehicles have you seized with Constable Abelli;

4  isn't that correct, Yitzchak?  That was your first

5  question.

6      MR. ZELMAN:  Sure.  We'll ask it in

7  two parts.

8      Q    So, how many vehicles have you seized

9  over the years with any constable?

10  A   I haven't seized any, but the executions

11  that were sent, the constables do that.

12      Q    Sure.  And how many of those have

13  resulted in vehicles seizures?

14  A   I do not know, but it is over 100, I would

15  say, over the years.

16      Q    And now with Mr. Abelli specifically,

17  can you give your best estimate about how many

18  vehicles he had seized on behalf of your companies?

19  A   I would say 75.

20      Q    Okay.

21  A   Best guess right now --

22      MR. PITTS:  Andrew, I don't want you

23  to guess.

24      THE WITNESS:  Okay.

25  A   I don't know.



Page 25

1    Q    Now, when you hire Mr. Abelli to
2  execute on a judgment, do you have to pay him up
3  front for his services?
4  A    No.
5    Q    Okay.  I saw something about a $700
6  constable fee somewhere in the discovery
7  production.  Does that sound familiar?
8  A    Yes.
9    Q    When does that get charged?
10  A    That is after a vehicle seizure.
11    Q    Okay.  What happens if a vehicle --
12  well, let me rephrase.
13        Over all these years with all of
14  these vehicle seizures, have you ever experienced a
15  situation where a vehicle -- let me -- I'll fix
16  that.  I'll fix that.
17        Over all these years with all of
18  these seizures, have you ever experienced a
19  situation where the wrong vehicle was taken?
20        MR. PITTS:  Objection.
21        If you understand it, Andrew, you can
22  answer.
23  A    Yeah.  I don't recall that situation similar
24  to this.
25    Q    Okay.  So, for example, a situation

Page 26

1  where one person's vehicle was taken, although they
2  were not the debtor, you don't recall a situation
3  like that?
4  A    Correct.
5    Q    What about a situation where a
6  vehicle was seized, but it was within the exemption
7  limits?
8  A    Yes.
9    Q    You recall that?
10  A    Yes.
11    Q    Okay.
12  A    Yeah.  Okay.
13    Q    So, in such a situation, does
14  Mr. Abelli still get his $700?
15  A    Yes.
16    Q    Okay.  You give the vehicle back,
17  though; right?
18        MR. PITTS:  Objection.  You give it
19  back when?
20    Q    Once you find out that the vehicle is
21  within the exemption limits.
22  A    Can you rephrase "within the exemption
23  limits," what your definition of that is?  Because
24  it sounds like you're -- you're saying -- can you
25  just rephrase what your definition of "within the

Page 27

1  exemption limits" is?
2    Q    I'm not trying to give you a hard
3  time.  I'm not sure what the difficulty is.  So, if
4  you tell me what difficulty you're having, I can
5  rephrase it according --
6  A    Yeah, yeah.  So -- so, within -- so -- so,
7  an exemption on the value of a vehicle, the age of
8  the defendant and the number of vehicles that they
9  have.  So, within or -- I guess, exempt or
10  non-exempt.
11    Q    Exactly.
12  A    Okay.
13    Q    If you have an exempt vehicle --
14  A    Right.
15    Q    -- that has been seized, do you
16  return that vehicle?
17  A    Yes.
18    Q    Okay.  And in such a situation, what
19  happens to that $700 fee?
20  A    They're still paid.
21    Q    By whom?
22  A    What was the question?  I'm sorry.
23    Q    By whom?
24  A    By -- by me.
25    Q    Okay.  And do you then bill that fee

Page 28

1  to the debtor?
2  A    Not typically, no.
3    Q    All right.  We'll come back to that.
4        Let's talk a little bit about the
5  debt at issue in this case.  Are you familiar with
6  the allegations generally in this action?
7  A    Yes.
8    Q    And in this case, we're here because
9  there was some collection attempts over a judgment
10  debt owed by Sergio Espinosa, Sr.; correct?
11  A    Yes.
12    Q    Okay.  Who is that debt incurred to?
13  A    I don't understand.
14    Q    The debt that you're trying to
15  collect on, who is that debt incurred to?
16  A    A credit card company.
17    Q    Sure.  Do you know which one?
18  A    I don't.
19    Q    Okay.  How is it that you came to
20  collect on this debt?
21  A    We were hired to collect it.
22    Q    Who's "we"?
23  A    Andrew Metcalf, Judgment Acquisitions, the
24  collection agency.
25    Q    And who hired you?

Page 29

1   A     Champion Funding.
2       Q     Okay.  So, how did Champion Funding
3   get the debt?
4   A     Through purchase.
5       Q     Okay.  And Champion Funding is your
6   company; correct?
7   A     Yes.  That is an entity, yes.
8       Q     When did Champion Funding purchase
9   this debt?
10  A     2019.
11      Q     Who did they purchase the debt from?
12  A     A broker I went through, there was a broker,
13  Runcci Group.
14      Q     Can you spell that?
15  A     R-U-N-C-C-I.
16      Q     Okay.  Did you buy this debt
17  specifically from Runcci Group or was it part of a
18  overall portfolio?
19  A     Portfolio.
20      Q     Okay.  Now, you didn't buy it from
21  Runcci Group themselves; right?  They were just a
22  broker, you said?
23  A     They were the broker, correct.  Yes.
24      Q     Okay.  So, who actually sold the debt
25  to Champion?

Page 30

1   A     I'm not sure.  I'm not 100 percent sure.
2       Q     Okay.  Do you know how much Champion
3   paid for this debt?
4   A     The portfolio?
5       Q     Well, I'm asking if you know how much
6   Champion paid for this debt specifically?
7   A     They purchased within a portfolio.  So,
8   they're not purchased individually.
9       Q     So, there's no, like, assigned price
10  for this specific account; correct?
11  A     Correct.
12      Q     This is purchased as part of an
13  overall portfolio?
14  A     Yes.
15      Q     Do you know what the price of that
16  overall portfolio was?
17  A     Yes.
18      Q     What is it?
19  A     40,000.
20      Q     Was there certain criteria that
21  Champion provided to Runcci Group for what they
22  were looking for to be part of their portfolio?
23  A     Can you repeat that question one more time?
24      Q     Sure.
25          Was there specific criteria that

Page 31

1   Champion provided to Runcci Group for what they
2   were looking for as part of the debts that they
3   were buying?
4   A     No.
5       Q     Was it just here's a whole portfolio
6   of debts, was it judgment debts, was it something
7   else?
8   A     Oh, this portfolio were all judgments.
9       Q     Okay.  And were they judgments over a
10  specific age?
11  A     Yes.  I would say.
12      Q     Do you know what that age was?
13  A     I would say at least 10 years.
14      Q     Okay.  All right.  So, Runcci Group
15  is just kind of like a middleman who facilitates a
16  sale of debts from buyer to seller?
17  A     They're a broker.  So, yes.
18      Q     Okay.  Now, in discovery, we have a
19  whole bunch of purchase and sale documents, limited
20  powers of attorney and so on.  So, I'm going to
21  show this to you.
22  A     Okay.
23      Q     I'm going to identify it by the Bates
24  number for the sake of the record.  This is Bates
25  stamped D01; do you see that?

Page 32

1   A     Yes.
2       Q     All right.  And this is a bill of
3   sale, an assignment of accounts from Erin Capital
4   Management to Caddis Funding, LLC, dated
5   February 6, 2019; do you see that?
6   A     Yes.
7       Q     Do you know who Erin Capital
8   Management is?
9   A     They are the plaintiff, original plaintiff.
10      Q     When you say they are the "original
11  plaintiff," are you referring to -- are they the
12  people who sued Mr. Metcalf in the state court
13  action?  I'm sorry, are they the people who sued
14  Mr. Espinosa in the state court action?
15  A     Yes.
16      Q     Okay.  Give me a second.
17          Now, do you see this Affidavit and
18  the Assignment of Judgment in the front of you,
19  which is Bates stamped D29?
20  A     Yes.
21      Q     Do you see the name of the plaintiff
22  in that caption?
23  A     Yes.
24      Q     It's not Erin Capital Management; is
25  it?



Page 33

1  A    No.
2      Q    It's CACV of Colorado, LLC; correct?
3  A    Correct.
4      Q    So, do you know who Erin Capital
5  Management is?
6  A    Erin Capital is the plaintiff in the case.
7  Apparently, they're not the plaintiff in this case.
8      Q    So, they're the plaintiff in what
9  case?
10  A    Another judgment maybe.
11      Q    Okay.  But do you have any idea who
12  they are in connection with the judgment that we're
13  talking about in this case?
14  A    No.
15      Q    Okay.  What about Caddis Funding,
16  LLC, do you have any idea who they are in
17  connection with the judgment that we're talking
18  about in this case?
19  A    I believe they were the seller of the
20  judgment.
21      Q    You believe that they were the seller
22  of Mr. Espinosa's judgment to Champion Funding?
23  A    Yeah.  They -- they're the ones that
24  facilitated the portfolio.
25      Q    I thought you said Runcci Group was

Page 34

1  the person who facilitated the portfolio?
2  A    They're the broker.
3      Q    Okay.
4  A    "Facilitated" maybe is not the -- they're
5  the seller, I should say.
6      Q    All right.  So, Caddis Funding, LLC
7  sold the judgment debt to Champion Funding; is that
8  your testimony?
9  A    I believe so.
10      Q    Okay.  Do you know who Merriman
11  Investments, LLC is?
12  A    They're a debt-buying entity.
13      Q    Okay.  I'm looking at D2, which is a
14  Bill of Sale and an assignment of accounts for
15  Merriman Investments, LLC to Caddis Funding dated
16  February 6, 2019; do you see that?
17  A    Yes.
18      Q    Do you know who Merriman Investments,
19  LLC is in connection with the judgment that we're
20  talking about 96?
21  A    I don't.
22      Q    Okay.  What about Celtic Financial
23  Services, which you can see on the document in
24  front of you Bates stamped D04?
25  A    Okay.

Page 35

1      Q    Do you know who they are in
2  connection with the judgment that we're talking
3  about in this case?
4  A    I don't.
5      Q    Okay.  So, we know that Caddis
6  Funding, LLC sold the judgment to Champion Funding;
7  correct?
8  A    I believe so.
9      Q    We also know that the plaintiff who
10  obtained a judgment against my client is CACV of
11  Colorado; correct?
12  A    I believe so.
13      Q    How did Caddis Funding obtain
14  ownership of the debt from CACV of Colorado?
15  A    I don't know.
16      Q    Okay.  Now, you say that Champion
17  purchased this debt in 2019; correct?
18  A    Correct.
19      Q    And I believe we looked at this
20  document a moment ago, which is Bates D029, which
21  is an Affidavit and Assignment of Judgment from
22  CACV of Colorado to Champion Funding; do you see
23  that?
24  A    Yes.
25      Q    And that's signed and notarized in

Page 36

1  September of 2019; correct?
2  A    Correct.
3      Q    So, it's your understanding that as
4  of 2019, Champion Funding owned this judgment debt?
5  A    Correct.
6      Q    Okay.  Let's look at D028, which
7  appears to be the identical document.  It's an
8  Affidavit and Assignment of Judgment from CACV of
9  Colorado to Champion Funding; do you see that
10  document?
11  A    Yes.
12      Q    The only difference is this document
13  is signed in June of 2021, two years after the last
14  document we looked at; do you see that?
15  A    Yes.
16      Q    Why were you -- why were -- I'm
17  sorry, on the bottom right I see your signature on
18  behalf of Champion Funding; correct?
19  A    Correct.
20      Q    Why was there another affidavit and
21  assignment of judgment signed in June of 2021?
22  A    To -- to correct the typographical error.
23      Q    What was the typographical error?
24  A    First one said "Champion Funding, LLC" and
25  it's actually "Champion Funding, Inc."



Page 37

1    Q    Okay. All right. Let me take this
2  off.
3         Okay. Now, after you bought this
4  debt from Caddis in 2019, what did you do in order
5  to try to collect on it?
6  A    Phone calls and letters.
7    Q    Let's break that down a little bit,
8  if you can --
9  A    Sure.
10   Q    -- in the order in which it happened.
11  So, what was the first thing you did to try to
12  collect on this debt?
13  A    Send a letter.
14   Q    Okay. Do we still have copies of
15  those letters?
16  A    Yes.
17   Q    I don't believe those letters were
18  produced in this action. Did you see them in your
19  production?
20  A    I don't recall.
21   Q    Okay. I mean, there's 112 pages that
22  have been produced in this action, by you guys at
23  least, not by Export. I don't see any collection
24  letters in here. Do you still have them?
25  A    Yes.

Page 38

1         MR. ZELMAN: Okay. So, we're going
2  to call for production of those letters. One
3  moment.
4         MR. PITTS: I'm not going to do
5  document production on the record. So --
6         MR. ZELMAN: I'm just making a note
7  so I can follow up with you after this deposition.
8    Q    Okay. Now, you did some phone calls,
9  some letters. Anything else, were there emails?
10  A    I don't recall any emails.
11   Q    Okay.
12  A    We don't do cold emails. So, I don't --
13   Q    Now, are you the one who sent out
14  these letters or was it someone else?
15  A    Typically, admin would send -- would --
16  would print and mail a letter.
17   Q    Is that someone specific at your
18  company?
19  A    The administration staff, no. Not anyone in
20  particular, specifically.
21   Q    How many employees does JAU have?
22  A    Six now.
23   Q    Okay.
24  A    Six.
25   Q    Does that include yourself?

Page 39

1  A    Yes.
2    Q    What about Champion Funding?
3  A    No employees.
4    Q    Okay. Does Champion Funding assign
5  debts to anyone other than JAU for collection?
6  A    I don't know.
7    Q    Do you recall that every happening?
8  A    No.
9    Q    Okay. You said JAU has six
10  employees, including yourself. For these phone
11  calls, did you ever speak to either of my clients
12  directly or was it all your staff?
13  A    I believe I spoke to junior -- do you
14  represent senior, or junior or both?
15   Q    I represent both.
16  A    Both. So, I spoke to junior.
17   Q    Okay. When was that?
18  A    I don't recall the day, but I believe it's
19  in the specific dates in the affidavits.
20   Q    What affidavits are you referring to?
21  A    Didn't we produce a timeline of
22  communications?
23   Q    Are you referring to your discovery
24  responses?
25  A    If that's what it's called.

Page 40

1    Q    Okay. Here you go. I'm going to
2  show you your discovery responses to Sergio
3  Espinosa, Jr.'s first set of interrogatories. Do
4  you see this document on your screen?
5  A    Yes.
6    Q    All right. At the bottom of the
7  document, is that your signature?
8  A    Yes.
9    Q    Okay. Now, you reference a timeline,
10  which I believe you'll see on your screen in front
11  of you now; do you see that?
12  A    Yes.
13   Q    Okay. Where on this timeline is the
14  conversation where you spoke with either of the
15  plaintiffs?
16  A    On 12. So, September 23rd of '20. Sergio
17  called in and spoke to me.
18   Q    Okay. I see September 23, 2020 at
19  1:30 p.m.?
20  A    Yes.
21   Q    Other than that conversation, did you
22  ever speak to either of the plaintiffs?
23  A    I don't recall speaking to them, other than
24  that.
25   Q    Who's Andre Taylor?



Page 41

1  A    He was an employee. He was a collector.
2      Q    You are using the past tense? Is he
3  no longer with your company?
4  A    Correct.
5      Q    Okay. When did he leave?
6  A    About a year ago, maybe a little bit longer.
7      Q    Is there a reason for him leaving the
8  company?
9  A    He became ill.
10     Q    Okay. All right. So, after your
11  phone calls and your letters didn't get you
12  anywhere, did you, at some point, decide to send
13  the file to Mr. Abelli?
14  A    Yes.
15     Q    When was that?
16  A    I don't recall the date.
17     Q    Okay. Is there anything that would
18  help you refresh your recollection about the date
19  when that happened?
20  A    I don't know.
21     Q    Do you have account notes at JAU that
22  you use to make notes about an account?
23  A    Yes.
24     Q    Okay. Let me put those up in front
25  of you.

Page 42

1  A    I have September 22, 2020.
2      Q    Is that when you sent the account to
3  Mr. Abelli?
4  A    That's when the package was created. When
5  it was specifically sent, it had to have been very
6  close, if not that day, the next day, within 24
7  hours.
8      Q    Well, at some point Mr. Abelli seized
9  a Mini Cooper in relation to this account; correct?
10  A    Correct.
11     Q    When was that?
12  A    The date he did that -- you don't have that
13  on your records?
14     Q    I have my records. I want to make
15  sure that we're all on the same page. That's the
16  whole point of today, to see where we are in
17  disagreement.
18        MR. PITTS: Andy, just answer the
19  questions the best you can.
20        THE WITNESS: Yeah.
21  A    Yeah. I don't know the date it was seized.
22     Q    Sure.
23        By September 23 you were already
24  talking to senior and junior about the seized Mini
25  Cooper; isn't that right?

Page 43

1  A    Whatever that date was, yeah. I recall -- I
2  don't recall what date you just had on that -- on
3  the screen for Item 12.
4      Q    All right. Here, let me put this up
5  on the screen in front of you.
6  A    It's so long ago that I don't remember.
7      Q    That's fair.
8        Let me make this a little bigger,
9  maybe that will help you.
10  A    Yep. Okay.
11     Q    Do you recognize this document?
12  A    Yep.
13     Q    I'm referring to D055.
14  A    Yes.
15     Q    What is this document?
16  A    Those are our collection CRM notes.
17     Q    Okay. So, on D56, we see an entry on
18  September 22, 2020 at 4:19 p.m.; do you see that?
19  A    At 4:19?
20     Q    Second line from the top.
21  A    Document generated; old constable, that one?
22     Q    Yes. Yep. What does that tell us?
23  A    That is the cover letter package to send to
24  the constable.
25     Q    Okay. And then right above that

Page 44

1  there are two entries. One is an adjustment cost
2  of $165 dollars and another one is an adjustment
3  cost of $700; do you see that?
4  A    Yes.
5      Q    What is that?
6  A    Those are the constable fee and poundage.
7      Q    Okay. So, are you -- have you
8  already incurred this fee to the constable or are
9  you only incurring it once he actually seizes
10  something?
11  A    Once he seizes it.
12     Q    So, why are you adding it to the
13  account at this point?
14  A    Because we're allowed to add our costs and
15  fees onto the collection.
16     Q    Even if you haven't already incurred
17  it?
18  A    This is our internal notes. I mean, this
19  isn't a bill to the constable. I mean -- excuse
20  me, not a bill to the debtor. This is our internal
21  --
22     Q    Okay.
23  A    -- notes.
24     Q    Now, you go up a couple of lines, do
25  you see an entry on September 23, 2020 at 11:25



Page 45

1  a.m.; do you see that?
2  A    Yes.
3      Q    Okay. At this point, it appears that
4  the Mini Cooper has already been seized; correct?
5  A    Yes.
6      Q    Okay. So, you would agree that the
7  Mini Cooper was seized somewhere between September
8  22, 2020 and September 23, 2020?
9  A    I would.
10     Q    Okay. Now, there are various names
11 in the second column where it says "By." Some have
12 your name, Andrew Metcalf, some have AnnMarie
13 Pinney, some have Andre Taylor; do you see that?
14 A    I do.
15     Q    Are those the names of the people who
16 input the notes that we're seeing?
17 A    Yes.
18     Q    So, when I see your name, Andrew
19 Metcalf, that would be your note that you're
20 inputting into the account notes?
21 A    Correct.
22     Q    Okay. Now, what made you decide to
23 send this account to Mr. Abelli?
24 A    Nonpayment of the account. That's -- that's
25 why we send them to the constables. We can't --

Page 46

1      Q    Was there --
2  A    Go ahead.
3      Q    Did the fact that Mr. Espinosa
4  recently registered a vehicle, is that what
5  triggered the sending of this account to
6  Mr. Abelli?
7  A    I don't know if that was the trigger.
8      Q    Is that something that will
9  typically, you know, cause you guys to send the
10 account to Mr. Abelli, if you get a ping or a
11 notification of some sort that the debtor has
12 registered a new vehicle?
13 A    Yeah. I would say that if they have -- if
14 they're within the exemptions, yes.
15     Q    Okay. Now, what did you send
16 Mr. Abelli when you assigned him to work on this
17 account?
18 A    The execution, a cover letter, a -- some
19 information on their address and assets that we
20 believed was theirs. Probably a copy of the court
21 order. Any other court documents that were related
22 to the case.
23     Q    Okay. I'm going to share my screen
24 with you.
25        So, I'm showing you part of your

Page 47

1  production in this case. This is starting at D039.
2  Do you see this document?
3  A    Yes.
4      Q    Okay. So, is this a cover letter
5  that you sent to Mr. Abelli?
6  A    Yes.
7      Q    All right. Now, you see over here
8  where it has a breakdown of the amount of the debt?
9  A    Yes.
10     Q    And there are costs on here of $865;
11 correct?
12 A    Correct.
13     Q    And that's the $700 constable fee and
14 the $165 poundage fee that you added to the account
15 on September 22, 2020?
16 A    Yes.
17     Q    Okay. Now, in this letter you write
18 to Mr. Abelli that, We have attached a lead on a
19 vehicle or vehicles, but if you find other property
20 owned by the defendant, please do not hesitate to
21 seize and hold it in order to satisfy the judgment;
22 is that correct?
23 A    Correct.
24     Q    Then you include a copy of the
25 execution from the trying court of Massachusetts;

Page 48

1  is that correct?
2  A    Correct.
3      Q    And then on D42 and D43, there is a
4  document listing names of vehicle; do you see that
5  document?
6  A    I do.
7      Q    What is this document?
8  A    So, those are -- it's called a Skip Trace
9  Report from our Skip Trace provider with
10 information about debtors' assets. I keep saying
11 "debtor." Sorry.
12     Q    Now, when did you read this report?
13 A    I'm sorry?
14     Q    Do you know when you read this
15 report?
16 A    I don't.
17     Q    Okay. On this report we see the Mini
18 Cooper; correct?
19 A    Correct.
20     Q    And there are two Mini Coopers
21 listed. One has -- the first one just lists Sergio
22 Espinosa, who is a 57-year-old living in Dracut,
23 Massachusetts; do you see that one?
24 A    I do.
25     Q    And below that you see the same Mini



Page 49

1 Cooper?
2 A    Yes.
3    Q    But this one has Sergio Espinosa and
4 Sergio Espinosa, Jr. as the owners of the vehicle?
5 A    Registrants, correct.
6    Q    Right.
7    And one of those is a 57-year-old
8 male and the other one is a 29-year-old male?
9 A    Yes.
10    Q    Okay. So, at this point in time,
11 were you aware that Sergio Espinosa, Jr. was
12 potentially the owner or partial owner of the Mini
13 Cooper?
14 A    From the phone call that junior made to us,
15 he had made us aware of that.
16    Q    I'm talking about from your Skip
17 Trace Report.
18 A    Yes.
19    Q    Okay. Now, if the vehicle is owned
20 by someone who is not the debtor, can you seize
21 that vehicle?
22 A    I am not sure. I would assume not. I'm not
23 sure, though.
24    Q    Okay. How long have you been doing
25 these vehicle seizures for?

Page 50

1 A    Maybe 20 years, give or take.
2    Q    Okay. And in those 20 years, you've
3 never had the -- you've never had the opportunity
4 to look into whether or not you can seize a vehicle
5 that is co-owned by someone else?
6    MR. PITTS: Objection.
7    Q    You can answer.
8 A    Yeah. I -- I -- as far as I know, yes. It
9 was an asset that was allowable to be seized under
10 an execution.
11    Q    And what is it that you would do in
12 such a situation, would you sell the vehicle?
13 A    In the event, yeah. It would have to go
14 through an auction process.
15    Q    Okay. Now, we saw from your account
16 notes that on that September 23 date Sergio
17 Espinosa, Jr. called you and let you know the
18 vehicle was his and not his dad's; correct?
19 A    Yes.
20    Q    Did you give the vehicle back at that
21 time?
22 A    I do not believe I did. It was released.
23    Q    Okay. Why not?
24 A    It was merely an allegation at the time.
25 You have to check people's stories. In -- in my

Page 51

1 business, people always don't tell the truth. So,
2 we have to check things out.
3    Q    Okay. What did you do to try to
4 check out that story?
5 A    I assigned it to Mr. Taylor.
6    Q    Okay. And what did Mr. Taylor do?
7 A    I assume he researched it and verified that
8 junior was the co-registrant to the -- to the
9 asset.
10    Q    Okay. One moment.
11    Now, Mr. -- let me rephrase that.
12    Back in April of 2020, you had pulled
13 a Lexis report concerning the assets of
14 Mr. Espinosa; correct?
15 A    Yes.
16    Q    That Lexis report also showed that
17 junior was at least the co-registrant of the Mini
18 Cooper; correct?
19 A    Correct.
20    Q    And you are aware that junior and
21 senior lived together at that time; correct?
22 A    I -- I don't -- I have no idea if they lived
23 together.
24    Q    I'm going to show you just one of the
25 pages from that Lexis report. This is Bates

Page 52

1 stamped D085; do you see that?
2 A    Yes.
3    Q    Okay. And under Possible Relatives,
4 the first person listed is Sergio Espinosa, Jr.,
5 age 29, with an address of 1366 Bridge Street in
6 Dracut, Massachusetts; do you see that?
7 A    Yes.
8    Q    So, that same Lexis report that you
9 pulled that showed you that Sergio Espinosa, Jr.
10 was at least a co-registrant of the vehicle, it
11 also showed you that Sergio Espinosa, Jr. lived at
12 the same exact address as his dad; correct?
13 A    The report shows that. That doesn't
14 necessarily mean they lived there.
15    Q    Would you agree that these reports
16 are not always the most accurate?
17 A    I would.
18    MR. PITTS: Objection.
19    Q    Okay. Yet you rely on these reports
20 for your debt collection?
21 A    Yes.
22    Q    Okay. When did you return Sergio
23 Espinosa, Jr.'s vehicle to him?
24 A    The vehicle was released, I don't recall the
25 exact date, but if it has -- if it has it in the



Page 53

1 discovery of the date, I -- I'm not disputing that
2 date that it was returned.
3     Q    Okay.
4 A    I'm in agreement with it.
5     Q    Cool.
6     Okay.  So, just real quick, just to
7 nail this down, you have on your screen in front of
8 you D52 and D53?
9 A    Yep.  Yes.
10     Q    So, if you look at the bottom of D52,
11 there is a note from AnnMarie Pinney on October 9,
12 2020 at 1:40 p.m.; do you see that note?
13 A    Yes.
14     Q    And the note says, From Constable
15 Abelli - Called Export.  Explained situation.  AJ
16 is going to go out tonight and if he sees the
17 vehicle he will call Export and they will bring the
18 Mini Cooper back and take the other cars.
19 Currently for tow and storage is $1,238; do you see
20 that?
21 A    I do.
22     Q    So, is that the date that the Mini
23 Cooper was returned to Sergio Espinosa, Jr.?
24 A    I will assume so.  I don't know the exact
25 date it was sent back.

Page 54

1     Q    Did you ever look at the registration
2 of the vehicle to see who it was registered to?
3 A    I don't have access to the registrations.
4 Just the -- just the skip trace reports.  If you
5 mean the skip trace report -- the registration on
6 the skip trace report, then yes.
7     Q    Let me show you this.
8 A    Okay.
9     Q    Do you see this document?
10 A    Okay.
11     Q    This is a Certificate of Registration
12 for the Mini Cooper from Massachusetts RMV,
13 effective as of August 20, 2019, with an expiration
14 of June 2021; do you see that?
15 A    Yep.  Yes.
16     Q    You would agree that the only person
17 registered for this vehicle is Sergio Espinosa,
18 Jr.?
19     MR. PITTS:  Objection.
20 A    Yeah.  I mean, on this certificate, there's
21 only one name.
22     Q    Right.
23     Did you ever look inside the vehicle
24 itself to see if there was a registration in there?
25 A    I -- I wasn't at the situation -- at the --

Page 55

1 the vehicle seizure.
2     Q    Okay.  Once Sergio Espinosa, Jr.
3 called your offices and let them know that, Hey,
4 you have my car, did you have anyone to check the
5 registration in the glove box?
6 A    No.
7     Q    Okay.  Did you ever reimburse Sergio
8 Espinosa, Jr. for taking his car?
9 A    I don't believe so.
10     Q    Do you feel like you should?
11     MR. PITTS:  Objection.
12 A    Maybe.
13     Q    Okay.  Now, after returning Sergio
14 Espinosa, Jr.'s, vehicle to him, did you then have
15 your office add the constable and poundage fees
16 associated with that account -- associated with
17 that seizure to Sergio Espinosa, Sr.'s balance?
18 A    Yes.
19     Q    Why?
20 A    Because costs associated with the collection
21 of the account are allowable.
22     Q    Sitting here today, knowing now that
23 Sergio Espinosa, Jr.'s vehicles was solely
24 registered to him, would you agree that it was
25 improper to have seized his vehicle?

Page 56

1     MR. PITTS:  Objection.
2 A    I don't know that.
3     Q    Okay.  Sitting here today, would you
4 agree that the Mini Cooper was not an asset of
5 Sergio Espinosa, Sr.?
6     MR. PITTS:  Objection.
7 A    No.
8     Q    So, I'm putting back up on the
9 screen --
10 A    Yep.
11     Q    -- what's Bates stamped Espinosa023,
12 which is part of the plaintiff's production and
13 which is the registration for the Mini Cooper
14 during the time in question.
15     Now, looking at this document, you
16 would agree that the only owner of this vehicle is
17 Sergio Espinosa, Jr.; correct?
18     MR. PITTS:  Objection.
19 A    Again, I don't -- I mean, he's the only name
20 on this document.  I am in agreement with that.
21     Q    Okay.  So, where it says in the box
22 with the name and address, Name of Owner and
23 Mailing Address, he's the only owner listed;
24 correct?
25 A    Correct.



Page 57

1    Q    Okay.  So, would you agree with this
2  that if Sergio Espinosa, Sr. was not the owner of
3  this vehicle, then you could not seize this vehicle
4  to collect on Sergio Espinosa, Sr.'s debt?
5         MR. PITTS: Objection.
6  A    I would.
7    Q    Okay.  So, if you could not seize
8  this vehicle to collect on Sergio Espinosa, Sr.'s
9  debt, then do you believe Sergio Espinosa, Sr.
10 should be responsible for fees and costs associated
11 with seizing this vehicle?
12        MR. PITTS: Objection.
13 A    No.
14   Q    But those fees and costs were added
15 to senior's balance anyway; were they not?
16 A    On our internal document, yes.
17   Q    Are you saying that you've never
18 asked senior to pay these fees?
19 A    I don't know if we have sent a demand letter
20 with that -- with those fees on there.
21   Q    Okay.  Did you tell the constable
22 that Sergio has to pay those fees?  I'm sorry, that
23 Sergio Espinosa, Sr. has to pay those fees?
24 A    The constable has nothing to do with -- with
25 any of the finances.  They just -- they just seize

Page 58

1  the assets.
2    Q    Right.
3         My question, though, is did you ever
4  tell the constable that senior is responsible for
5  the fees associated with the towing and the seizure
6  of the Mini Cooper?
7  A    I don't remember having that conversation,
8  no.
9    Q    Okay.  Did anyone from your company
10 tell that to the constable?
11 A    I do not know.
12   Q    Okay.  Okay.  One second.  Here we
13 go.
14        Going back to those account notes
15 that we saw earlier, do you see on D053 --
16 A    Yes.
17   Q    -- there's a note here from AnnMarie
18 Pinney on October 9, 2020 at 1:06 p.m.?
19 A    Correct.
20   Q    All right.  Now, the note says,
21 Stream to Andre.  What does that mean?
22 A    That's our internal instant message.
23   Q    Okay.  Okay.  Abelli is going to try
24 for other assets and I am adding all the costs into
25 financials.  Abelli is call tow yard now to get the

Page 59

1  balance of tow charge and storage for the Mini
2  Cooper.
3         Do you see that?
4  A    I do.
5    Q    Okay.  At that point, we see an
6  adjustment cost of $700 added to the account?
7  A    I do.
8    Q    And then another $150 adjustment cost
9  added to the account as well?
10 A    Yes.
11   Q    And then in addition to the 700 and
12 $165 charges that we saw on September 22, 2020;
13 correct?
14 A    I -- I guess.  I guess so.
15   Q    So, we're talking $1,400 in constable
16 charges plus another $315 of additional charges;
17 right?
18 A    Yes.  Those are our internal numbers.  Those
19 aren't front facing.  These -- we're not demanding
20 that money from the debtor.  Those are our keeping
21 track of what our costs are.
22   Q    Okay.
23 A    I just wanted to clarify this.
24   Q    Okay.  Did you ever try to bill
25 anyone for any of these fees?

Page 60

1  A    Not as far as I know.
2    Q    Okay.  Now, on October 9, 2020 we
3  know that the Mini Cooper was brought back;
4  correct?
5  A    Correct.
6    Q    And then the Honda Accord was taken
7  at that time?
8  A    Yes.
9    Q    Okay.  Now, before the Honda was
10 taken, you pulled a credit report from TransUnion
11 on October 5, 2020; isn't that right?
12 A    I believe Andre did, yes.
13   Q    Okay.  Let me just give you the page
14 number.  One second.  All right.  Here we go.  Let
15 me put this on the screen.
16        What was the point of pulling this
17 TransUnion credit report?
18 A    I don't know.  I can speculate, but I don't
19 know.
20   Q    Did it have something to do with
21 seeing what other assets were available to Sergio
22 Espinosa, Sr.?
23 A    I -- I don't know.
24   Q    Okay.  All right.  Would you look at
25 the screen in front of you Bates stamped D033.



Page 61

1 This is a TransUnion -- I'm sorry, let me go to the
2 beginning.
3       D31, this is that TransUnion credit
4 report, which is pulled by October 5, 2020; do you
5 see that?
6 A    Yes.
7    Q    At that time, were you able to see
8 that Sergio Espinosa, Sr. had a lease with American
9 Honda; do you see that?
10 A    Yes, yes. So, it was opened on 9/20 and
11 verified 9/20.
12       MR. PITTS: Andy, just wait for the
13 question.
14 A    I -- I see that entry.
15    Q    Okay. As of October 5, 2020, your
16 company was aware that senior had a lease with
17 American Honda --
18       THE REPORTER: Can you please repeat
19 your question? I was having trouble with your
20 audio.
21       MR. PITTS: Me as well.
22    Q    As of October 5, 2020, your company
23 was aware that senior had a lease with Honda, which
24 had been opened in September of 2020; correct?
25 A    Yes.

Page 62

1    Q    Let's go here. Let me make sure it's
2 the right page.
3       THE REPORTER: I'm sorry, I'm having
4 trouble with your audio again.
5       MR. PITTS: It was bad.
6    Q    Okay. Mr. Metcalf, if you could take
7 a look at the screen in front of you, which is
8 Bates stamped D093.
9 A    Was that --
10    Q    Do you --
11 A    I'm sorry.
12    Q    Yeah. Do you recognize this
13 document?
14 A    Yes.
15    Q    What is this document?
16 A    It's a skip trace report from LexisNexis.
17    Q    And there's a date there September
18 23, 2020; do you see that?
19 A    Yes.
20       MR. PITTS: Your audio is not very
21 good. I don't know if you changed something, but
22 it was good before and now it's very choppy.
23       MR. ZELMAN: Let me try something
24 else. Hang on.
25       MR. PITTS: The way you had it before

Page 63

1 without the headphones or something different was
2 better.
3       MR. ZELMAN: Hello.
4       MS. SALPOGLOU: Still choppy.
5       MR. ZELMAN: Let's take a five minute
6 break. I'm going to restart my computer. I'm
7 going to restart. Sorry about that.
8       (Whereupon a recess was taken.)
9       (Whereupon the reporter read back the
10 last question and answer.)
11    Q    All right. Mr. Metcalf, before you
12 got interrupted, this is the document I believe we
13 were looking at Bates stamped, D093; do you see
14 that?
15 A    Yes.
16    Q    All right. So, this report was
17 pulled on September 23, 2020?
18 A    Yes.
19    Q    And you can see the Honda, a 2018
20 Honda Civic?
21 A    Yes.
22    Q    Okay. Now, that's the lienholder,
23 Honda Lease Trust?
24 A    Yes.
25    Q    Do you see that?

Page 64

1 A    Yes.
2    Q    One second.
3       And separately you have the Mini
4 Cooper on D096. Do you see that, it's all
5 highlighted?
6 A    Yes.
7    Q    Who did this highlighting?
8 A    I don't know.
9    Q    Do you see that little note with a
10 pin? Do you know who did that?
11 A    I don't.
12    Q    Okay. And where is this report from?
13 A    LexisNexis.
14    Q    All right. This report shows the
15 2011 Mini Cooper and it lists Sergio Espinosa, Jr.
16 as the only titleholder; correct?
17 A    Yes.
18    Q    There's no senior here listed at all;
19 is there?
20 A    I don't -- the third one down says November
21 13, 1962. Both of them are on there, junior and
22 senior are both on there.
23    Q    Oh, I see what you're saying.
24       So, under Title Holders you see 1962,
25 born 57 years ago, but then you see junior, born 29

Page 65

1 years ago; correct?
2 A Yes.
3 Q Okay. I'm sorry, maybe I'm off on
4 the page number. Give me one sec. I think I just
5 messed up my page numbers. Give me just a moment,
6 please.
7 There we go.
8 I see where I was confused. It's all
9 good. All right. Let's get back to it.
10 On October 9, 2020, Constable Abelli
11 then seized the Honda Accord that was leased from
12 Honda; correct?
13 A Yes.
14 Q Okay. Part of what's throwing me off
15 with confusion here was Bates D052, your account
16 notes references a 2020 Honda Civic; do you see
17 that?
18 A Yes.
19 Q But it wasn't a Civic, it was an
20 Accord; is that right?
21 A I don't know.
22 MR. PITTS: Are you asking which car
23 he seized or -- what's the question?
24 MR. ZELMAN: I'm asking which car he
25 seized, yes.

Page 66

1 A I don't know.
2 Q Okay. Now, are you aware that you
3 cannot seize a leased vehicle?
4 A I am not.
5 Q Have you ever seized a leased vehicle
6 before?
7 A On our executions?
8 Q Yes.
9 A Well, I mean, the constables and sheriffs do
10 the seizing, but I believe leased vehicles have
11 been seized before.
12 Q Okay.
13 A Yes.
14 Q And have you had to address that with
15 the lienholder such as Honda, or Toyota or whoever
16 --
17 A Sometimes. Sometimes if -- if, yes.
18 Sometimes.
19 Q What happens in those situations?
20 A Just, they get a payoff of the -- whatever
21 the payoff of the vehicle is, is what typically
22 what the situation is. You're going to need a
23 clean title to send it to auction, most of the
24 time. They prefer it.
25 Q Do you pay off the vehicle before you

Page 67

1 send it to auction?
2 A It would have to be, yeah, to get a clean
3 title.
4 Q Did you contact Honda in this
5 situation to get the payoff for the vehicle?
6 A I don't recall.
7 Q So, is it JAU and Champion's policy
8 that if they locate a vehicle leased by the debtor,
9 they will seize that vehicle?
10 A No. It's not our policy.
11 Q Is it JAU and Champion's policy that
12 if they locate a vehicle that is leased by the
13 debtor, they will not seize that vehicle?
14 A No.
15 Q Do you have any policies relating to
16 the seizure of leased vehicles?
17 A No. We look at a lease as a way to finance
18 a vehicle.
19 Q Okay. You've never had a company
20 tell you, Hey, you can't seize a leased vehicle,
21 it's not lawful?
22 A Yes.
23 Q You have had that?
24 A Yes.
25 Q Okay. Who's told you that in the

Page 68

1 past?
2 A I had people tell me all kinds of things
3 that aren't true.
4 Q Okay. Have you done --
5 A I don't know. People -- go ahead.
6 Q Have you done anything to look into
7 whether or not there is -- you're legally allowed
8 to seize a leased vehicle?
9 A I don't recall, but as I said, the vehicle
10 -- leased vehicles are a way to finance a vehicle.
11 Q Would you agree that when someone
12 leases a vehicle, they don't actually own the
13 vehicle, they're merely using it for a time period
14 in exchange for a lease payment?
15 MR. PITTS: Objection.
16 A Yes.
17 Q Okay. You've never researched
18 whether or not you can lawfully seize a vehicle
19 that is leased in such a manner?
20 MR. PITTS: Objection.
21 A No.
22 Q Okay. At a certain point, Honda
23 reached out to you and told you you could not hold
24 this vehicle any longer; correct?
25 MR. PITTS: Objection.



Page 69

1  A    I don't recall that. They spoke to maybe an
2  employee, if they did, but that's not uncommon.
3      Q    It's not uncommon for the leaseholder
4  to reach out and let you know that you can't seize
5  a leased vehicle?
6  A    I would just say it's not uncommon for them
7  to -- to be in touch with our -- our offices, as
8  far as I don't know the context of the
9  conversation, but we do have conversations with the
10  finance companies on occasion.
11      Q    I'm going to show you account notes
12  here. There's a note in your account notes on
13  D052, it's October 13, 2020 at about 12:46 p.m.
14  A    Okay.
15      Q    Where Andre Taylor says, Called Honda
16  Financial Services, talked to Jeff. Asked why we
17  took the car. Their name is on title. Insist we
18  had no right to take it. Wants to know what
19  specifically gives us the right. Advised I will
20  have someone call him back. I have to conference
21  with Andrew.
22      Do you see that note?
23  A    I do.
24      Q    Do you remember talking to Andre
25  Taylor after this conversation?

Page 70

1  A    I -- I don't specifically for that
2  conversation.
3      Q    Okay. At a certain point, you
4  decided to release this vehicle?
5  A    It seems so.
6      Q    What are you basing that on?
7  A    Was talking with my lawyer, and my lawyer --
8      MR. PITTS: Hold on, hold on, Andy.
9  You don't talk about any conversations you had --
10      THE WITNESS: Oh, okay.
11      Q    Right. I can't ask you anything you
12  spoke about with your attorney.
13  A    Okay.
14      Q    And so, if that every happens, you're
15  going to hear your attorney jump in about that.
16  A    Okay.
17      Q    My question is, and again, think
18  about it before disclosing anything you discussed
19  with your counsel, the question is simply at some
20  point you decided to release the leased vehicle;
21  correct?
22  A    Yes.
23      Q    Do you know when that was?
24  A    I don't.
25      Q    Okay. There's a note here on D050,

Page 71

1  which is dated October 21, 2020 at 10:37 a.m.
2  A    Okay.
3      Q    From Andre Taylor, where Andre
4  writes, Called Honda Finance. Let them know the
5  car is released and that we will be invoicing them
6  $750 fee for constable. Called junior. He said he
7  already has his car and has had it for about a
8  week. Told him we also released dad's car, but
9  finance company is calling too. Either can come
10  get car. Junior will call senior.
11      Do you see that?
12  A    Yes.
13      Q    Does that refresh your recollection
14  about the date that this vehicle was released by
15  your company?
16  A    Yes.
17      Q    Even though the vehicle was released,
18  you decided to still invoice Honda $750 for the
19  constable fees associated with seizing that
20  vehicle?
21  A    I don't know if that happened. It's just --
22  again, that's an internal note.
23      Q    Sure.
24      If you look at the note right above
25  it where it says from Andre Taylor, Streamed to

Page 72

1  Ann. Again, this is the same date, October 21,
2  2020. Important. Please create invoice on the
3  finance constable fee only $750. This is for
4  Sergio Espinosa Honda. Please fax it to -- there's
5  a fax number. Let me know when it's done. Thanks.
6      Do you see that?
7  A    Yes.
8      Q    So, at some point, did you invoice
9  Honda $750 for the constable fees associated with
10  seizing the leased vehicle?
11  A    Once it's done, it would be in those notes,
12  if it was done.
13      Q    If what was done?
14  A    If -- if there was an invoice sent out or
15  faxed, you've got to scroll up a little bit higher,
16  it would be right above that about -- with a copy
17  of the printout or whatever.
18      Q    We see notes here that Ann faxed the
19  constable fee invoice to Honda on October 22, 2020.
20      Do you see that on D49?
21  A    Yes.
22      Q    And then Andre Taylor called Honda
23  Finance on October 29, 2020, this is on D48, and
24  they said they have an in-house attorney reviewing
25  the invoice?



Page 73

1  A    Correct.
2      Q    So, you would agree that you did, in
3  fact, invoice Honda for the constable fees
4  associated with seizing the leased vehicle?
5  A    It looks like it, yes.
6      Q    Okay. Sitting here today, do you
7  agree with the premise that you cannot seize a
8  leased vehicle?
9          MR. PITTS: Objection.
10  A    No. I still, as far as I understand, a
11  leased vehicle is -- as long as it's within the
12  exemption, it's an asset that can be levied upon.
13      Q    Are you aware that the court issued
14  an order on a Motion to Dismiss in about December
15  of 2021 in this case?
16  A    I am not.
17          So, yes. I -- without -- I see the
18  motion was filed. Motion to remove the default was
19  filed in December.
20      Q    I'm referring to a Motion to Dismiss
21  the plaintiff's complaint, it was filed by Export,
22  not by your company.
23  A    Oh, okay. Sorry.
24      Q    That's all right.
25          Have you ever -- let me rephrase

Page 74

1  this.
2          Having been involved in the business
3  of debt collection and seizing vehicles for the
4  past 20 years, have you ever looked into whether or
5  not you can seize a leased vehicle in the State of
6  Massachusetts in order to satisfy a debt?
7          MR. PITTS: Objection.
8  A    Yes.
9      Q    You have looked into this?
10  A    I've tried to, yes.
11      Q    How have you done that?
12  A    Internet.
13      Q    Is that it, just internet?
14  A    Yes.
15      Q    Did you ever get any sort of legal
16  opinion?
17          MR. PITTS: Objection. Don't answer
18  that.
19      Q    Yeah, I'm not going to ask you what
20  it is you spoke about with a attorney. I'm just
21  asking have you ever gone to a lawyer to ask for a
22  legal opinion about whether or not you can seize a
23  leased vehicle to satisfy a debt?
24  A    No.
25      Q    Okay. Same question, except instead

Page 75

1  of leased vehicle, I'm going to ask it in terms of
2  a vehicle that is co-owned by a non-debtor. Have
3  you ever gone to a lawyer and asked, Hey, am I
4  allowed to seize a vehicle that is co-owned by
5  someone other than the debtor in order to satisfy a
6  debt owned by the debtor?
7          MR. PITTS: Objection. Don't answer
8  that.
9          You asked -- you're having him
10  testify as to questions he might have asked his
11  attorney. That would be part of a conversation
12  that's privileged.
13          MR. ZELMAN: I'm asking if he's every
14  gotten a legal opinion as to whether or not he's
15  permitted to do something like this.
16          MR. PITTS: That was not the
17  question.
18          MR. ZELMAN: Sure. Okay. I'll
19  rephrase it.
20      Q    Have you ever gotten a legal opinion
21  about whether or not you are permitted to seize a
22  vehicle co-owned by someone who is not the debtor
23  in order to satisfy a debt owned by the debtor?
24          MR. PITTS: Objection. Don't answer
25  that, Andrew.

Page 76

1          You're putting in what the attorney
2  would say and then asking whether the attorney said
3  it.
4          MR. ZELMAN: I'm not asking what the
5  attorney said at all.
6          MR. PITTS: You're asking him --
7  you're asking him if an attorney gave him an
8  opinion and then you're stating the opinion and
9  asking whether the attorney gave it. That -- that
10  would be a privileged -- your --
11          MR. ZELMAN: No.
12          MR. PITTS: Your question --
13          MR. ZELMAN: My question is has he
14  ever gone to an attorney to ask this question. I'm
15  not asking what the attorney said in response.
16          MR. PITTS: But if he answers yes,
17  then you've just -- he's just divulged a
18  conversation he had with an attorney.
19          MR. ZELMAN: Okay. Let's try a third
20  time.
21      Q    Mr. Metcalf, have you ever attempted
22  to obtain a legal opinion as to the legality of
23  seizing a vehicle co-owned by someone who is not a
24  debtor?
25          MR. PITTS: You can answer that,



Page 77

1 Andrew, if you can.

2 A No.

3 Q Okay. All right. Now, in this case
4 you've produced written policies and procedures
5 related to debt collection; correct?

6 A Yes.

7 Q All right. And just so we're all on
8 the same page, I'm going to put them up real brief.
9 It's Bates stamped, I see in front of us a Policies
10 & Procedures Manual of Junction Acquisitions
11 Unlimited; do you see that?

12 A Yes.

13 Q It's Bates D072 all the way to the
14 very end of the document production, which would be
15 D082.

16 Actually, you know what? It will be
17 in here. There you go. Sorry, for the sake of the
18 record, let's just stick with this one document.
19 It doesn't have a Bates number, but it would be
20 D0103 to D0112; do you see that document?

21 MR. PITTS: You might want to mark
22 that. I know you haven't been marking exhibits,
23 but since -- for identification purposes, you might
24 want to mark this one, especially since it's not
25 Bates stamped.

Page 78

1 MR. ZELMAN: Yeah. I didn't realized
2 it wasn't Bates stamped until right now.

3 Okay. This is the Policies &
4 Procedures Manual of Junction Acquisitions
5 Unlimited, it is an 11-page document. I will mark
6 this as Plaintiff's Exhibit-A.

7 (Plaintiff's Exhibit-A, Policies &
8 Procedures Manual of Judgment Acquisitions
9 Unlimited, marked for identification by
10 Mr. Zelman.)

11 Q All right, Mr. Metcalf, do you see
12 this document?

13 A Yes.

14 Q Other than this document, do you have
15 any other policies or procedures relating to debt
16 collection maintained by either yourself, Judgment
17 Acquisitions or Champion Funding?

18 MR. PITTS: Objection. What time
19 frame are you looking for?

20 MR. ZELMAN: The time frame relevant
21 to the claims in this action. So, 2020 to the
22 present.

23 A Those are the same. Those are what I have.

24 Q Okay. There are no other policies or
25 procedures other than what's written on here;

Page 79

1 correct?

2 A I don't believe so.

3 Q Okay.

4 A Correct.

5 Q All right. While we're here, this is
6 Bates stamped D0101, and it's dated at the bottom
7 right April 9, 2021; do you see that?

8 A Yes.

9 Q What is this document?

10 A That is a statement of account.

11 Q Okay. Was this sent to anyone? What
12 is the point of this?

13 A It's our internal synopses. It's a
14 statement. It can be used in different purposes,
15 but it's -- it's a general purpose document.

16 Q Okay. So, help me understand this
17 document, because I see different amounts. There's
18 a claim amount and a judgment amount; do you see
19 that?

20 A Yes.

21 Q What's different between these two
22 amounts?

23 A Typically, not -- there's not really any --
24 oh, so, the claim amount is -- would be what --
25 what was initially filed in a civil suit, and then

Page 80

1 once the judgment comes out, they might have
2 prejudgment interests, maybe filing fees and costs.
3 So, it will be what the final judgment is.

4 Q Okay. So, this case you have a
5 judgment amount of $2,694.91; correct?

6 A Yes.

7 Q And there's interest in the amount of
8 $4,735.66?

9 A Yes.

10 Q All right. Does interest keep
11 accruing or have you stopped it?

12 A I believe it's still a valid judgment. So,
13 the interest is accruing still.

14 Q The reason why I ask is because at
15 the bottom here where it says, Account Claims, it
16 says, Claim Date, Amount and the interest, 0%; do
17 you see that?

18 A Yes.

19 Q Does it tell you if interest is still
20 accruing on this debt or not?

21 A According to that, it says no. So, I mean,
22 that says there isn't any on -- on that claim date,
23 but I'm not sure why that says that, because it's
24 not a claim, it's a judgment. So -- so, a claim in
25 our is prejudgment. So, that's -- and then once it



Page 81

1  gets to judgment, then there's -- that's just how
2  we call it. We know the difference between a
3  judgment and a non-judgment. We call them
4  "claims."
5       Q     A claim is non-judgment?
6  A    Excuse me?
7       Q     A claim is a non-judgment?
8  A    Internally, yeah. That's how we call it,
9  yeah. That's how we know the difference.
10      Q     All right. Let me take this off the
11 screen. Let me go back.
12      Now, you have costs of $1,830; do you
13 see that?
14 A    Yes.
15      Q     It's summarized the two constable
16 fees of $700 apiece, plus poundage for $165 each
17 time and $100 attorney coverage fee?
18 A    Correct.
19      Q     Would those costs -- the total amount
20 of the debt is $7,430.57; correct?
21      MR. PITTS: Objection. Are you
22 asking him to do the math?
23      MR. ZELMAN: Well, I did the math.
24 That's the math. Now I'm going to show that I'm
25 correct and that's what's being asserted here.

Page 82

1  A    I'll agree to that estimate.
2       Q     All I've done is take the judgment
3  amount of 2,694.91, add it to the interest amount
4  of 4,735.66, and I got a total of 7,430.57. My
5  question to you is is that the amount of the
6  judgment with the interest and the judgment amount?
7  A    Yes.
8       Q     Okay. Now, you are still trying to
9  collect that poundage and constable fees from my
10 client; isn't that right?
11 A    No.
12      Q     You're aware that you sued my client
13 or you counterclaimed against my client in this
14 action; are you not?
15 A    I am not aware of that.
16      Q     You're not aware that you filed a
17 counterclaim in this action against Sergio
18 Espinosa, Sr.?
19 A    I am not aware.
20      Q     Okay. Well, I'm going to show you a
21 copy of the answer that's been filed in this
22 action.
23      This was filed on February 18, 2022,
24 and it's your answer to a second amended complaint
25 with a counterclaim; do you see that document?

Page 83

1  A    I do.
2       Q     And in your counterclaim you ask the
3  court for an offset of $8,264.59; do you see that?
4  A    Yes.
5       Q     So, does that include the $700 of the
6  constables fee?
7  A    I believe so.
8       Q     Did Honda ever pay you the other
9  $700?
10 A    Did who pay me?
11      Q     Did Honda every pay you the other
12 $700 constable fee?
13 A    Oh, no.
14      Q     Are you sure about that?
15 A    I am not sure, but I don't see it in my
16 notes that they paid us. As far as I know, they
17 didn't pay that. They didn't pay it to me.
18      Q     Okay. Now, these notes that we have
19 here cut off as of February 12, 2021, and that's
20 Bates D47, at least those are the notes that I
21 have. Are you looking at notes that go further
22 than that?
23      THE WITNESS: I couldn't understand
24 what he said, sorry.
25      Q     Sure.

Page 84

1       Let me show you the final page of the
2  notes that I have, which is Bates D047; do you see
3  that?
4  A    Yes.
5       Q     And those notes terminate as of
6  February 12, 2021.
7  A    Yes.
8       Q     I assume there may be more notes on
9  this account that have continued after this date;
10 is that right?
11 A    Correct.
12      Q     Okay. And do you see anywhere in
13 those notes that Honda every paid you the $700?
14 Because we know that they billed my client for it.
15 So, that's why I'm asking if they paid you guys.
16 A    No. I don't see it there.
17      Q     One second.
18      Now, I'm going to show you -- I'm
19 going to put this up on the screen. Take a look at
20 what I have on the screen in front of you. It's
21 again your responses to junior's interrogatories;
22 okay?
23 A    Yes.
24      Q     If you look at Interrogatory 11, it
25 asks you to identify the lawsuits that were filed

Page 85

1 against you alleging that you violated the law
2 while attempting to collect on a debtor judgment;
3 do you see that?
4    A    Yes.
5        Q    And you list this case, and then
6 Champion Funding v. Young, and Young v. Champion
7 Funding for a state court action, and then
8 Fernandez-Urrego v. Champion Funding for 2020; do
9 you see that?
10   A    Yes.
11       Q    Have you been sued in any other
12 actions alleging that you violated the law in
13 attempting to collect a debt or execute on a
14 judgment?
15   A    I believe so.
16       Q    Okay. Any reason why you did not
17 identify those cases in response to this
18 interrogatory?
19   A    No.
20       Q    You just wanted to give us these four
21 and no more?
22       MR. PITTS:  Objection.
23   A    That was what I knew -- knew of, as far as I
24 know at the time.
25       Q    Are you familiar with the case of

Page 86

1 Marcio Barbosa against Champion Funding, Judgment
2 Acquisitions and Andrew Metcalf?
3    A    Yes.
4        Q    In that action, Mr. Barbosa sued JAU,
5 yourself and Champion, alleging that you seized his
6 vehicle, even though he's not the debtor; do you
7 recall those allegations?
8        MR. PITTS:  Objection.
9    A    I do.
10       Q    After you were -- I'm sorry, let me
11 rephrase.
12       So, that lawsuit was filed about four
13 months before you responded to interrogatories in
14 this action, but you didn't disclose that lawsuit.
15 Any reason why not?
16   A    No.
17       Q    Would you agree that you've had
18 situations in the past where you have seized
19 vehicles that do not belong to the judgment debtor?
20       MR. PITTS:  Objection.
21   A    Would I agree -- I'm sorry, can you say that
22 question again?
23       Q    Seizing a vehicle that doesn't belong
24 to the judgment debtor, that's not a new thing for
25 you; is it?

Page 87

1        MR. PITTS:  Objection.
2    A    Yeah.  That's not a common thing.
3        Q    But it does happen?
4        MR. PITTS:  Objection.
5    A    Anyone can allege anything.
6        Q    Okay.  You released Mr. Barbosa's
7 vehicle back to him after he notified you that you
8 had the wrong vehicle; isn't that right?
9    A    I don't recall before or after.
10       Q    Sure.
11       I'm going to put the complaint up in
12 front of you to make it easier for you.  This is a
13 copy of the complaint filed in Barbosa v. Champion
14 Funding, et al.; do you see that?
15   A    Yeah.
16       Q    Now, in paragraph -- there are
17 allegations in this complaint in Paragraph 65 that
18 the debtor -- not the debtor, but that Mr. Barbosa
19 showed up in court, provided proof that he's not
20 the individual named in the lawsuit; do you see
21 that?
22   A    Yes.
23       Q    Subsequently the vehicle was released
24 to Mr. Barbosa?
25   A    Yes.

Page 88

1        Q    Okay.  Now, Mr. Barbosa was still
2 required to pay the $700 for the constable as a
3 result of that seizure; correct?
4    A    I don't recall.
5        Q    Okay.  So --
6    A    I don't believe he paid anything, but I
7 don't recall.
8        Q    So, in Paragraph 68 where it alleges,
9 When Marcio called JAU about the tow and impound
10 charges, Taylor told him JAU was already out $700
11 for the constable, and there was no way that JAU
12 was paying the tow charges; do you see that?
13   A    I do.
14       Q    Do you know if those allegations are
15 accurate?
16   A    I don't know.
17       Q    Paragraph 70 of that complaint
18 alleges that when Marcio retrieved his vehicle on
19 September 29, 2020 at 6:55 p.m. from 50 Mystic
20 Avenue in Medford, Massachusetts, the lot to which
21 his vehicle was towed, the company operator, Export
22 Enterprises, Inc., charged Marcio $707.57 to
23 release the vehicle; do you see that?
24   A    I do.
25       Q    Do you believe that Mr. Barbosa was



Page 89

1 charged $707.50 to retrieve his vehicle?
2 A    By the tow company, I do.
3        Q    So, you believe he was charged that?
4 A    Looks like it. I don't know that for a
5 fact, but it looks like it from there.
6        Q    So, when your company seizes a
7 vehicle that doesn't belong to the judgment debtor,
8 does your company cover the towing and storage
9 charges?
10 A    There's a couple things there. So, no, I
11 don't believe so.
12        Q    Okay. But you know that Export still
13 expects to be paid correct?
14 A    Excuse me?
15        Q    You know that Export, the towing
16 company, still expects to be paid; correct?
17            MR. PITTS: Objection. Paid what?
18            MR. ZELMAN: Their towing and storage
19 fees.
20 A    Yes.
21        Q    Okay. Because you're not going to
22 pay it?
23 A    Not typically, no.
24        Q    Do you expect that -- that the
25 constable is going to pay that?

Page 90

1 A    I don't know. The constable hires the tow
2 company. I don't -- I have no relationship with
3 the tow company. So, I don't know what their deal
4 is.
5        Q    So, it's your position that the
6 towing and storage fees are not your problem;
7 correct?
8            MR. PITTS: Objection.
9 A    They're -- they're a separate fee. They're
10 -- again, they have nothing to do with my company.
11 We don't hire the tow company. We hire the
12 constable.
13        Q    Who do you think should be
14 responsible for paying those fees?
15 A    Customarily, it's the defendant.
16        Q    Right. We're talking about in a
17 situation where someone who is not the defendant
18 has his vehicle seized.
19            MR. PITTS: Objection.
20        Q    In that situation, who do you think
21 should be responsible for paying the towing and
22 storage?
23            MR. PITTS: Objection. Hypothetical.
24 A    Yeah. I think all situations are going to
25 be different; you know?

Page 91

1            MR. PITTS: You're asking him a
2 hypothetical. He's a fact witness.
3            MR. ZELMAN: Well, it's not a
4 hypothetical, because it happened in Mr. Barbosa's
5 case, it happened in this case, and what we're
6 trying to figure out is --
7            MR. PITTS: Well, you're alleging it
8 happened in those cases.
9            MR. ZELMAN: Okay.
10            MR. PITTS: And you're asking a
11 hypothetical based on what you believe to have
12 occurred.
13        Q    We're asking for an application to
14 facts. We know that the vehicle was seized at this
15 point, we know that senior was not a registered
16 owner of junior's vehicle. So, let's ask in this
17 situation. No hypotheticals.
18            In this situation, Mr. Metcalf, where
19 junior's Mini Cooper was towed and stored by
20 Export, who do you believe should be responsible
21 for paying those towing and storage charges?
22            MR. PITTS: Objection.
23 A    I don't know.
24        Q    Do you believe junior should be
25 responsible for paying those towing and storage

Page 92

1 charges?
2 A    I -- I don't -- I don't know. I mean --
3        Q    Do you believe senior should be
4 responsible for paying those towing and storage
5 charges?
6 A    I don't know. I really don't.
7        Q    What about the constable fees, same
8 question, do you think junior should be responsible
9 for paying those constable fees?
10 A    I don't know.
11        Q    Do you think senior should be
12 responsible for paying those constable fees?
13 A    I would think senior would be more likely to
14 be responsible, since it's his debt, but --
15        Q    So, you believe that when a vehicle
16 is seized that does not belong to junior, senior
17 should still be responsible for paying those towing
18 and storage charges?
19            MR. PITTS: Objection.
20 A    I do. I -- I would -- that -- that would be
21 my opinion, you know.
22        Q    Okay. Let me ask you this question,
23 after Mr. Abelli or any of your --- the constables
24 that --
25            MR. PITTS: You're breaking up. It's



Page 93

1 very scratchy. Can't really hear you.
2        MR. ZELMAN: Is this better?
3        MR. PITTS: Seems better.
4        MR. ZELMAN: Okay.
5        Q    After the constable that you send an
6 account to, after they seize a vehicle, whose
7 authority is needed to release that vehicle? Do
8 they have the authority or do they need your
9 authority?
10        MR. PITTS: Objection.
11 A    The constable does the release with the tow
12 company.
13        Q    Okay. Can the constable release the
14 vehicle without your permission?
15        MS. SALPOGLOU: I can't hear you.
16        Q    Can the constable release the vehicle
17 without your permission?
18 A    I suppose they could.
19        Q    Do they?
20        MR. PITTS: Objection.
21 A    I -- I don't know.
22        MR. PITTS: When are you referring to
23 or who are you referring to?
24        Q    In your experience, will the
25 constable release the vehicle without having your

Page 94

1 permission first?
2        MR. PITTS: Objection.
3 A    They have.
4        Q    Has Mr. Abelli?
5 A    I don't recall if he has.
6        Q    Does he typically wait to get your
7 permission first?
8 A    Typically, yes.
9        Q    Okay. Did you ever tell Constable
10 Abelli or the constable's office that senior
11 satisfied this debt?
12 A    I did not.
13        Q    Did you ever tell Constable Abelli or
14 the constable's office that junior satisfied this
15 debt?
16 A    I don't believe so.
17        Q    There's another document in front of
18 you. Have you seen this document before?
19 A    No.
20        Q    This is a document that was produced
21 by Export in discovery.
22 A    Okay.
23        Q    Take a moment to look at it. It's
24 only three lines.
25 A    Yep.

Page 95

1        Q    Mr. Abelli writes to Export, Hello, I
2 just received confirmation from Judgment
3 Acquisitions that Mr. Espinosa has paid Judgment
4 Acquisitions; do you see that?
5 A    I do.
6        Q    It continues, His car can be
7 released. This is authorized by myself.
8 Mr. Espinosa is responsible for all towing and
9 storage fees; do you see that?
10 A    I do.
11        Q    So, you don't know why Mr. Abelli
12 would have told Export that Mr. Espinosa has paid
13 Judgment Acquisitions?
14 A    Correct.
15        Q    Do you know why Mr. Abelli told
16 Export that Mr. Espinosa is responsible for all
17 towing and storage fees?
18 A    I don't.
19        Q    Did you tell Mr. Abelli to say that?
20 A    No.
21        Q    One second.
22        Now, you and Judgment Acquisitions
23 was sued by a Huong Luu in the District of
24 Massachusetts back in 2013; correct?
25 A    I don't remember.

Page 96

1        Q    Okay. Here's a copy of the complaint
2 filed in that action.
3        MR. PITTS: Are you going to mark
4 this as an exhibit or how are we --
5        MR. ZELMAN: Sure. Exhibit-B would
6 be the Luu complaint.
7        MS. SALPOGLOU: You're breaking up
8 again.
9        MR. ZELMAN: All right.
10        (Plaintiff's Exhibit-B, Huong Luu
11 Complaint, marked for identification by
12 Mr. Zelman.)
13        Q    All right. Do you see this
14 complaint, Mr. Metcalf?
15 A    I do.
16        Q    Does this refresh your recollection
17 that you were sued back in 2013?
18 A    I don't remember this.
19        Q    Okay.
20 A    There's not even a case number on that.
21        Q    You can see the case number at the --
22 A    Oh, there it is. Yep. I see it. Yep.
23        Q    Okay. Do you recall being sued in
24 the matter of Cristi Legare v. Andrew Metcalf,
25 Judgment Acquisitions and Champion Funding in

Page 97

1  October of 2021?
2  A    I do -- in October of 2021?
3       Q    Correct.
4  A    Yeah.  I believe I know that name, yes.
5       Q    What about, same question, but
6  another suit involving a repossession or a seizure,
7  this time by Garrett Manion (phonetic)?
8  A    Yes. --
9       Q    Do you recall being sued regarding a
10  seizure by Dayana Fernandez-Urrego in 2021?
11  A    That one, yeah.  I listed that one.
12       Q    In that action, the plaintiff alleges
13  that she texted you asking to pick up her car seat,
14  her handbag, and you responded by a text message
15  saying, I am sorry, we cannot allow that.  Once the
16  account is paid, you will have the car and the
17  contents and this account dismissed; do you
18  remember that?
19  A    I recall that.  That was an allegation.
20       Q    Do you remember that, writing that
21  text message?
22  A    I don't.
23       Q    Do you recall a lawsuit involving
24  claims of an illegal seizure filed by Sherry
25  Ricupero v. Champion Funding and Judgment

Page 98

1  Acquisitions in February of 2020?
2  A    I remember the name, but I don't know about
3  a case, no.
4       Q    Okay.  Now, in this case, after you
5  -- right after your company was informed that the
6  Mini Cooper belonged to junior and not to senior,
7  did your company tell senior that if the cars
8  aren't the right cars, we can always switch them
9  out?
10       MR. PITTS:  Objection.
11  A    I don't recall.  Can you say that again?
12  You broke up a little bit again.
13       Q    On September 23, 2020, did Andre
14  Taylor speak to senior and tell them that, you
15  know, if we have the wrong car, we can always
16  switch out the car?
17       MR. PITTS:  Objection.
18  A    Yeah.  I'm -- if his notes say that he said
19  that, then I've got to go with that.  I have to
20  concede that.
21       Q    Okay.  Would you agree that the notes
22  that you provided there --
23       THE REPORTER:  I'm sorry, can you
24  repeat your question?  You were breaking up.
25       Q    Would you agree that the CRM account

Page 99

1  notes that you've produced accurately reflect the
2  notes that were recorded by your company during the
3  times in question?
4       MR. PITTS:  Objection.
5  A    Yes.
6       Q    So, September 23, 2020 at 11:25 a.m.,
7  this is on Bates D055.
8  A    Okay.
9       Q    Where Andre Taylor writes, Talked to
10  defendant.  Said this is his son's car.
11       So far so good?
12  A    Said that -- said this is -- talk to
13  defendant.  Okay.  Yep.  He said that it's his
14  son's car.  Gotcha.
15       Q    Had a hard time trying to deescalate
16  him.  Went back and forth over the car.  Finally
17  convinced him to focus on the money and not the
18  car.  At the end of the day I told him if it's not
19  on your credit report, we can switch out cars.
20       Do you see that?
21  A    Yes.
22       Q    Okay.  There was a lot of phone
23  conversations with Sergio Espinosa, Sr. and Sergio
24  Espinosa, Jr. in this case; correct?
25       MR. PITTS:  Objection.

Page 100

1  A    I don't know.  Between them to, junior --
2       Q    No.
3  A    -- and senior?
4       Q    No.  Between your company and the two
5  Sergios.
6  A    Yes.
7       MR. PITTS:  Same objection.
8  A    It seems so.
9       Q    And does your company have a policy
10  about disclosing that the communication is from a
11  debt collector when they communicate with debtors?
12  A    Yes.
13       Q    Okay.  Is that policy in your written
14  policy documents that you provided?
15  A    I am not sure, but it's -- it's FDCPA law.
16  So, I believe it says we follow the FDCPA laws.
17       Q    Sure.
18       Is it your company's policy to
19  disclose on every call that the communication is
20  from a debt collector?
21  A    Yes.
22       Q    What about invoice mail, same policy?
23  A    No.  Not if we don't know it's the right
24  phone number.
25       Q    But if you do know it's the right



1  phone number, would you leave -- would you include
2  that disclosure in the voicemail?
3  A    Well, it depends on if we're talking about
4  the debt.  If we're just asking for someone to call
5  us back, no.
6        Q    Okay.  You produced one recording in
7  this action; do you recall that?
8  A    Yes.
9        Q    Do you record all your calls?
10  A    Do I refer to them?
11        Q    No.  I'm saying does your company
12  record all of their calls with debtors?
13  A    Yes.
14        Q    Okay.  Do you have additional
15  recordings, calls between your company and either
16  Sergio Espinosa, Jr. and Sergio Espinosa, Sr.?
17  A    No.
18        Q    How is it that you only have one
19  recording, if you record all your calls?
20  A    So, storage of those was an issue.  They're
21  supposed to be stored for three years, and
22  apparently they weren't stored for more than six
23  months.  So, storage was an issue with that.  We
24  didn't know that happened, but we learned it after
25  the fact during an audit.

1        Q    You say "storage was an issue."  What
2  does that mean?
3  A    Storing the calls are required for three
4  years, and ours are only stored for six months or
5  so.
6        Q    So, were they automatically being
7  deleted after that time?
8  A    I believe so.  I believe that's how it
9  worked.
10        Q    Do you know the date of the recording
11  that you produced in this action?
12  A    I don't.
13        Q    Okay.  Here is the recording file.
14  Do you see that file?
15  A    Yes.
16        Q    Does the title of this file tell you
17  when this recording was made?
18  A    Looks like September 24, 2020.
19        Q    Okay.  From the account notes, we saw
20  some phone conversations prior to September 24;
21  correct?
22  A    Yes.
23        Q    And we also saw a number of
24  conversations after that date; correct?
25  A    I believe so, yes.

1        Q    But this is the only recording that
2  you have?
3  A    Apparently.
4        Q    Well, if the recordings were being
5  deleted with a six-month expiration date, for lack
6  of a better word, how is it that you have this
7  recording, but not the later ones?
8  A    I can't answer that.  I don't know.  It's
9  not that I can't answer it, I don't know.
10        Q    Sitting here today, you're saying
11  there are no other recordings?
12  A    What was that?
13        Q    Sitting here today, are you certain
14  that you have no other recordings reflecting
15  conversations between your company and either of my
16  clients?
17  A    I don't believe so.
18        Q    Okay.
19        (Whereupon an off-the-record
20  discussion was held.)
21        (Whereupon a recess was taken.)
22        Q    So, a couple of questions left.
23        Now, there is some reference to
24  Attorney Michael Zola in the complaints that we
25  filed in this action.  Mr. Metcalf, if you know who

1  I'm referring to?
2  A    I do.
3        Q    All right.  And in your response to
4  Interrogatory 12, you write that, It is my
5  understanding that Attorney Zola was informed that
6  plaintiff is to pay $4,000 with $200 per month;
7  correct?
8  A    Yeah.  That was a message he gave to
9  Attorney Zola, from what I understood.  Is that --
10  is that what you're asking?
11        Q    So, you're -- I want to make sure I
12  understood that response.
13  A    Okay.
14        Q    Basically, you're saying that
15  plaintiffs offered $4,000 to settle the account,
16  not that Mr. Zola offered to have that deal?
17  A    Correct.
18        Q    Okay.  When you purchased the
19  portfolio of debts from the Runcci Group, was there
20  any specification as to whether or not, you know,
21  you're buying business debts, consumer debts or any
22  types of debts?
23  A    Do you know, I'm not sure.  Most of them are
24  -- I'm not sure.  "Charged off debts" are kind of
25  like a common language, but I'm not 100 percent



Page 105

1 sure --
2      Q      Sure.
3  A      -- on this one, yep.
4      Q      Do you typically buy business to
5  business debts?
6  A      We call it "commercial debt." Is that what
7  you mean?  Like, debts that business people owe?
8      Q      Exactly.
9  A      Not typically.
10     Q      No, typically you're buying consumer
11  debt?
12  A      Mostly.
13     Q      Okay.  One second.  I need one more
14  document here, but I lost it.  One second.
15          MR. ZELMAN:  All right.  I can't seem
16  to find it.  I'm going to turn you over to Brendan
17  and Pamela, and then I will ask any questions on
18  redirect, if I have any left; okay?
19          Brendan, do you have any questions
20  for this witness?
21          MR. PITTS:  I just have a few, but
22  Pam and Natalie, do you want to go or do you have
23  any --
24          MS. SALPOGLOU:  (Indicates negative.)
25          MR. PITTS:  Okay.  Yitzchak, can you

Page 106

1  pull up that registration doc. you showed him
2  earlier?
3          MR. ZELMAN:  Sure.  Give me one
4  second.  Here.  Which one do you want for the --
5          MR. PITTS:  The registration, not the
6  one -- it's the single document you kept showing.
7          MR. ZELMAN:  Right.  You want the
8  Mini Cooper one, is what I'm saying?
9          MR. PITTS:  Yeah, yeah, exactly.
10          MR. ZELMAN:  All right.  That's here.
11  Leased agreement.  Let's do like this.  Here we go.
12  I'll share the screen.
13          MR. PITTS:  Is that -- is that Bates
14  stamped?
15          MR. ZELMAN:  This is my production.
16  So, it would be Bates stamped.  Yes, Espinosa23.
17          MR. PITTS:  Hold on.  I just want to
18  refer to it.  I just want to see it.
19          MR. ZELMAN:  Sure.  Espinosa23.
20  CROSS EXAMINATION BY MR. PITTS:
21      Q      Mr. Metcalf, you were shown this
22  document earlier in the deposition.
23  A      Correct.
24      Q      And it's marked --
25          MR. PITTS:  Just give me the number

Page 107

1  one more time, Yitzchak.
2          MR. ZELMAN:  Espinosa23.
3      Q      Espinosa23.  At the time you sent the
4  package to Constable Abelli and Mr. Espinosa, was
5  your company in possession of this registration?
6  A      No.
7      Q      Is that because you don't have access
8  to the registry?
9  A      That's correct.
10      Q      After Mrs. Espinosa's Mini Cooper was
11  seized, did anyone come and show you this
12  registration?
13  A      No.  This is the first time I've ever seen
14  it today.
15      Q      Was this -- was Mr. Espinosa's Mini
16  Cooper ever in the possession of Junction
17  Acquisitions Unlimited, or Champion or you
18  personally?
19  A      No.
20      Q      Am I correct that the Mini Cooper
21  goes directly from the point of seizure to whatever
22  tow yard the constable chooses to have tow the car?
23  A      Correct.  That's the way I understand it.
24      Q      Who hires the towing company?
25  A      The constables or the sheriffs contract with

Page 108

1  them.
2      Q      Can you seize a vehicle that is not
3  owned by the debtor?  Did you hear me?
4  A      Yeah.
5      Q      Okay.  I'll ask it again.  Can you
6  seize a vehicle that is not owned by the debtor,
7  own or leased by the debtor?
8  A      No.
9      Q      Can you seize a car that is co-owned
10  by the debtor?
11  A      Yes.
12          MR. PITTS:  I don't have anything
13  else.
14          MR. ZELMAN:  Natalie, do you remember
15  want to go or Pamela?
16          MS. SRECA:  I don't have any
17  questions.
18          MR. ZELMAN:  Okay.  Pamela?
19          MS. SALPOGLOU:  I don't have any
20  questions either.
21          MR. ZELMAN:  Okay.  So, now I have,
22  like, two left that I was going to ask earlier.
23  REDIRECT EXAMINATION BY MR. ZELMAN:
24      Q      All right.  So, Mr. Metcalf, earlier
25  today we mentioned other cases where your company



Page 109

1   has been sued, and those cases also involved Export
2   Enterprises; correct?
3   A     There was that one, yeah, Barbosa.
4        Q      Sure.
5              Is that typically the storage company
6   that Brian Abelli and the MCO used when they are
7   seizing vehicles?
8   A     They use a variety of them.  They're not the
9   only one that they use.  "Typical," "typical"
10  meaning more than 50 percent, I guess, you're
11  saying?
12       Q      Sure.
13  A     I don't know.  I don't know.
14       Q      Okay.  Obviously, you're aware that
15  the constables or the sheriffs are going to be
16  using a towing company in order to be seizing and
17  storage these vehicles; correct?
18  A     Correct.  Yes.
19       Q      These guys don't have their own tow
20  trucks?
21  A     As far as I know they don't.
22       Q      Have you ever worked out with the
23  constables about policies for these towing
24  companies to follow in the event that, you know,
25  there's a problem?

Page 110

1              MR. PITTS:  Objection.
2   A     No.
3        Q      All right.  So, in the event that the
4   wrong car has been seized or an exempt vehicle has
5   been seized, you've never worked out who should be
6   responsible for what in such a situation?
7              MR. PITTS:  Objection.
8   A     I don't recall.
9        Q      You haven't made any effort to talk
10  to the actual tow companies in those situations to
11  try to hash that out; correct?
12             MR. PITTS:  Objection.
13  A     Correct.
14             THE WITNESS:  Sorry.
15       Q      Okay.  All right.  So, I have no
16  further questions for you either, unless anyone has
17  follows up.  I think that means you're free to go.
18             MS. SALPOGLOU:  No.  I have one
19  question.
20             MR. ZELMAN:  Oh, there you go.
21             MS. SALPOGLOU:  Just based on that.
22  Sorry.
23  CROSS EXAMINATION BY MS. SALPOGLOU:
24       Q      Mr. Metcalf, did you have any
25  conversations with Export Enterprises of

Page 111

1   Massachusetts, Inc., regarding this case?
2   A     I don't recall.
3        Q      Would your notes reflect if you had
4   any conversations with Export?
5   A     It -- yeah.  They usually would be.  We're
6   required to document all our conversations and
7   communications.  So --
8        Q      When going through the notes today,
9   did you see any communications with Export?
10  A     No.
11       Q      Okay.  And do you personally recall
12  having any conversations with my client regarding
13  this case?
14  A     I don't.
15       Q      Okay.  I don't have anything further.
16             MR. ZELMAN:  Okay.  Thank you for
17  your time today, Mr. Metcalf.  I know there were
18  some technological hiccups earlier.  We appreciate
19  your patience, but you are free to go, unless you
20  want to stick around for Expose's depo this
21  afternoon.
22             THE WITNESS:  No.
23             MR. ZELMAN:  All right.
24             THE WITNESS:  Thanks guy.
25             (Witness excused.)

Page 112

1              (Whereupon an off-the-record
2   discussion was held.)
3              THE REPORTER:  Natalie, did you want
4   a copy of the transcript?
5              MS. SRECA:  Yes.
6              THE REPORTER:  And Pamela, do you
7   want a copy of the transcript?
8              MS. SALPOGLOU:  I do not.
9              THE REPORTER:  You do not.  Okay.
10             (Deposition adjourned at 12:51 pm)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Page 113

```
 1              CERTIFICATE
 2        I, DONNA A. GROSIAK, a Certified Court
 3   Reporter and Notary Public of the State of New
 4   Jersey, certify that the foregoing is a true and
 5   accurate Computerized Transcript of the Zoom
 6   Deposition of ANDREW C. METCALF, who was first duly
 7   sworn by me.
 8        I further certify that I am neither attorney
 9   nor counsel for, nor related to or employed by any
10   of the parties to the action in which the
11   Depositions are taken, and further that I am not a
12   relative or employee of any attorney or counsel
13   employed in this case, nor am I financially
14   interested in the action.
15
16              Donna A. Grosiak
17              DONNA A. GROSIAK, C.C.R.
18
19   Dated:  June 2, 2022
20   My Commission Expires on
21   10/8/23
22   License No. 30XI00078600
23
24
25
```

