**In the Matter Of:**

SERGIO ESPINOSA SR. vs ANDREW C. METCALF

1:21-cv-10356-DJC

---

**BRIAN ABELLI**

*June 01, 2022*

---



## Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2          Civil Case Number:  1:21-cv-10356-DJC
 3   SERGIO ESPINOSA SR., and
     SERGIO ESPINOSA JR.,
 4
               Plaintiffs,
 5
          v.
 6
     ANDREW C. METCALF d/b/a
 7   JUDGMENT ACQUISITIONS
     UNLIMITED, CHAMPION FUNDING,
 8   INC., EXPORT ENTERPRISES, INC.,
     d/b/a MASSACHUSETTS CONSTABLE,
 9   INC., d/b/a MASSACHUSETTS
     CONSTABLES OFFICE and BRIAN
10   ABELLI
11               Defendants.
12   _____
13
14
15   REMOTE DEPOSITION UNDER ORAL EXAMINATION OF
16                  BRIAN ABELLI
17            DATE: June 1, 2022
18   REPORTED BY:  CHARLENE FRIEDMAN, CCR, RPR, CRR
19
20
21
22        ESQUIRE DEPOSITION SOLUTIONS, LLC
             1384 Broadway - 22nd Floor
23            New York, New York  10018
                   (212) 687-2010
24
25   JOB #J8270227
```

## Page 2

```
 1            TRANSCRIPT of the deposition of the
 2   witness, called for Oral Examination in the
 3   above-captioned matter, said deposition being taken by
 4   and before CHARLENE FRIEDMAN, a Notary Public and
 5   Certified Court Reporter of the State of New Jersey, a
 6   Registered Professional Reporter, and a Certified
 7   Realtime Reporter, via video teleconference, by Zoom, on
 8   June 1, 2022, commencing at approximately 2:00 in the
 9   afternoon.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 3

```
 1   A P P E A R A N C E S:
 2
 3
     MARCUS & ZELMAN, LLC
 4   701 Cookman Avenue
     Suite 300
 5   Asbury Park, New Jersey  07712
     (732) 695-3282
 6   BY:   YITZCHAK ZELMAN, ESQ.
     Attorneys for Plaintiffs
 7
 8
 9   FLAVIN PITTS
     424 Adams Street
10   Suite 100
     Milton, Massachusetts  02186
11   (617) 698-3000
     BY:   BRENDAN PITTS, ESQ.
12   Attorneys for Andrew C. Metcalf, Judgment
     Acquisitions Unlimited, Champion Funding
13
14
15   SIMONS LAW OFFICE
     10 Post Office Square
16   Suite 800
     Boston, Massachusetts  02109
17   (781) 797-0555
     BY:   NATALIE SRECA, ESQ.
18         SARA ATTARCHI, ESQ.
     Attorneys for Massachusetts Constable, Inc.,
19   d/b/a Massachusetts Constables, Inc., Brian
     Abelli
20
21
22   PAMELA SALPOGLOU LAW OFFICE
     1 Cabot Place
23   Stoughton, Massachusetts  02072
     (781) 341-0116
24   BY:   PAMELA SALPOGLOU, ESQ.
     Attorneys for Export Enterprises, Inc.
25
```

## Page 4

```
 1                    I N D E X
 2   WITNESS NAME                           PAGE
 3   BRIAN ABELLI
 4          By Mr. Zelman                 7, 111
 5          By Mr. Pitts                     103
 6          By Ms. Salpoglou                 117
 7
 8                 E X H I B I T S
 9   EXHIBIT NO.    DESCRIPTION             PAGE
10   A             LP Police Terms and      37
                   Conditions
11
12   B             LP Police Report        106
13   C             E-mail                  110
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 5

```
 1              - - -
 2         Deposition Support Index
 3              - - -
 4
 5  Direction to witness not to answer
 6  Page              Line
 7  None
 8
 9  Request for production of documents
10  Page              Line
11  None
12
13  Questions marked
14  Page              Line
15  None
16
17
18
19
20
21
22
23
24
25
```

Page 6

```
 1        CERTIFIED SHORTHAND REPORTER:  My
 2  name is Charlene Friedman, a Certified
 3  Shorthand Reporter and Notary Public of the
 4  State of New Jersey.  This deposition is
 5  being held via videoconference equipment.
 6        The witness and reporter are not in
 7  the same room.  The witness will be sworn in
 8  remotely, pursuant to agreement of all
 9  parties.  The parties stipulate that the
10  testimony is being given as if the witness
11  was sworn in person.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 7

```
 1  B R I A N  A B E L L I,
 2      called as a witness, having been first duly
 3  sworn according to law, testifies as follows:
 4
 5        MS. ATTARCHI:  If I could, Attorney
 6  Zelman, I just want to put on the record
 7  regarding any stipulations or objections.
 8        I would like to put my objections
 9  on the record.
10        MR. PITTS:  We did usual stips
11  yesterday reserving all objections except as
12  to form, motions to strike, until the time of
13  trial.
14        Yitzchak, I assume we're doing the
15  same thing today?
16        MR. ZELMAN:  That's fine with me.
17        Sara, if you want to put your
18  objections on the record at the same time,
19  that's fine with me as well.
20        MS. ATTARCHI:  Thank you.
21  EXAMINATION BY MR. ZELMAN:
22      Q    Mr. Abelli, you're on your phone,
23  right?
24      A    I am.
25      Q    All right.  So hopefully the
```

Page 8

```
 1  connection is good because I'm getting a red
 2  indicator for you.  Hopefully that works.
 3        Try to keep it on when you exit the
 4  Zoom.  It basically turns off your video
 5  feed.
 6      A    Okay.
 7      Q    So let's get started.
 8        Please state your name, for the
 9  record.
10      A    Brian Abelli.
11      Q    And what is your address, Mr.
12  Abelli?
13      A    2400 Hunters Trail, Sandwich, Mass
14  02563.
15      Q    Is that a home address or a work
16  address?
17      A    Home.
18      Q    Your connection seems a bit choppy,
19  but hopefully we can get through it today.
20        Is that where you're currently
21  participating in this deposition from?
22        MR. ZELMAN:  We lost him.
23        Let's go off the record.
24        (Whereupon, a discussion was held
25  off the record.)
```



Page 9

Q I see you put your address in the chat box. That works, but obviously this is a deposition. So everything just needs to be articulated so that the court reporter can get it down.
A Okay.
Q On that note, have you ever given a deposition before?
A No.
Q Okay. So just real brief, as you can see, there's a court reporter here who is taking down my questions and your answers. It's important that you speak slow and clear so she can do so, and that you articulate your answers. Nods or shakes of the head she can't obviously transcribe.
If at any point you don't understand a question, just let me know and I'll be happy to explain it.
A Okay.
Q We can take a break at any time as long as there's no question pending. If there's a question pending, I ask that you answer the question first, and then we can take that break.

Page 10

If at any point you want to talk -- I'm sorry, forget that.
At some point in time, you may hear your attorney voice an objection. If you hear that, you should let her finish her objection and then proceed to answer the question unless you're specifically instructed to not answer the question.
Do you understand these instructions?
A I do.
Q Okay. Who do you currently work for?
A Massachusetts Constables Office Law Enforcement Council.
Q Is that two different entities or is it the same entity?
A So you have the Law Enforcement Council and then you have the Massachusetts Constables, Inc., which is the one you brought the case against.
Q Right.
And I've come across the Massachusetts Law Enforcement Council earlier.

Page 11

Who are they?
A It's just a -- so we're -- we're a law enforcement council. I have constables throughout the state. We all work together. With everything that's changing, hopefully we'll start up an academy and whatnot, but it's just a bunch of constables that work together in an office.
Q Okay. How is that different from the Massachusetts Constables Office?
A When I took over, they were already part of -- I guess the previous chief had that with the state. So we just kind of got tagged on with the Law Enforcement Council.
Q Okay.
A So it's just a different name, same people.
Q In this case, we're going to be talking about seizures that occurred with regards to my clients' vehicles.
Did that happen under an arrangement with the Massachusetts Constables Office or with the Law Enforcement Council?
A Law Enforcement Council.
Q Okay. So we have some letters that

Page 12

we're going to look at today that you wrote on the letterhead of the Massachusetts Constables Office.
Are you saying that that is not the company that was contracted to perform these seizures?
A The one that we work for that has the contract is the Massachusetts Constables Office Law Enforcement Council. That's who we work for. That's who we are.
Q Okay. Are you also a police officer or are you a full-time constable?
A Part-time constable.
Q What are you doing when you're not a constable?
A I work for a non-profit organization in Boston.
Q What is it that you do?
A I work security. I'm in charge of the security.
Q What is the name of that company?
A Combined Jewish Philanthropies.
Q Okay. How long have you been a constable for?
A About one and a half years.

Page 13

1    Q   Did you say one and a half?
2    A   Yes, sir.
3    Q   Okay. And how is it that you
4    became a constable?
5    A   There were some officers working
6    for me at the Philanthropies, Combined Jewish
7    Philanthropies. One of them was a constable
8    and their chief was not going to do it
9    anymore.
10       They had asked me to take over
11   because I have an extensive military
12   background and some law enforcement
13   background. So they wanted me to take over
14   as new chief.
15   Q   Okay. Is that something that you
16   have to be appointed or elected to?
17   A   There's two types of constables.
18   One is, you can be elected. You go on a
19   ballot, and people elect you. There's no
20   background checks or anything with those.
21       But then the other one is an
22   appointment. You're appointed either by the
23   mayor or the town council or by both, and you
24   have to go through background checks and
25   whatnot.

Page 14

1    Q   Which one were you?
2    A   Appointed.
3    Q   Who were you appointed by?
4    A   Beverly, Massachusetts.
5    Q   Is that the mayor, the town council
6    or both?
7    A   The mayor.
8    Q   What are the terms of your
9    appointment?
10   A   It's from 2001 to -- I'm sorry,
11   it's from 2021 to 2023.
12   Q   Are you employed as an officer of
13   the town?
14   A   I'm not sure how exactly they --
15   they don't pay us. The towns don't pay
16   constables. We are self funded by civil
17   process.
18   Q   Are you required to take out a bond
19   in order to become a constable?
20   A   Yes, $5,000 bond.
21   Q   Do you then have to file with the
22   town of Beverly?
23   A   Beverly, correct.
24   Q   How many constables work for the
25   Massachusetts Constables Office?

Page 15

1    A   Currently, three.
2    Q   Who are they?
3        MS. ATTARCHI: Objection,
4    relevance.
5    Q   You can answer.
6        MS. ATTARCHI: You can still
7    answer, Mr. Abelli. I'm just voicing my
8    objection.
9        THE WITNESS: Okay.
10   A   I have Sergeant Arthur D'India, and
11   Corporal Lev Sokowski, S-O-K-O-W-S-K-I.
12   Q   Who is AJ?
13   A   Arthur D'India. He's one of my
14   constables.
15   Q   Is AJ like his nickname?
16   A   Yes.
17   Q   Okay. As a constable, what is it
18   that you do?
19   A   Constables, we do civil process.
20   We are also allowed to deal with criminals.
21   When we deal with criminals, we deal with
22   warrants. Jurisdiction for criminal and
23   warrants is throughout the State of
24   Massachusetts.
25       Doing civil, we can do capiases,

Page 16

1    which is a civil arrest warrant. We can do
2    execution of money judgments. We can do
3    evictions. We can do seizures.
4        So it's anything that is brought
5    through civil court.
6    Q   Okay. At some point, did you form
7    a relationship with Andrew Metcalf?
8    A   Yes.
9    Q   When was that?
10   A   It was probably about a year ago.
11   Q   Okay.
12   A   It's been a while. I can't
13   remember the exact date.
14   Q   Sure.
15       Does that relationship predate you
16   becoming a constable, or did that happen
17   after you became a constable?
18   A   After.
19   Q   Okay. And how is it that you were
20   first introduced to Mr. Metcalf?
21   A   We sent out a bunch of letters to
22   different creditors to try to get business,
23   because all we get is civil process. That's
24   how we pay our bills.
25   Q   Did you work for other creditors or

Page 17

1  debt collectors other than Mr. Metcalf and
2  his companies?
3      A   We do.
4      Q   What is your arrangement with Mr.
5  Metcalf?
6      A   Our arrangement is he is -- he
7  buys, I guess, portfolios of debts.  He goes
8  to court.  He gets execution of money
9  judgments which entails that if failure to
10  pay, then any private or personal property
11  can be seized.
12      And he gives us a packet that has
13  the person's information, a letter that goes
14  to the individual, also the court order that
15  is signed by the judge or magistrate or clerk
16  stating that it is an execution of money
17  judgment, and that property can be seized.
18      Q   When you say "property can be
19  seized," you mean property of the debtor,
20  correct?
21      A   Correct.
22      Q   We're going to be talking today
23  about the seizures of my clients' vehicles.
24      Were you involved personally in
25  those seizures?

Page 18

1      A   No.
2      Q   So were you personally present when
3  my client -- and let me rephrase and be very
4  specific.
5      Were you personally present when
6  Sergio Espinosa, Junior's Mini Cooper was
7  seized?
8      A   No.
9      Q   I'm sorry, was that a no?
10      A   Excuse me, no.  I wasn't there.
11      Q   Okay.  And were you personally
12  present when Sergio Espinosa, Senior's leased
13  Honda Accord was seized?
14      A   No, I was not.
15      Q   Okay.  So today we're going to be
16  talking about what happened at that time, you
17  know, what happened during those seizures.
18      What is your knowledge based off of
19  if you weren't there?
20      A   So when my office goes into a
21  seizure, they tell me what happens.  They
22  give me a brief of how things went.
23      MS. ATTARCHI:  Objection.
24      Q   You can answer.
25      A   So they give me a brief of how the

Page 19

1  seizure went.
2      Q   Okay.  So personally, have you ever
3  spoken to Sergio Espinosa, Senior?
4      A   No, I have not.
5      Q   Have you ever spoken to Sergio
6  Espinosa, Junior?
7      A   No, I have not.
8      Q   Now, it's my understanding that
9  your officers -- well, let me rephrase.
10      It's my understanding that you or
11  the officers went to the property on three
12  occasions; one to take the Mini Cooper, one
13  to take the Honda Accord, and one to bring
14  the Honda Accord back.
15      Is that your recollection?
16      MS. ATTARCHI:  Objection as to form
17  and objection as to compound question.
18      You can answer.
19      MR. ZELMAN:  I can rephrase it.
20      Q   Let me rephrase, Mr. Abelli, to
21  make this easier.
22      A   Okay.
23      Q   How many times did someone from
24  your office go to my client's property in
25  Dracut, Massachusetts?

Page 20

1      A   Three times.
2      Q   What were those three times?
3      A   I don't recollect the dates.
4      Q   Sure.
5      And we'll get into the specifics of
6  the dates in a moment, but what was the
7  purpose of those three visits?
8      A   So the first visit was to seize Mr.
9  Espinosa, Senior's vehicles, either one.
10  They were both on our -- in the packet.
11      The second time was to take
12  currently Mr. Senior's Honda.
13      And then, the third was to return
14  the Honda, which all -- which both vehicles
15  were returned at no charge because of the
16  issues.
17      Q   Did you visit the property on any
18  of the three occasions?
19      A   I did not.
20      Q   Who did?
21      A   Sergeant Arthur D'India.
22      Q   On all three occasions?
23      A   Yes.
24      Q   Was there anyone else from your
25  office there with him or just him?



Page 21

1   A   Just him.
2   Q   When Mr. -- when Sergeant D'India
3 visited the property on each of those three
4 occasions, was he wearing a uniform?
5   A   Yes.
6   Q   What does that uniform look like?
7   A   Similar to mine, except he has
8 sergeant chevrons on the shoulders.
9   Q   Just for the sake of record,
10 because we can't take a picture, you have a
11 badge on your upper left chest.
12      Is that right?
13   A   Right, correct.
14   Q   And there's an emblem on each of
15 your sleeves.
16      Is that the emblem of your office?
17   A   Correct.
18   Q   And then you've got like four stars
19 on your lapel.
20      He had those as well?
21   A   He does not.
22   Q   I'm sorry, I meant the collar.
23      Does that denote your position as
24 chief?
25   A   Yes.

Page 22

1   Q   And then he would have the sergeant
2 chevrons on the sleeve, correct?
3   A   Correct.
4   Q   Is there anything on the back of
5 the uniform?
6   A   No.
7   Q   Does Sergeant D'India carry a
8 firearm?
9   A   He does.
10   Q   Okay.  Does he drive some sort of
11 official-looking vehicle?
12   A   Around that time, he had his
13 personal vehicle.
14   Q   On all three occasions, do you
15 believe that Sergeant D'India was driving his
16 personal vehicle?
17   A   Correct.
18   Q   What kind of vehicle is that?
19   A   It's a Ford Taurus, gray.
20   Q   Does it have lights and sirens?
21   A   It does, and there's nothing on the
22 outside.
23   Q   Understood.
24      Sergeant D'India, was he appointed
25 in the same manner as you?

Page 23

1   A   He was.
2   Q   Also by the town of Beverly?
3   A   No, Peabody.
4   Q   Does he also have a $5,000 bond?
5   A   He does.
6   Q   And that's on file with the town of
7 Peabody?
8   A   It is.
9   Q   Now, in discovery in this case, we
10 asked some questions which you responded to
11 recently about communications that your
12 office had with my clients.
13      Do you remember those questions?
14   A   Yes.
15   Q   All right.  I'm going to put that
16 up on the screen real quick in front of you.
17 I hope you can see it on your phone.
18   A   Yes, I see it.
19   Q   Excellent.
20      So take a look at the screen.  I'm
21 going to try to minimize this.
22   A   Okay.
23   Q   So I'm showing you what's
24 designated as your Responses to the
25 Plaintiff's First Set of Interrogatories.

Page 24

1      Do you see that?
2   A   Yes. It's small, but I see it,
3 yes.
4   Q   Let me just enlarge it.
5      I just wanted to show it to you so
6 you can see it in full.
7   A   Okay.
8   Q   Now, I'm going to zoom into your
9 response to Interrogatory 8.
10      In Interrogatory 8, we ask about
11 communications that you or any of your agents
12 or employees or representatives had with the
13 plaintiffs or anybody else regarding the
14 plaintiffs, and the response is that neither
15 you or anybody from MCO had any
16 communications with the plaintiffs.
17      Do you see that response in
18 response to Interrogatory 8?
19   A   I do.
20   Q   Okay.
21   A   I do.
22   Q   Sitting here today, do you believe
23 that anyone from your office spoke with any
24 of the plaintiffs at any point?
25   A   To my knowledge, they didn't.

Page 25

1    Q   Did Sergeant D'India ever speak
2 with any of my clients?
3        MS. ATTARCHI: Objection.
4    Q   To the best of your knowledge.
5    A   To the best of my knowledge, he did
6 not.
7    Q   Okay. Do you or does your office
8 maintain any sort of account notes to kind of
9 keep track of what happens with a file once
10 it's assigned to your office?
11   A   We do have it all in a cloud. So
12 we do have the execution packet and whatnot
13 in a cloud that denotes either it's an open
14 case or a closed case.
15   Q   Sure.
16       And we're going to go through like
17 the execution package in a moment and we have
18 some e-mails that your counsel produced.
19       What I'm asking is, do you have any
20 sort of like CRM notes or account notes,
21 something that notates what's been happening
22 on a file as it happens?
23   A   No. Usually it's just off of what
24 officers tell me, and if there is a huge
25 issue to where local law enforcement or

Page 26

1 someone else is involved, then there is a
2 report that gets generated.
3    Q   That was going to be my next
4 question.
5        Was there ever any sort of incident
6 report generated as a result of these
7 seizures?
8    A   No, because local PD weren't
9 involved, and my officer didn't talk -- to my
10 knowledge, he didn't speak to either one of
11 the plaintiffs.
12   Q   Okay. So let's talk about what
13 happened here.
14       When were you first assigned to
15 work on this file?
16   A   I have to look at the records to
17 find out. I don't have the exact date.
18   Q   What is it that you need to look
19 at?
20   A   Excuse me?
21   Q   What is it you need to look at?
22   A   If you're asking me for a date,
23 then you would have to -- I probably would
24 put it into whatever questions you ask in
25 that paperwork. I probably put all the dates

Page 27

1 in there.
2    Q   All right. Let me see if this
3 helps.
4        MR. ZELMAN: Just to clarify, for
5 the record, what I've done here, to make this
6 a lot easier for everyone, we got the
7 document production from Mr. Abelli's counsel
8 yesterday, but it was a ton of different
9 documents. None of them are labeled.
10       So all I've done is I've combined
11 all of those documents into one big document
12 that's now 127 pages long, and then for ease
13 of use, I Bates stamped it Abelli and then
14 the number in the bottom right corner as you
15 can see.
16       I will circulate this so everyone
17 has it to make it easier for all of you. So
18 that's the document that I'll be using today
19 instead of many different little documents.
20       MS. SALPOGLOU: Yitzchak, will you
21 be sending all of the production answers in
22 that e-mail? Because I didn't get anything
23 yet.
24       MR. PITTS: Neither did I.
25       MR. ZELMAN: Sure. Why don't we

Page 28

1 take a moment here.
2        Off the record for a minute.
3        (Whereupon, a discussion was held
4 off the record.)
5    Q   Would you rather I call you Chief
6 Abelli?
7        I mean, I don't want to like -- how
8 do you prefer to be called?
9    A   It's up to you. It doesn't matter
10 to me.
11   Q   Okay. So if you can, take a look
12 at the document in front of you, which is
13 Bates stamped Abelli 116.
14       Do you see that document?
15   A   Yes. It's loading.
16       There we go.
17       Yep, got it.
18   Q   And is this the cover letter that's
19 part of the execution package you received
20 from Mr. Metcalf?
21   A   It is.
22   Q   I'm sorry, we didn't catch your
23 answer.
24   A   It is.
25   Q   Okay, great.

Page 29

1    So I see it's dated September 22,
2  2020.
3    Is that the date that you received
4  it?
5    A   I believe it was the 23rd that we
6  actually received it, but yeah, it's...
7    Q   Okay.  I believe by the 23rd, at
8  least the morning of the 23rd, the Mini
9  Cooper had already been taken.
10    Is that your understanding?
11    A   I have to look, but possibly,
12  because we tried to close them out as soon as
13  we get them.
14    Q   Okay.  So can you walk me through
15  what happened from your office receiving this
16  package to the Mini Cooper being seized?
17    MS. ATTARCHI:  Objection.
18    A   Sure.
19    Do you want me to keep answering or
20  not?
21    Q   Yes.
22    Whenever there's an objection, you
23  can answer unless someone instructs you not
24  to answer.
25    A   Okay.  So we get the package, which

Page 30

1  has, obviously, the defendant's information.
2  It has their address or what address they
3  currently have, which is not always correct.
4  We -- and it gives us vehicles that the --
5  that the debtor actually owns.
6    And then from there, we take the
7  packet and we use our own software to which
8  we also check to check for ownership, and
9  that was also submitted to my attorneys.
10    Q   Okay.
11    A   Once we get all the information, we
12  go to the -- to the address and -- you know,
13  to our understanding, the creditors already
14  reached out to the debtors, and it's come to
15  the point to where they're actually doing a
16  seizure of property to -- to, I guess, pay
17  for a debt or to get the debtor to pay.
18    As far as I know, the vehicle --
19  the Mini Cooper was seized, and that's what I
20  got from my officer, that the vehicle was
21  seized, was put on a tow truck, and brought
22  to a secure lot.
23    And I think it was -- it must have
24  been a few weeks later.  That's when all this
25  stuff started coming down with Mr. Espinosa,

Page 31

1  Junior.
2    Q   Okay.  So I want to break that down
3  a little bit.
4    A   Sure.
5    Q   After you received this package,
6  did you, at some point, reach out to the
7  towing company and call Export Enterprises?
8    A   Yes.  That's one of the tow
9  companies that we use.
10    Q   Okay.  And what were the
11  instructions that you provided to them?
12    A   So --
13    MS. ATTARCHI:  Objection.
14    Go ahead.
15    Q   Go ahead.
16    A   So Export Towing is one of the many
17  tow companies that we use that they do
18  seizures.  They do accidents.  They do all
19  kinds of -- I'm sure they do repos.
20    We told them that the Mini Cooper
21  was property in our records.  So that it was
22  property of Mr. Espinosa, Senior, and to --
23  and that's the vehicle that we're going to
24  take.
25    Q   Okay.

Page 32

1    A   They're given a copy of the court
2  order as safety for them.  In case someone
3  decides to say they stole it, they have the
4  court order to say no, it was not stolen.  It
5  was executed due to an execution on money
6  judgment.
7    Q   Is this a company that your office
8  worked with in the past?
9    A   Export, yes.
10    Q   I'm sorry, I just realized
11  something.
12    You said you were appointed
13  constable from 2020 to 2023, correct?
14    A   Yes.  When I saw the date it was
15  probably 2020, February of 2020.  My dates
16  were wrong.
17    Q   Okay.  How long is the appointment
18  for; two years or three years?
19    A   Three.
20    Q   That makes more sense.
21    Have you been working with Export
22  ever since you were appointed?
23    A   Export and other companies.
24    Q   Approximately how many seizures do
25  you affect each year?

Page 33

1    A    It really depends on the year, but
2  it could be anywhere from like 60 plus, 60 to
3  100.
4    Q    Of those seizures, how many do you
5  use Export for?
6    A    Oh, I'd say for about half at
7  least.
8    Q    Okay.  So going back to that
9  package that you were talking about
10 earlier -- and let me put it back up on the
11 screen for a second -- you identified some
12 vehicle information that came in that
13 package.
14       Do you see what's on the screen in
15 front of you?
16   A    Yes.
17   Q    And this is Abelli 114?
18   A    Correct.
19   Q    Is that the vehicle that you were
20 referring to?
21   A    I see a Cooper, yes.  That's the
22 Mini Cooper, correct.
23   Q    Do you know where this information
24 came from?
25   A    From Judgment Acquisitions

Page 34

1  Unlimited.  They're the ones that gave us the
2  info.  I don't know where they pulled that
3  from.
4    Q    Okay.  Now, you see there's two
5  listings for the Mini Cooper, one on top of
6  the other?
7    A    Correct.
8    Q    The bottom one has two owners; one
9  is Sergio Espinosa, Senior, and one is --
10 well, one is Sergio Espinosa with an age of
11 57 years old, and the other one is Sergio
12 Espinosa, Junior with the age of 29 years
13 old.
14       Do you see that?
15   A    I do.
16   Q    So when you see a vehicle that is
17 owned by someone -- I'm sorry, let me
18 rephrase.
19       So when you see a vehicle that is
20 co-owned by someone who is not the judgment
21 debtor, does that stop you at all from
22 seizing that vehicle?
23   A    The primary owner is still Sergio
24 Espinosa, Senior.  So he is still the owner
25 of that vehicle.  The secondary owner is just

Page 35

1  that, the secondary owner.
2        I mean, Senior still owns that
3  vehicle in our eyes.  He's the primary owner.
4    Q    So when you see a second owner
5  listed on a vehicle, that does not stop you
6  from seizing the vehicle if the debtor is
7  listed as a primary owner?
8    A    Correct.
9    Q    Okay.
10   A    It's still his property.
11   Q    Now, you said that prior to
12 affecting the seizure, you did your own
13 research with your own databases.
14       Is that accurate?
15   A    Yes.
16   Q    What databases did you use?
17   A    It's LP Police and ATLAS.
18   Q    And what is LP Police?
19   A    It's a service that we pay for.
20 What it does is it -- we can usually look up
21 an individual by birthdate, Social, whatnot.
22 It can give us information like what vehicles
23 they own, their addresses and that type of
24 information.
25   Q    Okay.  In your experience, is LP

Page 36

1  Police always accurate?
2    A    Sometimes it's a little delayed, LP
3  Police.  Yes.
4    Q    And do the terms and conditions
5  governing your relationship with LP Police
6  specifically provide that they're not
7  providing any sort of guarantee as to the
8  correctness of the information that they
9  provide, right?
10   A    Probably true.
11   Q    Okay.  I have the terms and
12 conditions up in front of me.
13       Is that LP Police.com?
14   A    I'm waiting for it to load.
15   Q    Sure.
16   A    That's correct, yes.
17   Q    That's the logo for LP Police that
18 you commonly see?
19   A    Correct.
20   Q    Okay.  And page 2 of the terms and
21 conditions for LP Police, under Section 10,
22 it's entitled, "Warranties."
23       Do you see that?
24   A    Yes.
25   Q    LP Police states that, "LP Police



Page 37

1 does not guarantee or warrant the
2 correctness, completeness, merchantability or
3 fitness for particular purposes of the
4 services or information provided therein."
5     Do you see that?
6 A   I do.
7     MS. ATTARCHI: Objection.
8     MS. SALPOGLOU: Is this part of the
9 production?
10    MR. ZELMAN: No. This is on LP
11 Police's website. I just pulled it up.
12    MS. SALPOGLOU: Are we going to be
13 marking it for identification?
14    MR. ZELMAN: Sure.
15    This will be Exhibit A. Let me
16 make a note.
17    (Above-mentioned document marked
18 for Identification.)
19 Q   Constable Abelli, are these the
20 terms and conditions you have to agree to
21 when you use LP Police.com?
22    MS. ATTARCHI: Objection.
23 A   I'm not -- I'm not signed up for LP
24 Police. That was Sergeant D'India that
25 signed up for it.

Page 38

1 Q   Okay. And you mentioned another
2 database that you consult as well. ATLAS, I
3 believe?
4 A   Yes, but we didn't consult that one
5 until after this whole thing started with
6 Junior and Senior.
7    So it was brought to our attention
8 that ATLAS is a system used by the RMV, and
9 Sergeant D'India went through their course on
10 how to use it and was certified to use their
11 system.
12 Q   Okay. All right. So after
13 searching LP Police, you reached out to
14 Export Enterprises to arrange for the actual
15 tow of the Mini Cooper.
16    Is that correct?
17    MS. ATTARCHI: Objection, leading.
18 A   So after we got the execution, we
19 saw that the vehicle, was, in fact, Mr.
20 Espinosa, Senior's. We reached out to Export
21 towing for the seizure. Absolutely.
22 Q   Okay. And at some point, did
23 Export go to the property to seize that Mini
24 Cooper?
25 A   They did.

Page 39

1 Q   How did they coordinate that with
2 you, because you mentioned that there's a
3 constable there as well at the time, correct?
4 A   Correct.
5 Q   Okay. So how do they coordinate
6 it?
7 A   So they meet us at the property.
8 So they arrive at the same time or before or
9 even after we're there. After we see that
10 the vehicle is present, usually that's when
11 we'll call them and they come and show up.
12 Q   Now, how does your office make
13 money from the seizure? Is it after
14 successfully seizing a vehicle or is it just
15 per assignment or something else?
16 A   It's for seizing the vehicle. Once
17 a vehicle is seized, that's when we get our
18 money.
19 Q   And what are those fees?
20 A   $700 per vehicle.
21 Q   And is there a poundage on top of
22 that?
23 A   As far as -- that's our fee.
24 That's what we get paid.
25 Q   So do you charge Judgment

Page 40

1 Acquisitions or Mr. Metcalf anything on top
2 of that $700?
3 A   No.
4 Q   Okay. What if you have to return a
5 vehicle because it was the wrong vehicle or
6 it was wrongly seized or anything like that?
7 Do you have to return that $700?
8 A   No.
9    MR. PITTS: Sorry, was the answer
10 no?
11    THE WITNESS: It was no.
12    MR. PITTS: Okay.
13 Q   So what time did Sergeant D'India
14 and Export arrive at the property to seize
15 the Mini Cooper?
16    MS. ATTARCHI: Objection.
17 A   I'm not aware what time. I wasn't
18 there. I don't know.
19 Q   Okay. When they arrived at the
20 property, did they speak with anyone?
21 A   To my knowledge, no.
22 Q   Okay. So they just arrived, they
23 saw the Mini Cooper, and then they took the
24 Mini Cooper and left?
25    MS. ATTARCHI: Objection.



Page 41

1    A   To my knowledge, yes.
2    Q   Where did the vehicle go
3  afterwards?
4    A   It went to Export's secure lot,
5  which I believe is in Medford.
6    Q   Did Sergeant D'India check the
7  registration in the glove box to make sure
8  that it matched the information that you
9  have?
10      MS. ATTARCHI:  Objection.
11   A   So if the vehicle is -- is closed,
12  we usually won't go through a vehicle until
13  it's off the property, and if we have to get
14  into the vehicle, you know, to do an
15  inventory if there's a lot of stuff that's in
16  the vehicle itself that would, you know, need
17  to be inventoried, then we would inventory
18  it.
19   Q   But that did not happen here,
20  right?
21   A   To my knowledge, he didn't go
22  inside the vehicle to check the registration.
23   Q   Okay.  So once the vehicle was
24  seized, when did you first learn that there
25  was an issue with this vehicle?

Page 42

1    A   I learned that about a few weeks
2  after --
3    Q   Your connection got real bad again
4  unfortunately.
5    A   How about now?
6    Q   We can try.
7       Can you hear me?
8       MR. ZELMAN:  We lost him.  Let's go
9  off the record.
10      (Whereupon, a discussion was held
11  off the record.)
12   Q   Can you hear us now, Mr. Abelli?
13   A   Yes.
14   Q   Do you remember the question?
15   A   Yes.  It was about two weeks later
16  when I heard of Espinosa, Junior apparently
17  was in touch with Judgment Acquisitions about
18  an issue of his ownership of the Mini Cooper.
19   Q   And how did you hear that?
20   A   I heard it because they were asking
21  about releasing the vehicle, apparently,
22  having it returned to Espinosa, Junior.
23   Q   Okay.  So it was someone at
24  Judgment Acquisitions who informed you of
25  that?

Page 43

1    A   Yes.
2    Q   Okay.  Now, prior to returning that
3  vehicle, did you do anything else to make
4  sure that you had the correct vehicle?
5    A   As far as the ownership?
6    Q   Yes.
7    A   We had the information that was
8  provided to us and LP Police that we used.
9  When it came to the ownership, I don't know
10  what Judgment Acquisitions did to, you know,
11  work with Espinosa, Junior.  So to that
12  knowledge, I have no idea.
13   Q   Okay.  Something just occurred to
14  me, but you cannot see us now, right?
15   A   Correct.
16   Q   Right.
17      MR. ZELMAN:  So if I try to share
18  documents to be seen by the witness, he may
19  not see that.
20      Just to make this easier, I'm going
21  to -- Sara, I think I'll e-mail you --
22  actually, no.  You don't need me to e-mail
23  you.
24      Sara, can you forward the documents
25  that I e-mailed you to the witness so that

Page 44

1  this way, if I need him to look at something,
2  I can just refer him to the page number?
3       MS. ATTARCHI:  Okay.
4       (Brief pause in proceedings.)
5       MS. ATTARCHI:  And Brian, you
6  should have received it.  It's three
7  attachments.
8    Q   You don't have to open it now.
9  I'll let you know when I want you to look at
10  something and I'll give you the page number,
11  just to make it easier.
12   A   Okay.
13   Q   So let's continue.
14      Now, at some point, did your office
15  return that Mini Cooper?
16   A   We did.
17   Q   Okay.  And how did that come about?
18      Walk me through that process.
19   A   So we were told that Judgment
20  Acquisitions, who was working on the case for
21  Mr. Espinosa, came to the assumption that,
22  you know, the vehicle needed to be returned
23  since there was arguments of it belonging to
24  either Junior or Senior.
25      But they also saw that Senior had

**Page 45**

1 another vehicle, which was the Honda. I
2 believe it's the Honda. So obviously, we
3 can't just return a vehicle without the say
4 so from the creditor because they're the ones
5 that hired us.
6     So once it was released, obviously
7 Junior did not want to pay for any towing and
8 storage, and neither did Senior. So I
9 believe what they ended up doing was
10 returning that Cooper and then taking the
11 Honda.
12   Q  Okay. Now, you said a couple of
13 things there.
14     First, you said you can't release
15 the vehicle without the creditor's say so,
16 correct?
17   A  Correct.
18   Q  So before you can release a vehicle
19 that you seized on behalf of Judgment
20 Acquisitions or Mr. Metcalf, do you need his
21 permission to release that vehicle?
22   A  Yes.
23   Q  Okay. Do you ever release a
24 vehicle without getting his permission?
25   A  No. If they're the creditor, it

**Page 46**

1 has to come from them.
2   Q  And you mentioned that Junior did
3 not want to pay the towing and storage fees
4 associated with seizing his vehicle.
5     Is that correct?
6   A  I believe so. I believe that's
7 what was going on.
8   Q  In this case, we produced a copy of
9 the certificate of registration for the Mini
10 Cooper, which we obtained from the RMV.
11     Have you ever seen that document
12 before?
13   A  I have not.
14   Q  Okay. Unfortunately, it's not in
15 the documents that you have. I'm going to
16 e-mail that quickly to Sara, who can forward
17 it to you. This should take no more than a
18 second.
19     MR. ZELMAN: Sara, just to make
20 this easier, what I just e-mailed you is our
21 Bates stamped production.
22     MS. ATTARCHI: Okay.
23     MR. ZELMAN: So if you can just
24 forward that along to Mr. Abelli, and then
25 just let me know when you've done that.

**Page 47**

1     MS. SALPOGLOU: Could you also
2 forward it to everybody else so we can look
3 at the exact same document?
4     MR. ZELMAN: I'll put it up on the
5 screen for us.
6     MS. SALPOGLOU: Thank you.
7     MR. ZELMAN: It was the same
8 document we looked at yesterday.
9   Q  Mr. Abelli, let me know when you
10 have that e-mail.
11   A  I didn't get it yet.
12   Q  Okay.
13     (Brief pause in proceedings.)
14   A  All right. I just got it.
15   Q  If you can open up that document,
16 please, and turn to page 23.
17     MR. ZELMAN: I'll put it up here
18 for the rest of us.
19   Q  And let us know when you're at page
20 23.
21   A  Okay.
22   Q  All right. Do you see a
23 certificate of registration?
24   A  I do.
25   Q  Okay. You'll notice that this is a

**Page 48**

1 certificate of registration issued by the
2 Massachusetts Department of Transportation
3 Registry of Motor Vehicles.
4     Do you see that?
5   A  I do.
6   Q  Okay.
7     MR. ZELMAN: Just for the record,
8 this is Bates labeled Espinosa 23.
9   Q  And Mr. Abelli, if you'll take a
10 look, you'll see this registration is for
11 that 2011 Mini Cooper, effective 2019 and
12 expired June of 2021.
13     Do you see that?
14     MS. ATTARCHI: Objection.
15   A  I do.
16   Q  And in the box, which lists the
17 name of the owner, the only owner listed is
18 Sergio Espinosa, Junior.
19     Do you see that?
20   A  I do.
21     MS. ATTARCHI: Objection.
22   Q  Sitting here today, would you agree
23 that at the time of the seizures, Sergio
24 Espinosa, Junior was the sole owner of this
25 Mini Cooper?

Page 49

1        MR. PITTS: Objection.
2        MS. ATTARCHI: Objection.
3    A   I would say yes.
4    Q   Given that Sergio Espinosa, Junior
5    was the sole owner of the Mini Cooper at the
6    time it was seized in connection with Sergio
7    Espinosa, Senior's debt, do you believe that
8    Sergio Espinosa, Junior should be responsible
9    to pay for the towing or storage costs
10   Associated with that seizure?
11       MS. ATTARCHI: Objection.
12       MR. PITTS: Objection.
13   A   That has nothing to do with me nor
14   my office. That has to do with the tow
15   company and the creditor. It has nothing to
16   do with me.
17   Q   Sure.
18   A   That's on them.
19   Q   I'm going to ask each of them the
20   same question, but I'm asking you now.
21       Is it your opinion that Sergio
22   Espinosa, Junior should be responsible to pay
23   the towing and storage costs in this
24   situation?
25       MS. ATTARCHI: Objection.

Page 50

1        MR. PITTS: Objection.
2    A   No, I wouldn't. It's not his
3    responsibility. It's his father's.
4    Q   Okay. Well, now for my next
5    question.
6        If your office seizes a vehicle
7    that does not belong to the judgment debtor,
8    do you believe that the judgment debtor
9    should be responsible for paying the towing
10   and storage costs associated with that
11   seizure?
12       MS. ATTARCHI: Objection.
13       MR. PITTS: Objection.
14   A   Once again, that would be just an
15   opinion. It had nothing to do with myself
16   nor my office. So no, he's not responsible
17   for paying for his vehicle, which he did not
18   pay for his vehicle at all.
19   Q   Okay. Let me ask it this way.
20       In all your time as being a
21   constable and seizing the vehicles that we've
22   discussed earlier today, have you come across
23   a situation where the wrong vehicle was taken
24   by mistake?
25       MS. ATTARCHI: Objection.

Page 51

1    A   Not to my knowledge, no.
2    Q   Okay. Has your office ever been
3    informed they seized a wrong vehicle in all
4    your time as a constable?
5        MS. ATTARCHI: Objection, asked and
6    answered.
7    A   In my time I have not, to my
8    knowledge.
9    Q   But you would agree that if a
10   vehicle is seized that does not belong to the
11   judgment debtor, then the judgment debtor
12   should not have to pay with the towing and
13   storage associated was that seizure?
14       MS. ATTARCHI: Objection as to
15   form.
16       MR. PITTS: Objection.
17   A   No. It would -- in my opinion, it
18   should be whatever fees get tagged onto
19   whatever -- whatever the debtor owes.
20   Q   Okay.
21   A   So it would go onto Senior's debt.
22   Q   Well, that's what I'm asking. I
23   want to make sure you understand my question.
24   A   I do.
25   Q   If you're trying to collect on

Page 52

1    Senior's debt but you seize a vehicle that
2    does not belong to Senior, do you still
3    believe that Senior should be responsible for
4    the costs associated with that seizure?
5        MS. ATTARCHI: Objection.
6        MR. PITTS: Objection, asked and
7    answered multiple times.
8        THE WITNESS: So am I answering
9    this or no?
10   Q   Yes.
11       MS. ATTARCHI: Yes.
12   A   Okay. Once again, it -- no, it
13   should be Senior that would have to pay for
14   it. I mean, if we seize a vehicle and our
15   information has it being Senior's vehicle,
16   then that's who would have to pay, not
17   Junior, and at no point did we ever ask
18   Junior to pay anything, either.
19   Q   Okay. Sitting here today, we can
20   all agree that the Mini Cooper is solely
21   owned by -- I'm sorry, let me rephrase.
22       Sitting here today, it sounds like
23   we're all in agreement that the Mini Cooper
24   was solely owned by Junior at the time of the
25   seizure.



Page 53

1     Is that correct?
2          MS. ATTARCHI:  Objection.
3          MR. PITTS:  Objection.
4          MS. SALPOGLOU:  Objection.
5          MS. ATTARCHI:  You do need to
6 answer that.
7          THE WITNESS:  Okay.
8     A   Yeah.
9     Q   Okay.  So when we -- let me
10 rephrase, because that's going to become
11 messy.
12          Do you believe -- well, I have a
13 better way to ask this question.
14          The execution that you were
15 enforcing directed you to seize the assets of
16 the debtor that you might find, correct?
17          MR. PITTS:  Objection.
18          MS. ATTARCHI:  Objection.
19     A   That is correct.
20     Q   Okay.  And we've agreed that the
21 Mini Cooper was not an asset of the debtor,
22 correct?
23          MR. PITTS:  Objection.
24          MS. ATTARCHI:  Objection.
25          MS. SALPOGLOU:  Objection.

Page 54

1     A   Learned that after the fact.
2     Q   Right.
3          But sitting here today in June of
4 2022, we can agree that the Mini Cooper was
5 not an asset of the debtor, correct?
6          MR. PITTS:  Objection.
7          MS. ATTARCHI:  Objection.
8          MS. SALPOGLOU:  Objection.
9     A   From looking at the registration,
10 yes.
11     Q   Okay.  Given that the execution
12 directed you to seize the assets of the
13 debtor and we've established that the Mini
14 Cooper is not an asset of the debtor, do you
15 still believe that Senior should be
16 responsible for the cost of that seizure?
17          MS. ATTARCHI:  Objection.
18          MR. PITTS:  Objection.
19          MS. SALPOGLOU:  Objection.
20     A   It was his vehicle.  Absolutely.
21     Q   On what basis?
22     A   To our knowledge, he owned that
23 vehicle.  When we found out otherwise, he
24 didn't have to pay for anything because it
25 was free of charge.  Senior nor Junior ended

Page 55

1 up paying a dime.
2     Q   All right.
3     A   Hello?
4     Q   Yes, I'm here.  Let's move on.
5          When your office returned the Mini
6 Cooper, it did seize the Honda Accord at the
7 same time, correct?
8          MS. ATTARCHI:  Objection, leading.
9     A   To my knowledge, yes.
10     Q   What was the basis for seizing the
11 Honda Accord?
12     A   Once again, it was brought to
13 our -- it was in his name, in Senior's name.
14 So it was an asset of Senior.
15     Q   And what was the basis for you
16 determining that it was in Senior's name?
17          MS. ATTARCHI:  Objection, asked and
18 answered.
19          MR. ZELMAN:  I don't think so.
20     Q   Go ahead.
21     A   So once again, it gets checked.  I
22 don't know if we actually had ATLAS at that
23 time.  So it would have came back as being to
24 Mr. Espinosa, Senior's.
25     Q   So I'm going to direct you to the

Page 56

1 first e-mail that we sent to you, which is
2 your production, Abelli's Bates stamp
3 production.
4          Please open that document, and let
5 me know when you have it open.
6     A   Which one is it?
7          MS. ATTARCHI:  It's one of the
8 three attachments, Brian, in that first
9 e-mail I sent you today.
10          THE WITNESS:  All right.
11          MS. ATTARCHI:  And go to Abelli's
12 Bates stamped production, the PDF.
13          THE WITNESS:  Okay.  Got it.  I'm
14 opening it now.
15     Q   And once you have it open, go all
16 the way to the end.
17     A   Okay.
18     Q   Now, I want you to go up four
19 pages, because I want to direct you to Abelli
20 123.  So it's four pages from the bottom.
21          MR. PITTS:  Are you going to put
22 that up?
23          MR. ZELMAN:  Right now.
24          MR. PITTS:  All right.  Thank you.
25     A   Okay.  Is this the one where it has



Page 57

1 the VIN, make, model, whatever for --
2     Q   Yes. If it says, "Abelli 123," it
3 should have the VIN, model, year, make and
4 model, that kind of thing.
5     A   I got it.
6     Q   And this is from your production.
7 This is what I see that references the Honda
8 Accord.
9         Do you know what this document is?
10    A   I don't.
11    Q   Does it resemble any sort of the
12 searches that your office performs in order
13 to determine the ownership of a vehicle?
14    A   I haven't seen this, so most of
15 that is done by Sergeant D'India.
16    Q   Okay. It was my assumption that
17 this document is a search that your office
18 ran to determine the ownership of the Honda
19 Accord, but if you don't know that to be
20 true, then that's just an assumption.
21        So sitting here today, do you know
22 what searches were performed to determine the
23 ownership of the Honda Accord?
24    A   I know that he did an LP Police
25 search, and I believe he also -- if we had

Page 58

1 it, we also done the ATLAS search.
2     Q   Do you see at the bottom of this
3 document, it says, "Lienholder"?
4     A   Sure.
5     Q   And it says, "Honda Lease Trust."
6         Do you see that?
7     A   Yes.
8     Q   Now, when you see that a vehicle is
9 leased, does that stop you from seizing that
10 vehicle?
11        MS. ATTARCHI: Objection.
12    A   I'm going to point you to where it
13 says, "Primary owner, Sergio DeJesus
14 Espinosa, date of birth, 11/13/62, license
15 number S64372575."
16        So, you know, he is the owner. Now
17 whether that ownership ends in three years
18 and he can update it, still he is as the
19 primary owner.
20        Just like if I finance a vehicle, I
21 don't own this vehicle per se, but I do
22 because I still pay for it. However, it can
23 get seized and guess what, I'm out. It's
24 still under my ownership.
25    Q   Okay. My question was, if you see

Page 59

1 that a vehicle is leased, would that stop you
2 from seizing that vehicle?
3         MS. ATTARCHI: Objection.
4     A   No, it's not. Being the primary
5 owner, it comes back to Sergio DeJesus
6 Espinosa. He's still the primary owner.
7     Q   Were you required to undertake any
8 sort of training in order to become a
9 constable?
10    A   Technically, no, but that's
11 something I'm changing.
12    Q   Okay. Did you -- well, let me
13 rephrase this.
14        How are you changing it?
15    A   So with all new laws, we're going
16 to end up hopefully having our own academy,
17 which is just going to be an academy just
18 like the police department, but it's going to
19 have stuff that's more leaning towards
20 constable work.
21    Q   So you're going to try to teach
22 future constables about what they can or
23 cannot do?
24    A   Correct. It would be through --
25 with injunctions to MPTC, which is the

Page 60

1 governing body of the police academy through
2 the State of Massachusetts.
3     Q   In your academy, do you intend to
4 instruct constables that they can seize
5 leased vehicles?
6     A   So the law on leased vehicles is a
7 very vague law. It doesn't say you cannot
8 seize leased vehicles nor does it say you
9 can.
10    Q   Okay.
11    A   My understanding is that as a
12 vehicle is leased and the debtor decides they
13 don't want to pay, the leasing company is
14 usually going to end up paying and they end
15 up charging the debtor whatever, I guess, the
16 difference is.
17    Q   Have you seen -- I'm sorry, it's
18 hard to see if you're still talking or not.
19    A   You know, it's just like a
20 repossession. If your vehicle gets
21 repossessed and it gets sold, are you still
22 responsible for paying the remainder? You
23 are.
24        So to me, that's the same thing as
25 a lease, you know. Yes, you can upgrade your




Page 61

1  vehicle every three years, but that doesn't
2  mean you don't own, you know, the vehicle.
3  At the time you're responsible for everything
4  on that vehicle.
5      Q   Have you seized leased vehicles in
6  the past?
7          MS. ATTARCHI: Objection.
8      A   I'm usually not out on the road,
9  per se. If a vehicle comes back as leased,
10 I'm sure we have.
11     Q   Okay. And have you ever managed to
12 successfully sell a leased vehicle in order
13 to satisfy a judgment debt?
14     A   Never got to a point where we had
15 to because I -- so I don't deal with the --
16 we do the seizure and then it's in the -- it
17 goes to the creditor. It's their ball, not
18 ours.
19         So whatever happens between the
20 creditor and the debtor is between them two.
21 It has nothing to do with us, but for some
22 reason everyone wants to drag us in the
23 middle.
24     Q   Okay. Does your office continue to
25 seize leased vehicles?

Page 62

1          MS. ATTARCHI: Objection.
2      A   They do.
3      Q   Okay. Did you ever do any sort of
4  research or get any sort of opinion as to
5  whether or not you can seize a leased
6  vehicle?
7          MS. ATTARCHI: Objection.
8      A   So it's been brought back and
9  forth, because it is questionable and it's
10 something that we're looking at because, you
11 know, the law is vague when it comes to a
12 leased vehicle of whether you can or cannot.
13     Q   So the question was -- I'm sorry.
14         The question was, have you ever
15 researched the issue or tried to obtain an
16 opinion on the issue?
17         MS. ATTARCHI: Objection.
18     A   I have not as I'm usually not
19 the -- I mean, Sergeant D'India may have, and
20 I'm sure he probably spoke to a few people on
21 the matter.
22     Q   Okay. So what is Sergeant
23 D'India's relationship with yours? Are you
24 his boss?
25     A   I am.

Page 63

1      Q   Okay.
2      A   But he's been doing constable work
3  longer than I have.
4      Q   All right. And he's a member of
5  your constable department?
6      A   He is.
7      Q   As his chief, are you responsible
8  for training him to make sure he does the
9  right thing?
10     A   I'm responsible for making sure he
11 has training, which he does have a reserve
12 police academy and he keeps up to date with
13 all the stuff that is needed, as opposed to
14 MPTC, going through PPI, which is an online
15 service that keeps up with all in-process,
16 in-service.
17     Q   Okay. Has he -- I'm sorry, let me
18 rephrase.
19         Have you ever given him
20 instructions about which types of vehicles he
21 can or cannot seize?
22     A   I have not.
23     Q   Okay. When were you first notified
24 that you had seized a leased vehicle?
25         MS. ATTARCHI: Objection.

Page 64

1      A   I wouldn't be able to give you that
2  date. I have no idea.
3      Q   At some point, a decision was made
4  to return that leased vehicle?
5          MS. ATTARCHI: Objection, leading.
6      A   That would have come from Judgment
7  Acquisitions. Once again, we have no control
8  over what they do. All they do is say hey,
9  do this or do that, release the vehicle, see
10 if you can get it returned and whatnot, and
11 we do it.
12         So that decision does not come from
13 me. It comes from the creditor, and it also
14 goes to the tow company, because obviously
15 there would be tow fees involved and once
16 again, I know that they didn't pay any tow
17 fees. They didn't pay any storage.
18     Q   Did you tell Export Enterprises
19 that Senior is responsible for the towing and
20 storage costs associated with the seizure of
21 his vehicle?
22         MS. SALPOGLOU: Objection, hearsay.
23     A   I didn't tell them anything of what
24 the towing and storage fees are nor did I
25 tell them that Senior is responsible, but --



Page 65

1  you know, there are things that apparently --
2  I can't answer that perfect because I didn't
3  tell him. So...
4      Q   Okay. Can you look at the document
5  open in front of you that I had you look at
6  before, which is Abelli's Bates stamp
7  production.
8      A   Okay, yeah.
9      Q   Okay.
10     A   It's open.
11     Q   All right. If you look at page 8
12  of the document, go all the way to the
13  beginning.
14         MR. ZELMAN: And I'll put it up on
15  the screen.
16     A   I think this is the right one.
17     Q   Okay. I'm referring to you to an
18  e-mail dated October 21, 2020.
19         Do you see it?
20     A   Is it October 23rd of 2020?
21     Q   October 21, 2020 at 10:56 a.m.
22     A   10:56 a.m., okay. I see it.
23     Q   Okay. Is that your e-mail address,
24  B.Abelli.MCOdirector@Outlook.com?
25     A   Yes.

Page 66

1          MS. ATTARCHI: Objection.
2      A   Yes, it is.
3      Q   Okay.
4      A   And that's with all e-mails that
5  we're told if they're responsible, then they
6  are responsible for the storage fees with
7  vehicles that are released. That's how the
8  tow company gets paid.
9      Q   Okay. But you would agree that on
10  October 21, 2020, you e-mailed Export and
11  stated, "Attached is the release for Mr.
12  Espinosa's car. Mr. Espinosa is responsible
13  for all towing and storage fees with both the
14  Mini Cooper and the leased vehicle."
15         MS. ATTARCHI: Objection.
16     A   Yes. That's what we were advised
17  by the creditor.
18     Q   That's what you were advised by
19  Judgment Acquisitions?
20     A   So when a vehicle is released, if
21  the debtor -- if the creditor is not paying
22  for it, then yeah, the debtor has to pay for
23  the towing.
24         I believe there's some kind of -- I
25  don't know. I don't know the tow laws, but I

Page 67

1  know that there's something out there that
2  says they have to be paid.
3      Q   So what's your basis for saying
4  that Senior is the one who has to pay it?
5      A   It's his debt. So being that it's
6  his vehicle, his vehicle got seized due to a
7  debt that he owes, which a money judgment was
8  put forward and signed by a judge for an
9  execution on judgment. So it does becomes
10  his debt to pay.
11         Just like all fees, like our fees
12  for having a constable gets tagged onto the
13  total that Mr. Espinosa, Senior would have to
14  pay, and that's added on by the creditor.
15     Q   Okay.
16     A   The tow -- the tow and storage fee
17  is paid to the tow company themselves.
18  That's not going to the creditor nor does it
19  go to me.
20     Q   You specifically instructed Export
21  that Senior is responsible to pay all towing
22  and storage charges, right?
23         MS. ATTARCHI: Objection.
24     A   That is correct. That is correct
25  because it's not me and it's not going to be

Page 68

1  anyone else. It would be him.
2      Q   If you can please turn to page 110
3  this same production.
4          I'm sorry to jump you around, but I
5  can't show it to you, so I have to do it this
6  way.
7      A   Page 110?
8      Q   Yes.
9      A   All right, go ahead.
10         Got it.
11     Q   This is on your -- this is a letter
12  on the Massachusetts Constables Office
13  letterhead.
14         Do you see that?
15     A   I do.
16     Q   Okay.
17         MR. ZELMAN: For the record, this
18  is Abelli 110.
19     Q   So in your e-mail on October 21,
20  2020, you refer to a release.
21         Is this the release?
22         MS. ATTARCHI: Objection.
23         Go ahead.
24     A   It says, "I just received
25  confirmation from Judgment Acquisitions



Page 69

1  Unlimited that Mr. Espinosa has paid Judgment
2  Acquisitions. His car can be released. This
3  is authorized by myself. Mr. Espinosa is
4  responsible for all towing and storage fees."
5      So I was under the assumption that
6  he already paid Judgment Acquisitions
7  whatever he owed them. When we get told the
8  release, that's usually the only time we're
9  told to release.
10     Q   Okay. But my point is, is this the
11  release that you were referring to in your
12  e-mail?
13     A   Most likely, yes.
14         MS. ATTARCHI: Objection.
15     Q   Okay. Did Judgment Acquisitions
16  actually tell you that Mr. Espinosa has paid
17  them?
18         MS. ATTARCHI: Objection.
19     A   Usually what I end up getting is
20  just either a text message saying please
21  release such and such vehicle. I don't get
22  told whether they paid or not. Them getting
23  paid is an assumption by me because
24  otherwise, I would see no reason why they
25  would release it.

Page 70

1      Q   Understood.
2      A   So usually a payment is either paid
3  in full or they come up with a payment plan
4  with the creditor.
5      Q   Okay. And when you tell Export
6  Enterprises that Mr. Espinosa is responsible
7  for all towing and storage fees, do you
8  expect that they're going to release his
9  vehicle to him without payment of those fees?
10         MS. ATTARCHI: Objection.
11     Q   You can answer.
12     A   I couldn't tell you what they would
13  or wouldn't do. I mean, they want to get
14  paid, so my assumption would be no, they
15  wouldn't release it because they're not
16  getting paid.
17     Q   Okay.
18     A   So...
19     Q   All right. Now, when the Mini
20  Cooper was returned to the property and the
21  Honda Accord was taken, do you know the date
22  that that happened?
23     A   I do not.
24         MS. ATTARCHI: Objection.
25     Q   I believe we've established in this

Page 71

1  case that that happened on or about October
2  9, 2020.
3      Does that date sound familiar to
4  you?
5         MS. ATTARCHI: Objection.
6      A   I can't give you an exact yes or
7  no. I don't know.
8      Q   Okay. At some point, that exchange
9  did happen, though, right?
10     A   Yes.
11     Q   All right. And on that date, did
12  Sergeant D'India or did anyone from your
13  office speak with Sergio Espinosa, Junior or
14  Senior?
15     A   I don't know.
16     Q   And that knowledge is based solely
17  on what Sergeant D'India has told you,
18  correct?
19     A   Correct.
20         MS. ATTARCHI: Objection, leading.
21     Q   And the knowledge that you have
22  regarding the -- regarding what happened at
23  the first seizure when the Mini Cooper was
24  taken, that also is all based on what
25  sergeant D'India told you?

Page 72

1      A   Correct.
2         MS. ATTARCHI: Objection.
3      Q   When did he tell you this stuff?
4      A   What do you mean?
5      He tells me -- he usually gives me
6  a briefing the day after there's a seizure if
7  there's problems. If there's no problems, I
8  usually don't hear about it.
9      Q   Okay. So for example, the first
10  seizure which took place on or about
11  September 23, 2020, he would have told you
12  what happened at that seizure on or about
13  that date, correct?
14         MS. ATTARCHI: Objection, leading.
15     A   If there was a problem.
16     Q   Okay.
17     A   If there was a problem, he would
18  have bought it up, but there was apparently
19  no problem.
20     Q   So your recollection today that
21  you're testifying from is based on your
22  recollection of a conversation that you would
23  have had with Sergeant D'India about a year
24  and a half ago?
25         MS. ATTARCHI: Objection.



Page 73

1    A   That would be correct.
2    Q   Okay. And you have no notes or
3  anything from that time period to, you know,
4  refer to?
5    A   No, I do not.
6      MS. ATTARCHI: Objection, leading.
7    Q   Same question with regards to the
8  October 9th seizure.
9      When the Mini Cooper was dropped
10 off and the Honda Accord taken, your
11 understanding of the events that happened at
12 that time is all based on a conversation you
13 had with Sergeant D'India about a year and a
14 half ago?
15     MS. ATTARCHI: Objection, leading.
16   A   Once again, if there was an issue,
17 he would have said something to me. He did
18 not. So to my knowledge, nothing of issue
19 came about. He dropped the vehicle off and
20 he picked the other vehicle up.
21   Q   Do you know if you had a
22 conversation or did you not have a
23 conversation at all since nothing untoward
24 happened?
25     MR. PITTS: Objection.

Page 74

1    A   I can't remember. I don't remember
2  having a conversation about it until your
3  client started whatever they started.
4    Q   Let's take this one step at a time.
5    A   Sure.
6    Q   For the first seizure that happened
7  on or about September 23, 2020, do you
8  actually recall having a conversation with
9  Sergeant D'India after that seizure?
10     MS. ATTARCHI: Objection, asked and
11 answered.
12   A   No, because like I said, unless
13 there's an issue, I wouldn't -- if there
14 wasn't an issue I wouldn't have heard about
15 it.
16   Q   On the October 9th seizure, when
17 the Mini Cooper was returned and the Accord
18 taken, do you remember actually having a
19 conversation with Sergeant D'India about that
20 seizure?
21   A   Once again, if there was no issue,
22 then no.
23   Q   So you don't recall having a
24 conversation?
25     MS. ATTARCHI: Objection, leading.

Page 75

1    A   No.
2    Q   Okay. At some point, once the
3  plaintiff's -- well, I don't want to put
4  words in your mouth. I'm sorry.
5      I believe you said that you didn't
6  know there was an issue until the plaintiffs
7  started something, correct?
8    A   Correct.
9    Q   What do you mean by that?
10   A   Junior started saying that the
11 Cooper was his. So the last thing I knew was
12 we were returning the Mini Cooper because it
13 was -- supposedly that's what we were asked
14 to do by Judgment Acquisition.
15     Whether they figured it out or not,
16 we asked the towing company to bring the
17 vehicle back and we took the Honda, because
18 that was still the primary owner as was on
19 that paperwork that you had me look at had
20 Mr. Espinosa, Senior as the owner of the Mini
21 Cooper.
22     Whatever conversation transpired
23 between Judgment Acquisitions and Junior or
24 Senior, I have no clue. That has nothing to
25 do with me or my office.

Page 76

1    Q   Okay. At a certain point, did you
2  speak with Sergeant D'India about his
3  recollection of the events from the two
4  seizures?
5    A   I did ask him when Junior was --
6  started bringing up stuff about it being his,
7  I started to ask him whether he spoke to him,
8  and I'm sure he told me no.
9      And then with the second vehicle,
10 when he took it, I don't believe I spoke to
11 him until we were told to return the second
12 vehicle, and I made sure I had him take
13 pictures of the returned vehicles, of both of
14 them being there.
15   Q   Okay. So each of these
16 conversations with Sergeant D'India would
17 have happened several weeks after the
18 respective seizures?
19   A   I'm sure they would have.
20   Q   Sergeant D'India still works for
21 your office?
22   A   He does.
23     MS. ATTARCHI: Objection.
24   Q   And have you spoken with him
25 recently about what happened during these



Page 77

1  seizures?
2      A  I asked him if he ever spoke with
3  the -- with either of the Espinosas, and he
4  told me no.
5      Q  Okay.
6      A  I asked him pretty much -- you
7  know, when he took the Mini Cooper, I asked
8  him if anything came about when he returned
9  the vehicles.  He said no, he never spoke to
10  either Senior or Junior when the vehicles
11  were taken.  And they were returned without
12  incident, to my knowledge.
13      Q  Okay.
14      A  Hello?
15      Q  Yes, I'm here.
16      A  Okay.
17      Q  At a certain point, Export asked
18  you to put together a letter on their behalf,
19  correct?
20          MS. ATTARCHI:  Objection.
21      A  So that is correct.
22      Q  And you did, in fact, put together
23  that letter?
24          MS. ATTARCHI:  Objection.
25      A  I did.

Page 78

1      Q  Okay.  If you can just look in that
2  production again towards the very, very
3  bottom.  It's the third-to-last page in the
4  production.  It's Abelli 125.
5      A  Yep, yep.  I got it.
6      Q  Okay.
7          MR. ZELMAN:  And let me put it up
8  for the rest of counsel here.  One second.
9      Q  This is a letter that you wrote on
10  behalf of Export Enterprises.
11          Is that correct?
12      A  Yes.
13      Q  Okay.  I want to ask you some
14  questions about this letter.
15          Go to the second line towards the
16  very end where the sentence starts, "Mr.
17  Espinosa."
18          Do you see that?
19      A  Still in the first paragraph?
20      Q  Yes.
21      A  Yeah, I see it.
22      Q  All right.  You write, "Mr.
23  Espinosa was less than thrilled when an
24  officer showed up to execute a lawful seizure
25  due to a debt of Mr. Espinosa."

Page 79

1          Do you see that?
2      A  That's the second line from the
3  bottom?
4      Q  No, from the top.  It's the second
5  line from the very top of the letter.
6      A  Okay.  Yes, hold on.
7          Okay.  I see it.
8      Q  All right.  So which Mr. Espinosa
9  are you referring to when you say, "Mr.
10  Espinosa was less than thrilled"?
11      A  I didn't specify because pretty
12  much I was writing a letter to help Export.
13  I know from what I was told that my office
14  didn't speak to him.  They didn't know if it
15  was Junior or Senior.
16      Q  So when you say, "Mr. Espinosa was
17  less than thrilled," you wouldn't even know
18  which Mr. Espinosa you were referring to, do
19  you?
20          MS. ATTARCHI:  Objection.
21      A  No.
22      Q  You don't know if either of the
23  Espinosas were less than thrilled, do you?
24      A  All I know is what I was told with
25  obviously e-mail going back and forth.  I'm

Page 80

1  not sure whether Espinosa spoke with the tow
2  truck driver or not, but from what I was
3  hearing, he was not too happy with the
4  vehicle being taken, as no one would be.
5      Q  We're going to go six lines from
6  the top where your letter states, "My officer
7  was not aware of the new 2020 vehicle that
8  was in Mr. Espinosa's name and my officer was
9  going to seize that vehicle instead, but Mr.
10  Espinosa's son asked if the Cooper could be
11  taken instead."
12          Do you see that?
13      A  Okay.  I found it.
14      Q  Do you believe that conversation
15  happened?
16      A  To my knowledge, it could have been
17  from the tow company or whatnot.  I mean,
18  whether he told Sergeant D'India or if he
19  told the tow company, he had to speak to
20  someone.  But to my knowledge, it was
21  probably the tow company he was asking.
22      Q  All right.
23      A  So he probably -- so what I'm
24  saying is the tow company probably asked
25  Sergeant D'India if it would be okay to take

Page 81

1  the Mini Cooper instead of the 2020 Honda,
2  and whether he found out that was also
3  Senior's, because it was a newer vehicle and
4  instead of a newer vehicle, take the older
5  vehicle and still settle the debt.
6     Q   Okay.  This is the part of the
7  deposition that I don't want you to guess or
8  make assumptions.  I'm only going to ask you
9  what you know.
10    A   Sure.
11    Q   Sitting here today, do you know if
12  Mr. Espinosa's son asked if the Cooper could
13  be taken instead?
14    A   I do not know that for a fact.
15    Q   Okay.  Next, about a line or two
16  down, it says, "From my understanding, Mr.
17  Espinosa's son called about a week later
18  complaining about the Mini Cooper being
19  seized."
20        Do you see that?
21    MS. ATTARCHI:  Objection.
22    A   Yes, I do see it.
23    Q   Did Mr. Espinosa's son call your
24  office about a week later?
25    A   He did not call my office.  He

Page 82

1  called Judgment Acquisitions, and he --
2     Q   Did -- I'm sorry, I didn't mean to
3  cut you off.
4         Go ahead.
5     A   Let me see.  (Reading.)
6         "About a week later complaining
7  about the Mini Cooper being seized and
8  stating that it was his car and not his
9  father's."
10        So that information came from the
11  creditor that he was -- because he was going
12  back and forth with Judgment Acquisitions.
13    Q   Just to clarify, Mr. Espinosa's son
14  did not call your office to complain,
15  correct?
16    A   No, he did not.
17    Q   You believe he called the creditor
18  about a week later?
19    A   Correct.  This letter wasn't done
20  during -- this case has been going on for
21  over two years.  I can't remember exactly
22  when the tow company asked me to write this
23  letter, but...
24    Q   Okay.  Lower down, still in the
25  first paragraph about five lines from the

Page 83

1  bottom of the first paragraph --
2     A   Okay.
3     Q   -- you write, "Export, my office
4  and Judgment Acquisitions have jumped through
5  hoops to help Mr. Espinosa, even after he
6  made quite a few foul language comments about
7  retrieving the car" --
8     MS. ATTARCHI:  Objection.
9     Q   -- "quite a few weeks after the
10  lawful seizure."
11        Do you see that?
12    A   I do.
13    Q   So which Mr. Espinosa made foul
14  language comments?
15    A   To my knowledge, it was Junior and
16  it was due to Judgment Acquisitions.  Whether
17  they were trying to get money from him or
18  Senior, I have no idea.  We were pulled in
19  the middle of this and kind of like trying to
20  be -- not that we want to be the middleman.
21  Our job stops at the execution and the
22  release.
23        When it comes to tows, when it
24  comes to anything to do with the actual debt
25  collection, that's on the creditors.  If a

Page 84

1  debt collector decides to say hey, you need
2  to pay us, that's on them, not us.
3     Q   Okay.
4     A   Like I said, I was the middleman.
5  I was getting heat from the tow company and
6  from the creditors about how Mr. Espinosa,
7  which I believe was Junior, was -- was very
8  upset and using foul language about the
9  vehicles.
10    Q   Okay.  So when you're talking about
11  "foul language comments," you're referring to
12  Junior?
13    A   Yes.
14    Q   And who did he make those comments
15  to?
16    A   I couldn't tell you exactly, but
17  from my knowledge, it would have been by
18  Judgment Acquisitions.
19    Q   Do you know when he would have made
20  those comments?
21    A   I do not.
22    Q   Do you know what those comments
23  would have been?
24    A   No.
25    Q   Okay.



Page 85

1 A And when it comes to the jumping
2 through hoops, to my knowledge, Judgment
3 Acquisitions and the tow company both tried
4 helping with tow costs or storage, and they
5 gave all kinds of options for Mr. Espinosa
6 Senior to help him with trying to take care
7 of the debt that he incurred on his own.
8 And he wanted nothing to do with it
9 to what was being told to me. He wanted
10 nothing to do with it and -- and he wasn't
11 going to pay.
12 Q Okay. I'm going to direct your
13 attention same production, page 55.
14 A Sure.
15 Q Let me know when you're there.
16 MR. ZELMAN: I'm going to put it up
17 for everyone here meanwhile.
18 Q This is Bates stamped Abelli 55.
19 A Let me see.
20 Okay. I found it.
21 Q All right. I just want to make
22 sure we're looking at the same thing. I'm
23 looking towards the bottom of the page, an
24 e-mail from Tom Tedford.
25 Do you see that?

Page 86

1 A Yes.
2 Q And it's to Brian Abelli, CCing
3 Andrew Metcalf, dated February 17, 2021 at
4 8:06 p.m.
5 Do you see that?
6 A Yep.
7 Q All right. So Tom Tedford, is that
8 someone over at Export?
9 A Formerly Export. He doesn't work
10 there anymore.
11 Q Okay. Do you know when he stopped
12 working there?
13 A I have no idea.
14 Q Was it recently?
15 A I don't know exactly when he left.
16 Q All right. But in this e-mail, Mr.
17 Tedford asks you for a letter, "And in the
18 letter, if you could just state that we do
19 not do collections for you or search
20 vehicles. We are simply one of many towing
21 companies your offices utilize 24 hours a day
22 to tow away seized vehicles at your request."
23 Do you see that?
24 A I do.
25 Q And then you respond a couple

Page 87

1 minutes later, "No problem. I will get it to
2 you tomorrow," correct?
3 MS. ATTARCHI: Objection.
4 A Yes, I do see that.
5 Q The letter that we just looked at,
6 is that the letter that you wrote in response
7 to this e-mail?
8 A Possibly.
9 Q Do you think you wrote a different
10 letter for him or was that the only one?
11 A No, I believe that was the only
12 letter I wrote for him.
13 Q Okay. So having looked at this
14 each exchange, would it be accurate to say
15 that you wrote that letter on or about
16 February 17, 2021?
17 A Sure.
18 Q Okay. If you can turn to Abelli 9,
19 and it will be the ninth page of this
20 production.
21 A Okay.
22 Q This is an e-mail from you dated
23 October 23, 2020 at 8:45 a.m.
24 Do you see that?
25 A I do.

Page 88

1 Q Who is it to? Because it appears
2 it's to yourself.
3 A It's not. So the e-mail, whatever
4 it was, that was set up so when we do
5 seizures, all of our -- like when we take
6 pictures of vehicles that are seized with the
7 seizure report, it gets sent to that e-mail
8 so his creditors who have that account can
9 open it and see what's going on.
10 Q Okay.
11 A So that e-mail actually belongs to
12 Judgment Acquisitions.
13 Q Got it.
14 So in this e-mail it's for Judgment
15 Acquisitions?
16 A Yes.
17 Q Okay. In this e-mail, you write,
18 "Mr. Espinosa I believe has settled with you,
19 Judgment Acquisitions Unlimited. However,
20 Mr. Espinosa has informed Export towing that
21 he does not want his car back, parenthesis,
22 the lease."
23 Do you see that?
24 A I do.
25 Q Isn't it true that Mr. Espinosa

Page 89

1 didn't want the car back because he didn't
2 want to have to pay the towing and storage
3 fees being charged by Export?
4        MR. PITTS: Objection.
5    A  I have no idea. I couldn't tell
6 you why he wouldn't want the car back. I
7 can't read his mind.
8    Q  Okay. If you can turn to page 21,
9 the same document.
10       And this one is a little tricky.
11 You'll see why when you get there.
12   A  Okay.
13   Q  So if you start at Bates 18, that's
14 where this e-mail starts. It's really,
15 really narrow.
16   A  Got it.
17   Q  Okay. If you can see this really
18 narrow e-mail we're looking at, it's an
19 e-mail from Tom Tedford on January 18, 2021
20 at 3:52 p.m.
21       Do you see that?
22   A  Yes, I do.
23   Q  All right. So now that we've
24 established what this e-mail is, you can go
25 back to Bates 21.

Page 90

1    A  Hello?
2    Q  Yes.
3    A  Okay.
4    Q  Go back to Bates 21.
5    A  Yes.
6    Q  Let me know when you're there.
7    A  I'm here.
8    Q  Okay. So there's a sentence that
9 starts -- the last sentence on this page,
10 which starts about seven lines from the
11 bottom.
12       Let me know when you see it.
13   A  I'm trying to read it, but yeah, I
14 can see it.
15   Q  I'll read it to you, and you let me
16 know if I mess up, okay?
17   A  Sure.
18   Q  This sentence reads, "The vehicle
19 was released per order of the MA Constables
20 office back in November of 2020 stating that
21 your client is responsible for the charges
22 owed for towing and storage. See attached
23 release letter. Your client came to retrieve
24 the vehicle shortly thereafter, and upon
25 learning he was responsible for the charges

Page 91

1 stated keep it, not my problem, and left."
2        Do you see that?
3    A  I do.
4    Q  Okay.
5    A  So that would have been from --
6 let's see. Let me go back.
7        That was to Tom Tedford or whoever
8 his name is. So that would have been him
9 telling me, you know, most of this stuff was,
10 you know, going back to me saying he didn't
11 want the vehicle and whatnot.
12   Q  Right.
13       But Export is telling us that he
14 didn't want the vehicle because he didn't
15 want to pay for the towing and storage
16 charges, correct?
17   A  Which is -- which is probably true.
18 He didn't think he had to.
19   Q  All right. And we're almost done
20 here, Mr. Abelli.
21       Now, in order for Export to release
22 the vehicle, they need your say so, correct?
23   A  They do, and I have to get say so
24 from the -- from the creditor.
25   Q  Got it. Understood.

Page 92

1    A  But just because I release a
2 vehicle doesn't mean that they're going to,
3 you know, release the vehicle until they're
4 paid. Whether the payment comes from the
5 creditor or it comes from the debtor,
6 that's -- that has nothing to do with me.
7    Q  All right. Have you ever
8 experienced other situations with Export
9 Enterprises where there have been mess-ups
10 that have resulted in the wrong vehicle being
11 taken?
12       MS. SALPOGLOU: Objection.
13   A  I can't remember.
14   Q  All right. If you can turn to page
15 98 in this production.
16   A  Okay.
17   Q  That's Bates stamped Abelli 98.
18       Let me know when you're there.
19   A  Abelli 98.
20       Got it.
21   Q  Okay. I'm referring you to an
22 e-mail from Tom Tedford to Andrew Metcalf and
23 yourself dated May 7, 2021 at 4:52 p.m.
24       Do you see that?
25   A  Yep, I see it.

1    Q   Okay.  And Mr. Tedford writes,
2   "Guys, you need to settle this claim for all
3   I'm done waiting and screwing around.  If
4   you're challenging me to sue you, you're
5   doing a great job at it.  This is ridiculous,
6   and all we did is what was ordered and at
7   your request perform towing services.  If you
8   screwed up, open your checkbook and settle
9   this.  There seems to be many screwups lately
10  and I don't know who is at fault, but one
11  thing I can guarantee you is it's not my
12  fault and liability."
13       "If I'm paying anyone any more
14  fees, it will be my attorneys and against you
15  for wrongfully ordering me to provide
16  services under color of law, and in my
17  deposition I plan to explain how many times
18  screwups have been made."
19       Do you see that?
20  A   I do.
21  Q   Did I read that accurately?
22       MS. ATTARCHI:  Objection.
23  A   Yes.  I'm reading it.
24       Yes.
25  Q   Do you know what other screwups Mr.

1   Tedford is referring to?
2       MS. ATTARCHI:  Objection.
3   A   I cannot remember.  This was when,
4   I guess, your client was going against both
5   Judgment Acquisitions and Export.  This was
6   before we got drug into the middle of this.
7   So unfortunately, they kept on having me on
8   these e-mails thinking that there was some
9   magic wand I could wave to take care of this.
10      The e-mail was directed to Judgment
11  Acquisitions due to them not responding to
12  Ted, and I was kind of playing the middleman
13  to try and calm Ted down, you know, and try
14  to -- unfortunately, I was trying to play
15  referee.
16  Q   Right.
17      So the question was, do you know
18  what other screwups Ted was referring to at
19  this time?
20      MS. ATTARCHI:  Objection.
21  A   Unfortunately, I couldn't remember
22  right now.
23  Q   Okay.
24  A   That goes a ways back.
25  Q   If you can turn to Bates 31,

1   please.
2   A   Okay.
3   Q   Same production, page 31.
4   A   Okay.
5   Q   Now I'm looking at an e-mail from
6   you to Tom Tedford, Andrew Metcalf and
7   Matthew Clifford dated January 22, 2021 at
8   10:37 a.m.
9       Do you see that?
10  A   10:37 a.m., yes.  I see it.
11  Q   Okay.  And in this e-mail, you have
12  two points, the first one is Point 1, and
13  that refers to our case it looks like,
14  "Espinosa was a Mini Cooper that he started
15  for it to be taken, then called stating that
16  the Honda Accord should have been taken to
17  which the vehicles were then switched."
18      Do you see that?
19  A   Yes.
20  Q   And then you have Point 2, which
21  is, "The BMW Renoso.  The paperwork stated
22  the Mercedes was owned by the debtor, however
23  after a quick investigation, found that the
24  Mercedes was owned by the debtor's son, who
25  is a Junior.  The BMW is owned by the debtor

1   and that was the correct vehicle that was
2   taken."
3       Do you see that?
4   A   I do.
5   Q   Does that jog your memory about
6   another situation where a Junior and Senior
7   vehicle was wrongly taken by mistake?
8   A   If I remember that correctly, it
9   was corrected by the debtor themselves.
10  There was no way to tell if it was a Junior
11  or Senior on that as far as a primary owner
12  or secondary owner.
13  Q   Okay.  But it refreshes your
14  recollection that at least once in the -- at
15  least once in the past --
16  A   Sure.
17  Q   -- you've had a situation where a
18  son's car was taken for a dad's debt,
19  correct?
20      MR. PITTS:  Objection to the form.
21      MS. ATTARCHI:  Objection to the
22  form.  Leading.
23  A   Correct.
24  Q   All right.
25  A   So if we do our investigation and

Page 97

1  we check, ATLAS nor LP Police will not
2  always -- will not always put Junior or
3  Senior on an ownership. So it makes it
4  really difficult to find out if it was a
5  Junior or Senior.
6      Q  Okay. Will they put a date of
7  birth?
8      A  I haven't looked at it, so if I'm
9  not looking at it -- I mean, usually I would
10  think they would put the date of birth or a
11  license number.
12      Q  Give me one second.
13      A  Hello?
14      Q  Yes, I'm here.
15         Give me one moment.
16      A  All right.
17      Q  Did anyone from Judgment
18  Acquisitions let you know that there was a
19  son living at the property with the same name
20  as the dad?
21      A  I don't recollect, no. I don't
22  recollect that.
23      Q  Okay. So we're at that point in
24  the deposition where I may have asked all my
25  questions already. I went a little out of

Page 98

1  order, so I would like to take three or five
2  minutes to go through it to make sure I
3  haven't missed any.
4      A  Sure.
5         MR. ZELMAN: We can take a quick
6  break, if counsel wants to -- we've gone for
7  quite a while -- or we can turn it over to
8  counsel for the co-defendants and see if they
9  have any questions for you while I look over
10  my questions.
11         It's up to them.
12         MS. SALPOGLOU: Just for the
13  record, I was just provided these documents
14  today like everybody else, and pages 39 --
15  I'm sorry, 32 through 49 are my
16  communications to my client which are
17  privileged and have been now produced.
18         MR. ZELMAN: Right. I guess we
19  can --
20         MS. SALPOGLOU: We've got a big
21  problem here.
22         MR. PITTS: Pamela, I was looking
23  at that. It looks like those communications
24  were part of a stream, right?
25         MS. SALPOGLOU: Exactly.

Page 99

1         MS. ATTARCHI: They were forwarded
2  by --
3         MS. SALPOGLOU: They were forwarded
4  and they have been produced as part of this.
5         MS. ATTARCHI: I understand, but I
6  think they were forwarded by your client.
7         MS. SALPOGLOU: I'm not certain if
8  they were produced to or forwarded to Mr.
9  Abelli, but those are clearly attorney-client
10  communications that should not have been
11  produced to anyone else.
12         MS. ATTARCHI: I understand that.
13         I'm certainly happy to look into it
14  Pamela, but I think the issue is that your
15  client waived his privilege by forwarding
16  that.
17         MR. PITTS: I'm not sure he can do
18  that without Pamela's knowledge.
19         MS. SALPOGLOU: Yes, guys.
20         MR. ZELMAN: This is a tough
21  situation to sink our teeth into, but for
22  courtesy for the witness, is this a
23  question -- do you have questions for this
24  witness at this point? We can hash that out
25  afterwards, right?

Page 100

1         MS. SALPOGLOU: We can, but I just
2  want it on the record that again, we were
3  just provided these documents during the
4  deposition.
5         I haven't had a chance to go
6  through all of them, and it's 4:00 something.
7  I don't think we're going to finish today.
8         MR. PITTS: Pamela, I was going
9  to -- based on that, I was going to keep the
10  deposition open based on being provided the
11  documents the first time during the
12  deposition.
13         MR. ZELMAN: We got these documents
14  yesterday. I didn't realize you guys didn't
15  get them.
16         MR. PITTS: Well, we can't be given
17  documents during a deposition and be asked to
18  review them and --
19         MS. SALPOGLOU: And clearly with
20  the attorney-client privileged information
21  that should not have been produced, I'm going
22  to need time. I need to go through this.
23  It's 127 pages.
24         MR. PITTS: So I think what Pamela
25  and I -- my request is the deposition has to



Page 101

1  be kept open based on that.
2         MS. SRECA: For the record, we did
3  not receive the document production from any
4  other defendants, either. We haven't seen
5  anything that was presented yesterday as
6  well. So...
7         MR. PITTS: Yeah, I guess that
8  doesn't have any relevance. I appreciate
9  that, but it doesn't have any relevance to
10 what we're talking about now, which is
11 documents that were provided during this
12 deposition.
13        MS. ATTARCHI: I understand the
14 issue, but I would be asking Attorney Pitts
15 and Attorney Salpoglou that you can send us
16 your production as well.
17        MS. SALPOGLOU: I produced
18 everything to all the attorneys that were of
19 record when I produced my answer.
20        MR. PITTS: And I think I did too,
21 and I don't think the other attorney in your
22 office was of record when I did.
23        MS. SALPOGLOU: That's correct.
24        MS. ATTARCHI: We'll go through our
25 files.

Page 102

1         MR. PITTS: Regardless --
2         MR. ZELMAN: What do you want to do
3  for Mr. Abelli? I feel bad for him.
4         MR. PITTS: I think we should
5  continue. Pamela, given that your client's
6  privilege has been kind of disclosed here,
7  what do you want to do?
8         MS. SALPOGLOU: I'm not prepared to
9  go forward, and Mr. Tedford is no longer with
10 the company as Mr. Abelli has said. So I
11 need to regroup with my client.
12        I suggest that Yitzchak completes
13 his portion today, and then we suspend and I
14 can have an opportunity to talk to my client
15 and deal with this breach of the
16 attorney-client.
17        MR. PITTS: I think that's
18 reasonable.
19        MR. ZELMAN: Okay. So I will
20 finish my questions today subject to redirect
21 when you guys ask your questions, whenever
22 that happens.
23        Give me three minutes to go over my
24 notes to see if I missed anything. Give me
25 two or three minutes, and then I can finish

Page 103

1  my questioning, okay?
2         MS. ATTARCHI: Sure.
3         (Brief recess taken.)
4         MR. ZELMAN: I got all my
5  questions, so I'm good.
6         And if you guys do not want to ask
7  questions of this witness today and reserve
8  your right to ask your questions on a later
9  date, let us know so we can let the witness
10 go.
11        MR. PITTS: I'm going to ask a few,
12 and then we'll suspend since we're suspending
13 anyway.
14        MR. ZELMAN: Sure.
15        MR. PITTS: I'm going to ask some
16 questions, and then I'm going to reserve the
17 right to ask the rest of my questions.
18        MR. ZELMAN: Go ahead.
19 EXAMINATION BY MR. PITTS:
20    Q   I'm Brendan Pitts. I represent
21 Andrew Metcalf, Judgment Acquisitions
22 Unlimited and Champion Funding.
23    A   Okay.
24    Q   I just want to go over one or two
25 verifications briefly here.

Page 104

1         Mr. D'India, am I correct you
2  verified the registered owner of the Mini
3  Cooper using a program using LP Police?
4     A   Correct.
5     Q   Does he do that before he seizes
6  the vehicle?
7     A   To my knowledge, yeah. He usually
8  does that before seizing a vehicle.
9     Q   And do you still have the Abelli
10 Bates stamp production available to you
11 there?
12    A   Give me one second.
13    Q   When you get it up, I just want you
14 to go to -- to go towards the back.
15    A   So towards the end?
16    Q   Yes.
17    A   Okay.
18    Q   Go to Bates stamp Abelli 126. It's
19 got the green highlights on it.
20    A   Yep. I believe that -- I don't
21 know if that's ATLAS or if that's LP.
22    Q   I want to direct your attention to
23 the middle of the document at the top. It
24 says, "LP Police."
25        Do you see that?



Page 105

1    A   I see it.  It looks like there was
2  two pieces of paper on top of each other.  I
3  see it.
4    Q   After reviewing this, is this your
5  understanding that this was the LP Police
6  report for Sergio Espinosa?
7    A   Yes.  It has no -- it doesn't say
8  Junior or Senior on it.
9    Q   I'll direct your attention to the
10  DOB.
11    A   Yes, I see it.
12    Q   Based on that date of birth, am I
13  correct it's Sergio Espinosa, Senior?
14    A   That is correct.
15        MR. PITTS:  Yitzchak, I know you
16  didn't mark any of them, but which ones did
17  you mark?
18        MR. ZELMAN:  I didn't mark
19  anything.  I just identified everything by
20  Bates number.
21        The only thing I marked was Exhibit
22  A, the policies and procedures from LP
23  Police.
24        MR. PITTS:  Charlene, I want to
25  mark Abelli 126, as Exhibit B.

Page 106

1        (Above-mentioned document marked
2  for Identification.)
3    Q   So this document we marked as
4  Exhibit B, Brian, is the LP Police Report
5  that was run for Sergio Espinosa, Senior,
6  correct?
7    A   Yes.
8    Q   And do you know who did the green
9  highlighting?
10    A   After I was asked, my guess is I
11  highlighted it.
12    Q   Okay.
13    A   And there were -- sorry.
14    Q   Are you finished with your answer?
15    A   Oh, I said when I was asked to get
16  information, this is what I looked up and
17  this is what was given to me.  And the
18  information for the Mini Cooper is obviously
19  ownership of Senior.
20        That's why I would have highlighted
21  it to show that yes, it is actually -- it
22  would be, in fact, Senior and not Junior
23  given the date of birth and the social, even
24  though it doesn't signify Junior or Senior on
25  the paperwork.

Page 107

1    Q   So Mass Constables has the
2  information Judgment Acquisitions Unlimited
3  provided with its letter to you showing that
4  Mr. Espinosa, Senior, was the registered
5  owner of the Mini Cooper.
6        Is that correct?
7    A   Correct.  I believe the paperwork
8  that they gave us had Senior as the primary
9  owner, which makes him the first owner or
10  however you want to look at it, but he was
11  the primary owner.
12    Q   Okay.
13    A   And this came up as the primary
14  owner, also.
15    Q   So Mass Constables' own LP Police
16  report is consistent with the information
17  that Judgment Acquisitions provided?
18    A   It is.
19    Q   And am I correct you did another
20  verification for ownership of the Mini
21  Cooper, correct?
22    A   We did.  It was after -- it was
23  quite a while after we got the ATLAS system
24  being that, you know we've already heard all
25  this stuff was coming about with, you know,

Page 108

1  the Espinosas and this case.  So we ran it
2  through ATLAS, which is through the RMV
3  itself.
4    Q   Was the ATLAS search consistent
5  with the information you found in the LP
6  Police report and the information that
7  Judgment Acquisitions Unlimited had provided?
8    A   I believe so, and I believe I also
9  attached that paperwork.
10    Q   Okay.  So --
11    A   I don't know exactly where, but
12  I -- I'm sorry, go ahead.
13    Q   Okay.  So am I correct there was
14  three sources of information, all of which
15  showed that Mr. Espinosa, Senior was the
16  registered owner of the Mini Cooper?
17    A   That is correct.
18    Q   Prior to you being brought into
19  this litigation as a defendant, had you ever
20  seen any documents showing that -- strike
21  that.
22        MR. PITTS:  I think I'm good for
23  now.
24    Q   Well, actually, one more.
25        Do you know when you ran that ATLAS



Page 109

1  report?
2      A   Well, I -- I don't know.  I
3  would -- I might be able to look it up via
4  e-mail or whatnot, but I would have to
5  research and find out when it was ran.
6      Q   Okay.
7      A   And I do know that it was done
8  after --
9      Q   You broke up.  I'm sorry.
10     A   I know the ATLAS report was
11 definitely done after we seized the vehicle.
12 And it was quite a time after we seized the
13 vehicle, but I would actually have to look up
14 and see if I can find it.
15     Q   Okay.  In the Abelli Bates stamp,
16 can you go to Abelli page 31, please?
17     A   Sure.
18     Q   Let me know when you're there.
19     A   Page 31, yep.
20         Got it.
21     Q   At the top -- and we went over this
22 before, but am I correct this is an e-mail
23 from you to Tom Tedford and my client on
24 January 22, 2021?
25     A   Yes.

Page 110

1          MR. PITTS:  Charlene, I'm going to
2  mark this as Exhibit C.
3          (Above-mentioned document marked
4  for Identification.)
5      Q   I want to go to the bottom of that
6  first e-mail.
7          It reads, "I am one hundred percent
8  willing to help unmess this stuff because
9  we're not in the business of taking vehicles
10 without investigating prior to seizure."
11         You go on to say, "We use both LP
12 Police and ATLAS from the RMV."
13         Do you see that?
14     A   Yes, I see that.
15     Q   So as of January 22, 2021, you're
16 informing them that you're using the ATLAS
17 program at that time, correct?
18     A   Yes, that would make sense.
19     Q   At least as of January 22, 2021,
20 you were using the ATLAS program, right?
21     A   Correct.
22     Q   Okay.  And just to be clear, the
23 ATLAS program pulled this information
24 directly from the Registry of Motor Vehicles?
25     A   It is.  That is their program.

Page 111

1      Q   Okay.
2          MR. PITTS:  I'm going to suspend
3  the deposition now for the reasons we
4  discussed earlier.
5          MR. ZELMAN:  I just have a couple
6  of questions based on this.  I don't want to
7  leave it for the next time because I won't
8  remember them.
9  CONTINUED EXAMINATION BY MR. ZELMAN:
10     Q   Based on the LP Police report that
11 we were looking at earlier, I just have two
12 or three questions on that and then we can
13 go.
14     A   Okay.
15     Q   So if you can turn back to that LP
16 report, Mr. Abelli.
17     A   Sure.
18         That's at the end, right?
19     Q   Yes.  I'm going to give you the
20 exact page number right now.
21     A   I found it.
22     Q   What page are you at?
23     A   126.
24     Q   Yes, exactly.
25         First of all, this is a two-page

Page 112

1  document, correct?
2      A   Correct.
3      Q   Now, did you pull this document or
4  did someone else pull this document?
5      A   I don't have access to it, so it
6  was probably pulled by Sergeant D'India.
7      Q   Okay.  And this is not the complete
8  document, is it?
9          This looks like you just put
10 together the two pages that you believe are
11 relevant to this action.
12     A   I couldn't tell you yes or no.
13 This looks like that was continued on a
14 second page.
15     Q   Right.
16         But to your understanding, is this
17 the complete document or is it not a complete
18 document?
19     A   I'd say it's possibly complete
20 because it goes into a Honda Civic, a 2018,
21 and 2017 Kia Soul.  So the Mini Cooper is
22 what was highlighted.
23     Q   Right.
24         But you would agree that this is
25 not the complete LP Police report that was

Page 113

1  pulled that day, right?
2      A   I would probably say probably not.
3  There's probably more pages to it.
4      Q   And do you know the date that this
5  LP report was pulled?
6      A   I don't.
7      Q   Do you believe it was pulled before
8  the seizure or after?
9      A   It was definitely done before the
10  seizure.
11     Q   Okay.  Well, if you look on the LP
12  Police report, on the second page of the
13  report -- it's still Bates Abelli 126 -- you
14  have two pages together, right?
15     A   Okay.
16     Q   And on the top left of the second
17  page, which comes out somewhere in the middle
18  on this page, it says "LP Police" in the
19  middle.
20         Do you see that?
21     A   I do.
22     Q   And on the far left, it has a date
23  that's cut off, but it says -- the month is
24  cut off, but we have the day, which is 17 and
25  the year, which is 2021.

Page 114

1      A   Where is that at?
2      Q   So again, on Abelli 126, it's two
3  pages of the report that are together.
4         Do you see that?
5      A   I do.
6      Q   And just about the middle of the
7  page, where the two pages come together --
8      A   Okay.
9      Q   -- it looks to be the header of
10  that second page.
11         Do you see that?
12     A   "Registration current, expires."
13         Yes, I see that.
14     Q   Okay.  So in the header of that
15  second page where it says, "LP Police," on
16  the left -- on the far left, it appears to
17  have a date of some month, then the date 17,
18  and then the year 2021.
19         Do you see that?
20     A   I do, I think.
21         Yeah, I see it.
22     Q   Does that reflect the date when it
23  was pulled?
24     A   Oh, I see now, okay.
25         Yes, I would say that would be

Page 115

1  correct.
2      Q   That would be the date that the
3  report was pulled, correct?
4      A   Either that or a date that it
5  was -- I don't know.  That would be my guess.
6      Q   Okay.  So your guess would be that
7  report was not pulled before the seizures in
8  September and October of 2020, correct?
9      A   So he's not going to print a
10  report.  He's going to look at it.  That's
11  what he -- so when he pulled this, that was
12  probably due to all the legalities that your
13  client was going through with judgment
14  acquisitions and Export.
15         So that would be my guess of why
16  this -- why we actually printed it out as to
17  support for those two other clients, but
18  prior to taking the vehicle, he ran it that
19  day or the day before to make sure the
20  vehicle was -- and if this report is printed
21  out, it's because it was at a request to help
22  the other two clients.
23         Like I said, we weren't brought in
24  to this until way after the fact, and then we
25  were brought in as an empty chair as opposed

Page 116

1  to that's what you told me before.
2      Q   Okay.  So just to clarify, you
3  don't know when this report was pulled, do
4  you?
5         MR. PITTS:  You're referring to
6  the -- to the printed report, right, the
7  paper?
8         MR. ZELMAN:  Yes.
9      Q   You don't know when that report was
10  pulled, do you?
11     A   I don't.
12     Q   Okay.  And if we're trying to
13  figure out what month and date that record
14  was pulled -- and if you can turn to Bates
15  Abelli 55, which is in that same production,
16  page 55.
17     A   Okay.
18     Q   And just let me know when you're
19  there.
20     A   Okay.  Got it.
21     Q   Okay.  On February 17, 2021, you
22  write to Mr. Tedford, "Here is the
23  information off of the site we use to check
24  registration ownership."
25         Do you see that?

Page 117

1    A    Okay.
2    Q    So the day matches up, 17, the year
3  matches up, 2020, and we have the month,
4  February.
5        Do you believe that LP Police
6  report was pulled on February 17, 2021?
7    A    Okay. It seems right.
8    Q    Okay.
9        MR. ZELMAN: I have no further
10  questions, unless anyone else does.
11       We're going to suspend the
12  deposition, and that means you're free to go,
13  but I'm not going to say that until someone
14  confirms.
15       MS. SALPOGLOU: I just would like
16  to ask just a couple real quick.
17       MR. ZELMAN: Sure.
18  EXAMINATION BY MS. SALPOGLOU:
19    Q    Mr. Abelli, I just want to ask just
20  a few questions for you.
21       With reference to my client, who
22  was Export Enterprises of Massachusetts,
23  Inc., does Export ever have any control over
24  what vehicles it will seize at your request?
25    A    So when we have a vehicle that

Page 118

1  needs to be seized, if the vehicle is on
2  site, we'll call up Export or whatever tow
3  company and we tell them that hey, this is a
4  vehicle and they seize that vehicle.
5        We give them the -- the order, you
6  know, just in case, you know, because we had
7  people call local PD and say hey, my car was
8  stolen when, in fact, they know it wasn't.
9  So the tow truck driver is giving me payment
10  work as far as judgment.
11    Q    So my question directly is in this
12  particular case, did Export, my client, seize
13  the Mini Cooper at the request of
14  Massachusetts Constables Office?
15    A    Yes.
16    Q    In this case, did Export, my
17  client, seize the Honda Accord at the request
18  of Massachusetts Constables Office?
19    A    Yes.
20    Q    In this particular case, did my
21  client, Export, release the Mini Cooper upon
22  your written release?
23    A    Yes.
24    Q    In this particular case, did my
25  client, Export, release the Honda Accord on

Page 119

1  your written release?
2    A    Yes.
3    Q    Okay.
4        MS. SALPOGLOU: I'm going to
5  suspend for the moment.
6        MR. ZELMAN: Okay. Is that it for
7  today, guys?
8        MS. SALPOGLOU: Yes.
9        MR. ZELMAN: Thank you very much.
10       MR. PITTS: Thank you.
11       MS. ATTARCHI: Thank you.
12       (Whereupon, the deposition was
13  concluded at 4:45 p.m.)
14       (Witness was excused.)
15       MR. ZELMAN: Regular delivery on
16  the transcript.
17       MS. SRECA: Same for us. Thanks.
18       MR. PITTS: I will take a copy.
19       MS. SALPOGLOU: No transcript for
20  us at this time. Thanks.
21
22
23
24
25

Page 120

1            C E R T I F I C A T E
2        I, CHARLENE FRIEDMAN, a Certified Court
3  Reporter and Notary Public, qualified in and for
4  the State of New Jersey do hereby certify that
5  prior to the commencement of the examination BRIAN
6  ABELLI was duly sworn by me to testify to the truth
7  the whole truth and nothing but the truth.
8        I DO FURTHER CERTIFY that the foregoing
9  is a true and accurate transcript of the testimony
10  as taken stenographically by and before me at the
11  time, place and on the date hereinbefore set forth.
12       I DO FURTHER certify that I am neither a
13  relative of nor employee nor attorney nor counsel
14  for any of the parties to this action, and that I
15  am neither a relative nor employee of such attorney
16  or counsel, and that I am not financially
17  interested in the action.
18
19
20
21  CHARLENE FRIEDMAN, RPR, CRR, CCR of the
22  State of New Jersey
23  License No: 30XI00204900
24  Date:  June 1, 2022
25

## Page 121

```
1                    LAWYER'S NOTES
2    PAGE  LINE
3    ___  ___    _____
4    ___  ___    _____
5    ___  ___    _____
6    ___  ___    _____
7    ___  ___    _____
8    ___  ___    _____
9    ___  ___    _____
10   ___  ___    _____
11   ___  ___    _____
12   ___  ___    _____
13   ___  ___    _____
14   ___  ___    _____
15   ___  ___    _____
16   ___  ___    _____
17   ___  ___    _____
18   ___  ___    _____
19   ___  ___    _____
20   ___  ___    _____
21   ___  ___    _____
22   ___  ___    _____
23   ___  ___    _____
24   ___  ___    _____
25   ___  ___    _____
```

## Page 122

```
1                DEPOSITION ERRATA SHEET
2
3    Assignment No. J8270227
4    Case Caption: Espinoza v. Metcalf, et al.
5
6
7         DECLARATION UNDER PENALTY OF PERJURY
8         I declare under penalty of perjury
9    that I have read the entire transcript of
10   my Deposition taken in the captioned matter
11   or the same has been read to me, and
12   the same is true and accurate, save and
13   except for changes and/or corrections, if
14   any, as indicated by me on the DEPOSITION
15   ERRATA SHEET hereof, with the understanding
16   that I offer these changes as if still under
17   oath.
18
19
20
21        Signed on the _____ day of
22        _____, 20____
23
24   _____
25                BRIAN ABELLI
```

## Page 123

```
1                DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25                BRIAN ABELLI
```

## Page 124

```
1                DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25                BRIAN ABELLI
```

