## Page 1

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Case Number 1:21-cv-10356-DJC

*****************************************
SERGIO ESPINOSA, SR. And SERGIO   *
ESPINOSA, JR.,   *
        Plaintiffs,   *
           v   *
             *
ANDREW C. METCALF, d/b/a JUDGMENT   *
ACQUISITIONS UNLIMITED, CHAMPION   *
FUNDING, INC. And EXPORT ENTERPRISES, *
INC. BRIAN ABELLI and MASSACHUSETTS   *
CONSTABLE INC., D/B/A MASSACHUSETTS   *
CONSTABLES OFFICE,   *
Defendants.   *
*****************************************

Zoom Deposition of SERGIO ESPINOSA, SR.,
taken on behalf of Andrew C. Metcalf, Judgment
Acquisitions and Champion Funding, pursuant to Notice
under the Federal Rules of Civil Procedure, before
Janice A. Maggioli, RPR, RMR, CRR, and Notary Public
in and for the Commonwealth of Massachusetts, at 1366
Bridge Street, Dracut, Massachusetts, on June 17,
2022, commencing at 2:05 p.m.

COPLEY COURT REPORTING
71 Commercial Street
Boston, Massachusetts 02109
(617) 423-5841

## Page 2

1  APPEARANCES:

2  FLAVIN PITTS, P.C.
   [By Brendan R. Pitts, Esq.]
3  424 Adams Street, Suite 100
   Milton, Massachusetts 02186
4  T: (617) 698-3000
   E: bpitts@flavinpitts.com
5    On behalf of Andrew C. Metcalf, Judgment
   Acquisitions and Champion Funding.

6  MARCUS & ZELMAN, LLP
7  [By Yitzchalk Zelman, Esq.]
   701 Cookman Avenue, Suite 300
8  Asbury Park, New York 07712
   T: (732) 695-3282
9  E: yzelman@marcuszelman.com
   On behalf of the Plaintiffs.

10

   PAMELA SALPOGLOU LAW OFFICE
11  [By Pamela Salpoglou, Esq.]
   One Cabot Place
12  Stoughton, Massachusetts 02072
   T: (781) 341-0166
13  E: esqesp@comcast.net
   On behalf of Export Towing.

14

   SIMONS LAW OFFICE
15  [By Joseph B. Simons, Esq.]
   10 Post Office Square, Suite 800
16  Boston, Massachusetts 02109
   T: (781) 797-0555
17  E: joe@jbsimonslaw.com
   On behalf of Brian Abelli and Natalie Sreca.

18
19
20
21
22
23
24

## Page 3

3

1         I N D E X

2  -------------------------------------------

  WITNESS:                PAGE

3  -------------------------------------------

4  SERGIO ESPINOSA, JR.
   EXAMINATION BY:
5    MR. PITTS            4
   MS. SALPOGLOU       87,130
6    MR. SIMONS         118
   MR. ZELMAN         126

7

8  -------------------------------------------

  EXHIBITS     DESCRIPTION     PAGE

9  -------------------------------------------

10  1   Response to Interrogatories

11  2   Response to Export Towing's

12     Interrogatories

13  3   Copy of Certificate of Registration

14  4   E-mail September 24, 2020

15

16   (Exhibits e-mailed to all counsel.)

17
18
19
20
21
22
23
24

## Page 4

4

1      STIPULATIONS

2     It is agreed by and between counsel for the

3  respective parties that the reading and signing of

4  the deposition will not be waived. All objections,

5  except as to the form of the question, and motions to

6  strike will be reserved until the time of trial.

7     (Exhibits 1-5 premarked for identification.)

8

9     SERGIO ESPINOSA, JR.,

10     A witness, having been satisfactorily

11  identified and duly sworn by the Notary

12  Public, was examined and testified as

13  follows:

14     MR. PITTS: Counsel, the usual stipula-

15  tions again?

16     MR. ZELMAN: Yes.

17     MS. SALPOGLOU: Yes.

18     MR. SIMONS: Yes.

19     MR. PITTS: So we'll reserve all

20  objections, except as to form, and motions to strike

21  for the time of trial. Yitzchalk, again, we'll do 30

22  days, waive notary?

23     MR. ZELMAN: Yes.

24    EXAMINATION BY MR. PITTS

**5**

1    Q. Mr. Espinosa, my name is Brendan Pitts.
2 I represent Andrew Metcalf, Judgment Acquisitions, and
3 Champion Funding.
4    Have you ever had your deposition taken
5 before?
6    A. **No.**
7    Q. I'm going to go through a few rules to
8 make it go smoothly. The first is, as you can see,
9 this is not like a normal conversation, so I ask that
10 you let me finish my full question and you provide
11 your full response and we don't talk over each other,
12 okay?
13    A. **Okay.**
14    Q. The second thing is if you want to take a
15 break, you can do so, but you have to answer the
16 question that's pending before you take the break,
17 okay?
18    A. **Okay.**
19    Q. If you don't understand any of my
20 questions, please just tell me.
21    Are you on any medications that would prevent
22 you from understanding or answering my questions
23 today?
24    A. **No.**

**6**

1    Q. Can you state your full name, please.
2    A. **Sergio Espinosa, Junior.**
3    Q. Do you have a middle initial or name?
4    A. **No.**
5    Q. Date of birth?
6    A. **1/19/91.**
7    Q. What's the last four of your Social?
8    A. **3683.**
9    Q. What's your current occupation?
10    A. **I'm a software technician.**
11    Q. Where?
12    A. **Zoll Medical Corporation.**
13    Q. Did you say "Zone"?
14    A. **Zoll, Z-O-L-L.**
15    Q. I'm sorry, you broke up. D-O-L-L?
16    A. **No, Z for zebra, O for Oscar, L for Lima,**
17 **L for Lima. Zoll.**
18    Q. Got it, okay. How long have you worked
19 there?
20    A. **Going on three years now.**
21    Q. So were you working there in September of
22 2020?
23    A. **Yes.**
24    Q. Do you go by any other names?

**7**

1    A. **Just my suffix, Junior.**
2    Q. That's like a nickname?
3    A. **Yeah.**
4    Q. What's your current address?
5    A. **305 Dutton Street, Lowell, Massachusetts,**
6 **01854.**
7    Q. How long have you lived there?
8    A. **About a year now.**
9    Q. Where did you live prior to that?
10    A. **1366 Bridge Street, Dracut,**
11 **Massachusetts, 01826.**
12    Q. That's your parents' home?
13    A. **Correct.**
14    Q. And am I correct you were residing there
15 in September of 2020?
16    A. **Yes.**
17    Q. And you were residing there with your
18 sister and your two parents?
19    A. **Yes, stepmom.**
20    Q. I'm sorry?
21    A. **Stepmom.**
22    Q. And was anyone else living there at the
23 time?
24    A. **My girlfriend stayed with me. She was**

**8**

1 **actually -- she stayed with me sometimes, but she**
2 **didn't reside here.**
3    Q. And just estimate for me, how often would
4 she stay at the house?
5    A. **Pretty often.**
6    Q. How would she get there?
7    A. **She would drive.**
8    Q. She would drive her car?
9    A. **I'm sorry?**
10    Q. She would drive her car to your house?
11    A. **Yes.**
12    Q. What kind of car did she have?
13    A. **She has a Toyota Corolla.**
14    Q. In September of 2020 were you also the
15 owner of a Toyota Corolla?
16    A. **Yes.**
17    Q. So you had one and she had one?
18    A. **No, that's my car.**
19    Q. So would she use your car to transport
20 herself?
21    A. **Correct. I leased it, but it's her car.**
22 **She uses it. She makes the payments, but it's under**
23 **my name.**
24    Q. In September of 2020 you had I think it

**9**

1 was a 2011 Mini Cooper, right?

2   A. **Yes.**

3   Q. Would your girlfriend always have

4 possession of the Toyota Corolla in September of 2020?

5   A. **Yes.**

6   Q. In other words, that was basically her

7 car. If she was to come to your house or leave your

8 house, go to work or wherever, she would drive the

9 Corolla?

10   A. **Correct.**

11   Q. Who made the payments on the Corolla?

12   A. **She makes the payments.**

13   Q. Do you know what year the Corolla is?

14   A. **2020.**

15   Q. In September of 2020 what kind of car did

16 your dad drive?

17   A. **A Honda Accord I believe it is, a Honda**

18 **Accord.**

19   Q. As I said before, my client is Judgment

20 Acquisitions Unlimited is the name of it. Did you

21 ever speak on behalf of your father regarding debts he

22 owed to Judgment Acquisitions?

23   A. **I did.**

24   Q. Do you remember the first time you spoke

**10**

1 to him?

2   A. **I don't.**

3   Q. Do you know whether you spoke to them at

4 all prior to your Mini Cooper being seized in

5 September of 2020?

6   A. **I don't recall.**

7   Q. We're here today because you filed a

8 lawsuit regarding the seizure of your 2011 Mini

9 Cooper, correct?

10   A. **Correct.**

11   Q. When was the Mini Cooper seized?

12   A. **September of 2020.**

13   Q. If I told you it was September 22nd of

14 2020, would that sound about right?

15   A. **That sounds about right.**

16   Q. Did your dad ever file with the Registry

17 of Motor Vehicles to be a registered owner of the 2011

18 Mini Cooper?

19   A. **No.**

20   Q. Do you know why three separate databases

21 online show him as a registered owner of the Mini

22 Cooper?

23   A. **I don't know.**

24   Q. What time of day was your Mini Cooper

**11**

1 seized; do you remember?

2   A. **Late at night. It was dark out.**

3   Q. Late at night on the 22nd?

4   A. **I think it was about between 2 and 3 in**

5 **the morning.**

6   Q. Do you think it was between 2 and 3 in

7 the morning on the 22nd?

8   A. **I don't recall.**

9   Q. In any event, it's your recollection it

10 was early in the morning?

11   A. **About 2 or 3 in the morning.**

12   Q. How did you learn that your Mini Cooper

13 was being seized?

14   A. **When I walked outside, when I went**

15 **outside.**

16   Q. How did you know to come outside?

17   A. **My father called me.**

18   Q. When your father called you, do you know

19 where he was?

20   A. **He was outside, outside.**

21   Q. Was anyone else outside with him?

22   A. **His wife.**

23   Q. Your stepmother?

24   A. **Right.**

**12**

1   Q. Was anyone else outside?

2   A. **The tow truck and the -- the tow truck**

3 **gentleman and the constable gentleman.**

4   Q. Anybody else?

5   A. **I don't recall.**

6   Q. Where were you when your dad called?

7   A. **Upstairs, second floor.**

8   Q. Am I correct that you live -- you lived

9 at the time upstairs on the second floor of that

10 house?

11   A. **Correct.**

12   Q. When he called, were you sleeping?

13   A. **I believe I was.**

14   Q. Did you hear a dog barking?

15   A. **Yes.**

16   Q. So what woke you up, the dog barking or

17 your dad calling?

18   A. **My dad calling woke me up.**

19   Q. What did your dad say?

20   A. **He told me to come downstairs**

21 **immediately. They are taking my car.**

22   Q. So at the time he calls, you are in bed?

23   A. **Correct.**

24   Q. Did your dad's phone call -- it sounds

**13**

1 like it was pretty urgent, correct?
2     A. **Yes.**
3     Q. Did you immediately go downstairs to meet
4 your dad?
5     A. **Yes.**
6     Q. Did you take anything with you?
7     A. **My cellphone that I had in my hand and I**
8 **grabbed my keys.**
9     Q. Why did you grab your keys?
10     A. **Because he mentioned that my car is being**
11 **taken.**
12     Q. So do you look out any window or do you
13 go directly to a side door exit?
14     A. **Directly to the side door.**
15     Q. When you get to the side door, where is
16 your dad?
17     A. **On the driveway.**
18     Q. What's he doing?
19     A. **As soon as I got downstairs, he's just**
20 **outside in the driveway on the side of the vehicle,**
21 **the Mini Cooper.**
22     Q. Where was the Mini Cooper?
23     A. **On the side driveway.**
24     Q. Was it attached to a tow truck?

**14**

1     A. **Yes.**
2     Q. The tow truck, was it like a flatbed or
3 was it one of those where the car attaches kind of to
4 the end and the back wheels stay on the road
5 (Indicating)?
6     A. **I believe a flatbed.**
7     Q. And when you get down there, the truck is
8 on the flatbed and your dad is standing next to it?
9     A. **The car is not on the flatbed. The car**
10 **is hooked up to chains.**
11     Q. Can you describe to me the position of
12 the car at that point in time?
13     A. **All four wheels were on the driveway.**
14     Q. Did it appear that the tow truck company
15 had moved your car at all?
16     A. **I don't recall.**
17     Q. Did it appear that they had towed it with
18 chains or anything the first time you saw it?
19     A. **I don't recall.**
20     Q. When you get outside and your dad is in
21 the driveway, where is the tow truck driver?
22     A. **In front of my father.**
23     Q. Are they talking?
24     A. **I don't think so because as soon as I got**

**15**

1 downstairs, I was the main attention. Both the
2 constable and the tow truck driver kind of approached
3 me.
4     Q. When you first saw the tow truck driver
5 standing in front of your father, what was he doing?
6     A. **I just seen them in front of each other.**
7     Q. Was he doing anything, any movements, any
8 activity?
9     A. **I don't recall.**
10     Q. Where was the constable?
11     A. **Next to my father.**
12     Q. Was your dad talking to the constable?
13     A. **I don't recall.**
14     Q. What was your mom doing?
15     A. **My mom is in New Jersey. She was in New**
16 **Jersey.**
17     Q. I'm sorry, your stepmother. Your
18 stepmother that was outside, what was she doing?
19     A. **She was -- I don't think I saw her**
20 **immediately when I got downstairs. It's kind of a**
21 **sharp curve between my end once I get downstairs to**
22 **the center of the driveway.**
23     Q. When you get downstairs and exit the side
24 door, is the tow truck in the driveway or is it on the

**16**

1 street?
2     A. **Driveway.**
3     Q. And where is your car? Is it also in the
4 driveway or is it on the street?
5     A. **Driveway.**
6     Q. So both the tow truck and your car are on
7 the -- in your driveway?
8     A. **Not -- my car was in my driveway. The**
9 **tow truck was in between my driveway and the**
10 **neighbor's front yard.**
11     Q. After you initially see what you just
12 described for us, what did you do next?
13     A. **I was approached by the constable**
14 **gentleman.**
15     Q. What did the constable look like?
16     A. **Just a male, probably mid-30's, 40's.**
17     Q. How tall?
18     A. **I don't recall.**
19     Q. Taller than you?
20     A. **Yes.**
21     Q. How tall are you?
22     A. **Five-seven.**
23     Q. Was he significantly taller than you?
24     A. **I don't recall.**

**17**

1     Q. What was he wearing?

2     A. He was dressed in all black.

3     Q. Did it have any writing on it?

4     A. He had his vest over his outfit. He had

5 a vest over an outfit.

6     Q. Would you describe it as a uniform?

7     A. I don't know what you mean by "uniform."

8     Q. Well, did he look like he was on his day

9 off or did he look like he was a constable at work?

10 Was he wearing a constable uniform?

11     A. I've never met a constable before.

12     Q. Why don't you describe for me what he was

13 wearing.

14     A. He was wearing black pants, black shirt.

15 He was wearing a black vest over his black shirt.

16     Q. Did he have a hat on?

17     A. I don't recall.

18     Q. What kind of shoes was he wearing?

19     A. I don't recall.

20     Q. Were they black?

21     A. I don't recall.

22     Q. Did he have a gun attached to his belt?

23     A. He did have something on his belt. I

24 don't know if it was a gun. It could have been a

**18**

1 radio. I don't recall.

2     Q. Did he have anything else on his belt?

3     A. I don't remember.

4     Q. The constable, what's the first thing he

5 says to you when he comes over to you?

6     A. He had two pieces of paper in his hand.

7 He ripped one up and gave me the first page out of the

8 two papers.

9     Q. And what was the paper?

10     A. They had Andrew's Judgment Acquisition

11 information. He said give them a call in the morning.

12     Q. What else did the paper say?

13     A. I don't know what the paper said. I

14 can't remember.

15     Q. What did you do with the paper?

16     A. I kept it.

17     Q. Now, at that point in time what did you

18 do with it?

19     A. I kept it.

20     Q. Did you just hold onto it? Did you put

21 it in your pocket? Did you give it to your stepmom?

22     A. I don't recall.

23     Q. Did the constable say anything else to

24 you?

**19**

1     A. He did inform me that the car is being

2 towed because of a credit card debt.

3     Q. Did he say whose credit card debt it was?

4     A. Yes.

5     Q. What did he say?

6     A. He says, "Sergio Espinosa."

7     Q. Is that all he said? Did he say Junior

8 or Senior?

9     A. I don't recall.

10     Q. Did the paper that you were holding that

11 he gave to you, did that say Junior or Senior?

12     A. I will have to look at the paper.

13     Q. After he tells you it's a credit card

14 debt of Sergio Espinosa, did he say anything else?

15     A. I don't recall.

16     Q. What did you say in response?

17     A. I did explain to him that it's -- at some

18 point in time we found out that they were there for a

19 credit card debt for my father. I don't recall how I

20 was informed or what gave it away, but I do recall

21 instructing him that's my car.

22     Q. I want to stay with the conversation you

23 were having with him initially in the driveway when he

24 comes up to you and he gives you a piece of paper and

**20**

1 he tells you it's a credit card debt.

2     A. Okay.

3     Q. He tells you it's a credit card debt.

4 What do you say in response?

5     A. I don't know what I responded two years

6 ago.

7     Q. There's a constable in front of you.

8 They are telling you it's credit card debt. Your Mini

9 Cooper is chained to a tow truck and being pulled onto

10 a tow bed, and you don't remember what your response

11 was?

12     A. I don't. I was sleeping when my father

13 called me.

14     Q. So your car is being towed for a credit

15 card debt. It's connected to the tow truck, and you

16 have no recollection as to what your reaction was to

17 that situation?

18     A. I didn't say that. You are asking me

19 what I responded back to him. I don't know exactly

20 what I responded back to him.

21     Q. Was there any other communication between

22 you and the constable at that point?

23     A. There was definitely conversation between

24 us. Do I recall exactly what was said? No, I don't

**21**

1  recall exactly what came out of my mouth.
2      Q. At the point in time you are done
3  speaking with the constable. Where is the Mini
4  Cooper?
5      A. **In the driveway.**
6      Q. Had it moved at all from the location you
7  saw it when you walked out the side door?
8      A. **No.**
9      Q. The tow truck driver hadn't further towed
10 it or done anything to further the tow of the car at
11 that point?
12     A. **He was working on it, but the tow truck**
13 **remained on the driveway.**
14     Q. The tow truck or your car?
15     A. **I'm sorry, both. My car remained on the**
16 **driveway.**
17     Q. While you are talking to the constable,
18 what's the tow truck driver doing?
19     A. **He is getting everything situated to**
20 **further tow the car.**
21     Q. What did you do after your interaction
22 with the constable?
23     A. **I opened my vehicle and I showed him my**
24 **registration.**

**22**

1      Q. Was your car locked?
2      A. **Yes.**
3      Q. And did the constable or the tow truck
4  driver tell you that you couldn't access the vehicle
5  or that you weren't allowed to at that point or give
6  you any indication that you shouldn't be touching your
7  vehicle?
8      A. **No.**
9      Q. After you retrieved the registration,
10 what do you do next?
11     A. **I showed it to the constable. I believe**
12 **at that point the tow truck gentleman approached the**
13 **situation because I wanted to show him that they**
14 **shouldn't be towing my car. This is my car. The tow**
15 **truck driver said he's there to do his job, and the**
16 **constable just followed up with his orders to proceed**
17 **to take the car.**
18     Q. Did you direct them to the car in the
19 driveway that was your dad's?
20     A. **What do you mean "direct them?"**
21     Q. Tell them if it's my dad's credit card
22 debt, my dad's car is over there?
23     A. **No.**
24     Q. If they have got your car attached to a

**23**

1  tow truck and they are going to take it away and you
2  are out there in the middle of the morning and they
3  are telling you your dad has got credit card debt, you
4  don't tell them, Well, his Honda Accord is over there,
5  take that one?
6      A. **No.**
7      Q. You just let them take your car?
8      A. **They said they were taking it. They were**
9  **there for that car. It wasn't my decision if they**
10 **were taking the car or not. The car was being taken.**
11     Q. After you show the registration -- I'm
12 sorry, was it the constable or the -- who told you
13 that -- who did you show the registration to?
14     A. **I showed it to the constable. I don't**
15 **know how much the tow truck driver seen, but he was**
16 **there at the moment. He leaned over to kind of see**
17 **what was going on. I don't know of the paper he seen.**
18     Q. After the constable tells you that he is
19 taking the car, what happens next?
20     A. **The car was taken.**
21     Q. The car is on the ground still, right?
22 Is that correct? You have to say yes.
23     A. **Yes, sorry.**
24     Q. At the time the constable tells you after

**24**

1  you showed him the registration that he is still
2  taking the car, where is the car at that point?
3      A. **On the driveway.**
4      Q. What happens next?
5      A. **The registration goes back in my vehicle.**
6  **I close the door, lock the car, and I think that that**
7  **was it. Then the car went off from there.**
8      Q. What do you do after -- well, let me back
9  up.
10     The tow truck drives away. Is the constable
11 still there?
12     A. **I don't recall.**
13     Q. After the constable told you that he is
14 taking the car, despite you showing him the
15 registration, did you communicate at all thereafter
16 with the tow truck driver or the constable?
17     A. **I don't recall.**
18     Q. Did you see the constable leave?
19     A. **I don't remember.**
20     Q. From your interrogatory answers, the
21 anger, and the embarrassment, and the anguish that you
22 suffered over this event, there seems to be a fair
23 amount of it that you don't remember. Do you know why
24 that is?

25

1    A.  No.  You are asking for specifics if I
2  remember what came out of my mouth after a response,
3  and I don't recall.
4        Q.  What did you do after the tow truck
5  driver leaves?
6        A.  I don't know how much longer I stayed in
7  the driveway, but the tow truck driver did leave with
8  the car.
9        Q.  Did anyone else come out of the house
10 other than your dad, your stepmom, and you?
11       A.  I think a neighbor came out --
12       Q.  Out of your house I'm talking about.
13       A.  I think my girlfriend came out from what
14 she told me.  I don't know how far down she made it.
15 She was probably just obviously trying to be nosy, if
16 you will, of what's going on.  I don't think she made
17 it to the driveway.
18       Q.  Did she make it outside?
19       A.  She made it outside, but I don't know how
20 far she made it outside.
21       Q.  After your Mini Cooper was taken away by
22 the truck, did you call the police?
23       A.  No.
24       Q.  Why not?

26

1        A.  I'm sorry, so you are talking about that
2  night or in the future.
3        Q.  I'm talking about the point in time that
4  you are standing in the driveway.  You have been told
5  the credit card debt is your dad's.  They take your
6  Mini Cooper instead of your dad's Accord.  They drive
7  away with it.  I'm saying at that point in time you
8  are standing there at 3 o'clock in the morning and you
9  didn't call the police?
10       A.  No.
11       Q.  Why not?
12       A.  I didn't know the constable at that
13 point.  I know how.  I think that night I believe that
14 vest had some writing that led me to believe that he
15 was some sort of police, so I didn't call the Dracut
16 police that night.
17       Q.  You believe that your car was wrongly
18 taken at that point in time, though, right?
19       A.  Yes.
20       Q.  So your car is wrongfully taken by a tow
21 truck at 3 in the morning and you don't call the
22 police?
23       A.  No.
24       Q.  Did you call anybody?

27

1        A.  No.  I was instructed to call the number
2  on the paper that I was given the next morning.
3        Q.  So what did you do next?
4        A.  I went upstairs.  I went back home.
5        Q.  And did what?
6        A.  I didn't sleep.
7        Q.  You went back to bed?
8        A.  I tried.
9        Q.  Did you have any conversation with your
10 stepmom or your dad about what just happened?
11       A.  We must have.  I don't know how long more
12 I stayed in the driveway, but I was there.
13       Q.  What did you talk about?
14       A.  I think I kind of pretty much told him
15 what the constable told me to do in the morning.  I
16 don't think he understood that part, so I kind of
17 explained it to him in Spanish.
18       Q.  And did you and your dad have any
19 conversation about, Dad, this isn't my debt, why did
20 they just take my car away?
21       A.  We were pretty much clueless that night.
22       Q.  Clueless about what?
23       A.  About what just happened.
24       Q.  Well, you know your car has been taken by

28

1  a tow truck.  You have been informed it's your dad's
2  debt, so you know all of that, right?
3        A.  I know that part, yeah.
4        Q.  And you just testified that you felt at
5  that point in time that your car was wrongfully taken,
6  right?
7        A.  Correct.
8        Q.  But you don't have a conversation with
9  your stepmom or your dad about, Hey, this has to be
10 resolved; this isn't my issue?
11       A.  We had that conversation the next day.
12 It's 3 in the morning.  There's really nobody to call
13 at that point.  We were instructed to call the number
14 on the paper the next morning, and I followed those
15 instructions.
16       Q.  When did you have that conversation that
17 you just described with your parents?
18       MR. ZELMAN:  The father and stepmom.
19       Q.  I'm sorry, my apologies.  Stepmom and
20 dad.
21       A.  What conversation?
22       Q.  You just told me that you had a conversa-
23 tion with your stepmom and your dad about the fact
24 that, Hey, it's not my debt.  They took my car.  It's

**29**

1  not my issue.  What are we going to do about it?  When
2  did that conversation take place?
3          A.  The next morning.
4          Q.  Where did it take place?
5          A.  At the house.
6          Q.  And what did your parents say in response
7  when you voiced your belief that this wasn't your
8  issue?
9          A.  Well, we just said we were going to
10  figure it out, see what's going on.  He was -- he
11  didn't know what credit card or what's the reason.  He
12  didn't recall.
13          Q.  And, again, when was that conversation?
14          A.  The next morning.
15          Q.  Was it early in the morning when you woke
16  right up or was it later in the morning?
17          A.  Early in the morning.
18          Q.  What did you do after you had that
19  conversation with your parents?
20          A.  I waited for business hours that morning.
21  The first thing I did was call that number.
22          Q.  Do you mean the Judgment Acquisitions'
23  phone number?
24          A.  That was the only number on that paper,

**30**

1  yes.
2          Q.  You called Judgment Acquisitions, and who
3  did you speak with?
4          A.  I don't recall.
5          Q.  Do you remember what they said?
6          A.  They explained the debt, pretty much what
7  was on the paper.  They said the debt belonged to my
8  father.
9          Q.  And what did you say to them?
10          A.  I explained to them that they just took
11  my car.
12          Q.  And how did you leave it with Judgment
13  Acquisitions?
14          A.  It was a lot of back-and-forth
15  conversations.  We left it I believe he did offer a
16  settlement of $4,000, and he will -- it was a $4,000
17  settlement from what I recall that he had offered over
18  the phone.
19          Q.  So now it's the next morning.  Your car
20  has been wrongfully taken in the middle of the night.
21  You have spoken to your parents.  You have called
22  Judgment Acquisitions.  You still don't have your car
23  back.  What do you do next?
24          A.  I contact my father, pretty much

**31**

1  explained to him what I was offered over the phone.
2  Again, that's -- it was towards him, so I explained it
3  to him.  Obviously he is frustrated.  He's bothered
4  because they just took my car, and I think he
5  instructed me to give them a call.  So if there's
6  something we can do to get the car back to me, he will
7  deal with whatever debt was there on his own.
8          Q.  Did you call the constable at that point?
9          A.  I don't recall.
10          Q.  Did you call the police at that point?
11          A.  I did.
12          Q.  You called the -- which police did you
13  call?
14          A.  Dracut police.
15          Q.  Did you call them by phone?
16          A.  Yes.
17          Q.  And where were you when you made that
18  phone call?
19          A.  I was home.
20          Q.  Do you remember where in the house you
21  were?
22          A.  Upstairs.
23          Q.  Was there anyone else with you when you
24  made the call?

**32**

1          A.  I don't think so.
2          Q.  What did you tell the Dracut police?
3          A.  I called them on the nonemergency line
4  and I explained to them what was going on.  The lady
5  at the police station, she explained to me that this
6  has been happening a lot, and she did inform me of a
7  previous case she was working on with a customer.  The
8  same exact thing happened.
9          Q.  What's the same thing?
10          A.  A tow truck coming late at night and
11  taking a car.
12          Q.  Did she tell you what tow truck company
13  did that?
14          A.  She did not, no.
15          Q.  Did she tell you where it happened?
16          A.  In Dracut.
17          Q.  Where in Dracut?
18          A.  I don't know.
19          Q.  After she tells you that she's had this
20  happen before, what happens next with your communica-
21  tion with the police?
22          A.  I did ask her for a favor.  I asked her
23  if she can -- I gave her my license plate number
24  because my conversations with Judgment Acquisitions,

**33**

1 they were pretty confident that that vehicle belonged
2 to my father.
3     So my conversations with the police department
4 she did do me a favor and run my plate, and she did
5 say I'm the registered -- the only registered owner
6 to that vehicle. She also instructed me to check
7 with the Lowell police station, and I went physically
8 there, and they also confirmed that.
9     Q. Did you ask the police if you could get a
10 copy of whatever they pulled showing you you were the
11 sole registered owner of the vehicle?
12     A. Not with Dracut.
13     Q. And why not?
14     A. Because -- I don't know. I think she
15 instructed me to go to Lowell. I don't know if it's
16 something with the city because the car was registered
17 in Lowell. I have no idea. So I went to the Lowell
18 police station and I asked her that.
19     Q. I just want to be clear. So the Dracut
20 police tell you that they look it up in their system
21 and told you that you are the sole owner of the Mini
22 Cooper?
23     A. Correct.
24     Q. And you don't ask them for any type of

**34**

1 documentation that you can pick up what they are
2 looking at?
3     A. I don't recall if I asked. I know she
4 instructed me to go to Lowell police station to
5 request that.
6     Q. Wouldn't you agree that what the Dracut
7 police officer is looking at is something that you
8 would want to show to Judgment Acquisitions to get
9 your car back?
10     A. I don't recall if I asked for it, but I
11 do recall that the Lowell police station said that's
12 not something they can provide to me. I think those
13 records are for internal use only. I don't think they
14 can provide an outsider that record.
15     Q. She told you that?
16     A. Lowell police did.
17     Q. I'm back in Dracut, the Dracut police
18 officer.
19     A. She instructed me to go to the Lowell
20 Police Department.
21     Q. But you didn't ask her for a printout or
22 documentation as to what she was looking at on her
23 screen?
24     A. I don't recall if I asked, but I recall

**35**

1 that she instructed me to go to the Lowell police
2 station. I don't know if it was because I asked that
3 or something else, but she instructed me to go to the
4 Lowell police.
5     Q. When did you go to the Lowell Police
6 Department?
7     A. I don't recall the exact date.
8     Q. Well, did you go right away after calling
9 Dracut Police Department or did you wait five days or
10 what was the timing of when you decided to go to
11 Lowell as instructed?
12     A. That same day.
13     Q. When the next day did you call the Dracut
14 Police Department? Was it in the morning, the
15 afternoon?
16     A. I don't know. The next day. I don't
17 recall exactly the day that I called Dracut police.
18     Q. You don't know the date you called Dracut
19 police to report your car was taken by a tow truck
20 company wrongfully?
21     A. I don't know, but I can find out if I
22 want to.
23     Q. Do you know when you went to the Lowell
24 Police Department?

**36**

1     A. The same day I talked to Dracut Police
2 Department.
3     Q. When you went to the Lowell Police
4 Department, what did you tell them?
5     A. I explained to him what was going on. My
6 vehicle got towed. They are accusing my father of
7 being the registered owner of the vehicle, so I asked
8 him if he could do me a favor and pull up the record
9 with the license plate number, and that's when he had
10 told me that he couldn't do that.
11     Q. And why couldn't he do that?
12     A. He said it's for internal use only. They
13 couldn't provide outsiders with that information.
14     Q. So you're at a police department
15 reporting that a tow truck company has wrongfully
16 taken your car in the middle of the night, and they
17 are telling you they have evidence that you are the
18 sole owner and they can't provide it to you or they
19 can't check?
20     A. They can't check.
21     Q. But I'm correct Dracut was able to tell
22 you you were the sole owner, but they couldn't give
23 you the information?
24     A. Correct.

---

**37**

1       Q. I want to clarify this a little bit. So
2 you called Dracut Police Department. They tell you
3 you are the sole owner. You don't request any type of
4 documentation, and they tell you to go to Lowell,
5 correct?
6       MR. ZELMAN: Objection, mischaracterizes
7 his testimony. He said he didn't recall if he asked
8 them.
9       MR. PITTS: Okay.
10       Q. So you go to Lowell and they can't
11 confirm for you whether you are the sole owner of the
12 Mini Cooper or not, correct?
13       **A. Correct.**
14       Q. So at that point in time you have tried
15 two police departments, and no one has been able to
16 provide you any documentation showing you are the sole
17 owner of the Mini Cooper, correct?
18       **A. That's correct.**
19       Q. What did you do next?
20       **A. My next step was to go to my bank.**
21       Q. To go to your bank?
22       **A. Correct.**
23       Q. At the time they towed your car, did you
24 know the company that had performed the tow?

---

**38**

1       **A. Yes.**
2       Q. How come you didn't -- and that's Export
3 Towing, correct?
4       **A. Correct.**
5       Q. After you left the Lowell Police
6 Department, how come you didn't go to Export Towing
7 that's the entity that's holding your car?
8       **A. Because at this point I'm trying to get**
9 **proof that that vehicle is registered under my name.**
10       Q. So you went to your bank, and what did
11 you do at your bank?
12       **A. I requested a letter from the bank**
13 **stating that that car, that writ number, it's loaned**
14 **to me. I'm the owner of that car.**
15       Q. You said you got a letter saying you were
16 the owner of the car?
17       **A. Correct.**
18       Q. I'm going to pull up what I've marked as
19 Exhibit 4.
20       (Pause)
21       Q. Is that the letter?
22       **A. Yes, sir.**
23       Q. Does that letter anywhere in there say
24 that you are the owner of the Mini Cooper?

---

**39**

1       **A. The loan is under my name.**
2       Q. I know it says that. I'm saying does
3 that letter state that you are the owner of the Mini
4 Cooper?
5       **A. No.**
6       Q. So this proves that the loan might be in
7 your name, but there's nothing in here that shows or
8 indicates here you are the, quote-unquote, owner of
9 the Mini Cooper, right?
10       **A. Well, it's loaned to me, correct, so --**
11       Q. My question is simple: In this letter is
12 there anywhere in here that indicates you are the
13 owner of the 2011 Mini Cooper?
14       **A. No.**
15       Q. In this same exhibit I'm going to show
16 you an e-mail. Who is Attorney Zola?
17       **A. He was the attorney representing -- he**
18 **is, I don't know, representing Judgment Acquisitions**
19 **at that time.**
20       Q. Your understanding was he was a represen-
21 tative of Judgment Acquisitions?
22       **A. I'm sorry?**
23       Q. Your understanding was he was a represen-
24 tative of Judgment Acquisitions?

---

**40**

1       **A. Correct.**
2       Q. The correspondence that you reference in
3 this e-mail, is that the Digital Federal Credit Union
4 letter we just looked at?
5       **A. Yes, and I believe there was more**
6 **attachments to there. There could have been more than**
7 **just that one correspondence.**
8       Q. What else was attached to that e-mail?
9       **A. I don't recall.**
10       Q. Was it this printout?
11       **A. It could have been, yeah. Was there**
12 **anything else?**
13       Q. I'll show you the whole document.
14 There's the Lowell District Court document and the
15 correspondence to the Digital Federal Credit Union.
16       **A. Is there more?**
17       Q. There is no more. It looks like these
18 are the two things you included in the e-mail, and it
19 ends right there.
20       In this e-mail to Attorney Zola do you ever
21 tell him that you are the owner of the 2011 Mini
22 Cooper?
23       **A. Yes.**
24       Q. Where do you do that?

---

**41**

1 A. Second paragraph.

2 Q. You say "my vehicle," but you never tell

3 him you are the owner.

4 A. I don't, but I accept it's my vehicle.

5 Q. Wouldn't you agree with me that a big

6 issue at this point in time was when you are

7 corresponding with Attorney Zola is that you are the

8 owner of this car; you are the registered owner of

9 this car? Isn't that the issue at this point?

10 A. Correct.

11 Q. But you don't tell Attorney Zola, "I'm

12 the registered owner, I'm the only registered owner?"

13 Did you tell him that?

14 A. I thought my vehicle was enough for him

15 to understand that it's my vehicle.

16 Q. Do you tell Attorney Zola that the Dracut

17 Police Department confirmed for you that you were the

18 sole owner of the Mini Cooper?

19 A. I don't recall. I did speak to Zola over

20 the phone I believe a couple of times --

21 Q. I'm not asking when you spoke to him.

22 You said you went to Dracut Police Department and then

23 you went to the bank. At the bank you got this

24 correspondence. You are now forwarding the correspon-

**42**

1 dence to Attorney Zola. I'm asking: Did you tell

2 Attorney Zola that you had already been to the Dracut

3 Police Department and they told you they were the

4 sole -- you were the sole owner of the Mini Cooper?

5 A. I don't recall.

6 Q. Wouldn't you agree with me that that

7 would be a key piece of information to include in the

8 e-mail to Judgment Acquisitions' lawyer about the

9 ownership of the car?

10 A. This was the opening e-mail to Zola. I

11 did speak to Zola over the phone a couple of times.

12 It could have been said during those calls. I don't

13 recall what was said in the conversation.

14 Q. Did you tell Attorney Zola that "I've

15 contacted the Dracut Police Department, and they have

16 confirmed to me that I'm the sole owner of the Mini

17 Cooper"?

18 A. I don't recall if I said it to Zola or

19 Judgment, but I did bring that up a couple of times.

20 There was just a lot of back and forth. I don't know

21 who I was speaking to.

22 Q. It seems to me the Dracut Police

23 Department telling you you are the sole owner if you

24 want to get your car back, I figured you would be

**43**

1 telling everybody that.

2 A. I never said I didn't.

3 Q. Well, you wrote an e-mail to Attorney

4 Zola and you don't tell him. You can't recall whether

5 you told him in phone conversations. So who did you

6 tell that the Dracut police confirmed that you were

7 the sole owner of the Mini Cooper?

8 A. It was either Andrew or Zola. I don't

9 know at what point did Zola carry on with the

10 conversations, but I did mention it to them.

11 Q. Did you ever go to the Dracut Police

12 Department?

13 A. No.

14 Q. You never went there and said, "Can I

15 have what you just told me reflects that I'm the sole

16 owner of this Mini Cooper"?

17 A. No.

18 Q. You testified earlier that you had an

19 initial conversation I think you said the day after

20 with Judgment Acquisitions about the seizure of the

21 Mini Cooper.

22 A. Correct.

23 Q. And they in that conversation brought up

24 $4,000 and that's kind of where it was left; is that

**44**

1 right?

2 A. Correct. There was a little more to it.

3 Q. What else was there to it?

4 A. He just said a $4,000 settlement. I'm

5 going to call my dad. Then I called back Judgment

6 Acquisitions, explained to him that my father doesn't

7 recall the debt, nor can he pay $4,000 right now. He

8 was given a 24-hour window to make the payment.

9 Q. Was that during the first conversation?

10 A. I don't recall. There were multiple

11 conversations that same day.

12 Q. That same day that you are having those

13 multiple conversations did Judgment Acquisitions say

14 anything else to you about either the debt or the Mini

15 Cooper?

16 A. He did say I'm not getting the car back

17 until it's paid, so I rushed to call my father and

18 explain that to him, and based on his response, I

19 called back and we went back and forth.

20 Q. Did Judgment Acquisitions say anything

21 else to you about either the loan, the debt or the

22 Mini Cooper?

23 A. I think at one point he did say that he

24 can settle for $3,000 within 24 hours and then make

**45**

1 additional payments to total the 4,000 he was asking
2 for.
3          Q. And did you communicate that to your dad?
4          A. I did.
5          Q. What did your dad say?
6          A. That he didn't have $3,000.
7          Q. These conversations were the next day,
8 right?
9          A. That morning.
10          Q. The -- I'm sorry, it was seized around 3
11 a.m. on the 23rd and you are having these calls the
12 same day?
13          A. Correct.
14          Q. Did Judgment Acquisitions communicate
15 anything else to you on that day regarding the debt or
16 the Mini Cooper?
17          A. I know I was explaining to him that it's
18 my car no matter the debt. They shouldn't have taken
19 my car. He went on and just called me a liar, pretty
20 much said that he deals with this every day. This is
21 his job; that he is not taking my word for it. This
22 is the car that shows on record that should have been
23 taken and he took it, and we're not giving it back
24 until it's paid.

**46**

1          Q. Did that make you mad?
2          A. Yes.
3          Q. Were you angry?
4          A. Yes.
5          Q. Did you want your car back?
6          A. Yes.
7          Q. What did you do next?
8          A. I don't recall. I know I called multiple
9 people just to see who can help me with the situation.
10          Q. Did you go to Export Towing and tell them
11 you were the owner of the car?
12          A. No.
13          Q. Did you go to any other police department
14 and explain the situation in that your car was
15 wrongfully taken?
16          A. No.
17          Q. Did you ever file a police report or a
18 complaint with any police department about your car
19 being taken?
20          A. An actual police report, I don't think
21 so, but I don't know what was documented during my
22 call with Dracut, if it was.
23          Q. After the calls that day with Judgment
24 Acquisitions the same day the car was taken, what do

**47**

1 you do next to try to get your car back?
2          A. I'm calling around. I'm literally on the
3 Web. I'm trying to see if someone can help me out,
4 explain the situation --
5          Q. Are you calling --
6          A. I'm sorry.
7          Q. I'm sorry. If you weren't finished, keep
8 going. I didn't mean to interrupt you.
9          A. I was just calling around explaining the
10 situation, see who could help me out on this matter.
11          Q. Who did you call?
12          A. I just called around. I talked to some
13 attorneys. They gave me some free information over
14 the phone. They pretty much said that they should not
15 have taken my car, and I was going off that informa-
16 tion. A lot of calls from I believe his name was
17 Andrew. I think he works for Judgment Acquisitions,
18 and he kept calling me trying to get those payments.
19          Q. What did you tell Andrew when he kept
20 calling you?
21          A. I explained to him that my father doesn't
22 have that money, and that's my vehicle.
23          Q. Did you tell Andrew that you were going
24 to take any action to attempt to get your car back?

**48**

1          A. I don't recall.
2          Q. What else did you do other than call
3 around and everything else that we discussed that day?
4 What else did you do in an attempt to get your Mini
5 Cooper that was wrongfully taken back?
6          A. I talked to my father. There was just a
7 lot of back and forth. What else did I do? I really
8 don't recall. I have to look at a timeline.
9          Q. Did you guys offer to make any payment
10 towards the debt Judgment Acquisitions was claiming
11 you owed?
12          A. We did, yes, correct.
13          Q. How much did you offer?
14          A. A couple hundred dollars.
15          Q. Is a couple hundred dollars all you had
16 to try and get your car that was wrongfully taken
17 back?
18          A. Well, the couple hundred dollars -- yes,
19 to clear that debt and get the car back.
20          Q. At the time in September of 2020 what
21 were you doing for work?
22          A. Working at Zola Medical.
23          Q. As what?
24          A. A software technician.

**49**

1      Q. Were you a salaried or an hourly
2 employee?
3      **A. Hourly.**
4      Q. What were you paid an hour?
5      MR. ZELMAN: Objection. He is not a
6 Judgment debtor. His assets are not an issue in this
7 case. He is under no obligation to disclose his
8 assets or his salary.
9      So, Mr. Espinosa, if you have an issue with
10 disclosing your assets or your salary, let me know
11 and I can move to limit or terminate this deposition
12 under the federal rules.
13      **A. I wouldn't like to share my hourly**
14 **salary.**
15      Q. That's fine. Between you and your father
16 did you have the ability to pay $1,000 to get the Mini
17 Cooper released?
18      **A. No.**
19      Q. You didn't have $1,000 between you?
20      **A. I did not.**
21      Q. When was your Mini Cooper returned?
22      **A. About three weeks from when it was taken.**
23      Q. If I told you that October 9, 2020, is
24 when your father said it was returned, does that sound

**50**

1 accurate?
2      **A. That sounds right.**
3      Q. Did the tow truck company drop off your
4 Mini Cooper and take your dad's Honda Accord?
5      **A. Yes.**
6      Q. Between the day your car was taken and
7 October 9th did you do anything else other than what
8 we've already discussed? Any other actions to attempt
9 to get your Mini Cooper back?
10      **A. I will have to look at a timeline to see**
11 **exactly what I did. Last year I kind of took some**
12 **notes to just see what I did. I know I contacted**
13 **plenty of helpful people that explained to me that**
14 **shouldn't have been done.**
15      Q. Whose timeline would you look at?
16      **A. My own.**
17      Q. In this case you were asked to produce a
18 series of documents related to the Mini Cooper seizure
19 and the Honda Accord seizure.
20      **A. From who?**
21      Q. With your lawyer. Did you work to
22 produce -- respond to and produce documents and
23 respond to document requests in this matter?
24      **A. Yes.**

**51**

1      Q. Why wasn't the timeline included in your
2 document production?
3      **A. I don't recall. It probably wasn't asked**
4 **for it.**
5      Q. Where is the timeline now?
6      **A. In my home computer.**
7      Q. And your notes, how were those notes
8 taken?
9      **A. Typed.**
10      Q. And are they in your home computer?
11      **A. Yes.**
12      Q. And why weren't those notes produced in
13 response to the parties in this case's request for
14 documents?
15      **A. I'm sorry?**
16      Q. Why weren't they produced, the other
17 documents you produced in this case in response to our
18 request?
19      **A. I don't think I was asked for my personal**
20 **timeline. I was trying to get someone to help me to**
21 **get my car back.**
22      Q. Do you think that a personal timeline and
23 notes about these events is relevant to this case?
24      **A. Yes.**

**52**

1      Q. Those helpful people you talked about
2 that you spoke with between the time that your car was
3 seized and the time you got it back, can you identify
4 any of those helpful people?
5      **A. There was multiple attorneys. I didn't**
6 **note the names of them, just local attorneys that I**
7 **called, and they just gave me free advice. I believe**
8 **one of them said it was outrageous that that happened,**
9 **and he actually told me to call a local news reporter**
10 **that was willing to take the case, but I declined.**
11      Q. Why wouldn't you call a local news
12 reporter and report that your car was wrongfully
13 taken?
14      **A. Because that's embarrassing. I don't**
15 **want to be on the news because of that.**
16      Q. Do you have any documents from these
17 attorneys that you spoke with, e-mails, cards,
18 pamphlets?
19      **A. Phone call records I can get if needed.**
20      Q. Between the time your Mini Cooper was
21 seized and the time you got it back on October 9th,
22 I'm assuming you had to go to work every day, right?
23      **A. Correct.**
24      Q. How did you get to and from work?

53

1    A.  My girlfriend's car.  I got a couple of
2 rides from colleagues back and forth.
3    Q.  At the time what did your girlfriend do
4 for work?
5    A.  She worked as an engineer at BA Systems.
6    Q.  So you didn't have to rent a vehicle to
7 get to and from work or to get anywhere else you
8 needed to go during that period?
9    A.  No, no, I had some very helpful
10 colleagues that were willing to take me there.  I had
11 to share the information with them.
12    Q.  You what?
13    A.  I had to share the information with them
14 as to what happened, and they were very helpful during
15 that time.
16    Q.  What individuals were aware that your
17 Mini Cooper was seized?
18    A.  Probably -- I work in a corporate
19 building in Chelmsford, and my department is 300
20 employees, and I think every single one of them was
21 aware of what was going on.
22    Q.  All 300 employees of your company were
23 aware that your car was improperly seized?
24    A.  Correct.

54

1    Q.  And how would all 300 people learn about
2 that?
3    A.  I was getting rides.  I was asking for
4 advice.  I was questioning just to see what was going
5 on.  I was still going to work.  I was frustrated.
6 They will see me get up, pick up phone calls, multiple
7 phone calls during my work hours from a gentleman at
8 Judgment Acquisitions.  So everybody was made aware
9 about what was going on.
10    Q.  I just want to be clear, your company has
11 got 300 people in it, and you are saying all 300
12 people were aware that your car was taken or seized?
13    A.  My department was aware.
14    Q.  How many people are in your department?
15    A.  About 300.
16    Q.  You just said there were 300 in the whole
17 company.
18    MR. ZELMAN:  I think you are mistaken.
19    A.  My company is about 2,000 people.
20    MR. ZELMAN:  Brendan, are you done
21 screen sharing?
22    MR. PITTS:  Yes, I forgot, sorry.
23    MR. ZELMAN:  We are all little pictures
24 now instead of like the bigger full screen I would

55

1 have if not for this.
2    MR. PITTS:  Sorry.
3    MR. ZELMAN:  It's okay.
4    Q.  Can you identify for me the individuals
5 at your work that were aware your car got seized?
6    A.  You want me to identify 300 people?
7    Q.  I want you to identify who you can
8 remember, who you can identify that was aware.  I want
9 to talk to them.
10    A.  Sure.  I can give you the ones that were
11 right there.
12    Q.  Why don't we start with them.
13    A.  Sure.  Richie Alfonso.
14    Q.  Richie?
15    A.  Correct.
16    Q.  How do you spell the last name?
17    A.  A-L-F-O-N-Z-O -- I'm sorry, S-O.
18    Q.  Richie Alfonso?
19    A.  Correct.
20    Q.  Who else?
21    A.  Scott Daley.
22    Q.  Is Daley D-A-L-Y?
23    A.  E-Y.
24    Q.  D-A-L-E-Y?

56

1    A.  Correct.
2    Q.  Who else?
3    A.  Phin Churb.
4    Q.  How do you spell Phin?
5    A.  P-H-I-N.
6    Q.  How do you spell the last name?
7    A.  C-H-U-R-B.
8    Q.  Who else?
9    A.  Stephanie Christopher.
10    Q.  Who else?
11    A.  That's all I can remember right now.
12    Q.  Did any of these people provide
13 transportation for you to get to and from work?
14    A.  Richie did.
15    Q.  Anyone else?
16    A.  No.
17    Q.  If Scott, Phin, and Stephanie didn't
18 provide you transportation, why did they have to know
19 that your car got seized?
20    A.  Because I explained to them -- it's a
21 department upstairs where everybody talks.  Everybody
22 shares information.  I was asking questions.  There
23 was a point where I think I took a couple of days off
24 and I explained to them why.  I didn't have to, but I

1 did.

2     Q. So you chose to divulge all this

3 information to these people that didn't provide you

4 transportation. You just wanted to tell them what

5 happened?

6     A. I was looking for advice, and they seen

7 me on the phone frustrated. I work on live calls, so

8 I had to request just to be off the phones for a

9 little bit because I had to pick up a phone call.

10     Q. You make a claim in this case that you

11 were embarrassed, angry, mad, correct?

12     A. Correct.

13     Q. If you are embarrassed about what

14 happened, then why are you going around work telling

15 people what happened?

16     A. I'm not going around work telling people

17 what happened. I was asking for advice, and the word

18 spread out and everybody found out, and that made me

19 more embarrassed.

20     Q. Well, you weren't going around telling

21 people. You just told me that 300 people at your

22 office were aware, and you are the one telling them.

23     A. I was asking for advice. I didn't

24 know -- this never happened to me, so I work with

1 older gentlemen, and I asked them what I can do in

2 this situation.

3     I did mention that I was calling around

4 trying to figure this out, and during work hours I

5 was asking my colleagues just to see what I can do.

6     Q. This embarrassing situation that you are

7 claiming emotional damages for, the embarrassment, the

8 anger, you didn't have any concern that if you started

9 to tell people at work, that it might become even more

10 public at your own doing?

11     A. No, I wasn't thinking about that at the

12 moment. I didn't feel embarrassed telling the story,

13 but I was looking for guidance. I was trying to get

14 my car back.

15     Q. Did you get any guidance?

16     A. Besides Richie offering to drive me

17 whenever I needed a ride, that was pretty much it. I

18 don't think this has happened to anybody there, so no

19 one could really relate.

20     Q. So you have now told 300 people at a

21 software company as to what happened, and you didn't

22 get any advice as to what to do or anything somebody

23 thought might help your situation?

24     A. I didn't tell 300 people. 300 people

1 found out.

2     Q. Other than those four individuals at work

3 that you said have knowledge of your car being seized,

4 who outside of your workplace knows your car was

5 seized?

6     A. My left neighbor, my right neighbor, my

7 girlfriend, I think a couple of her colleagues because

8 she explained to them that she was letting me use her

9 car.

10     Q. So both you and your girlfriend are

11 telling your work colleagues about this terribly

12 embarrassing situation that you had with your car

13 being wrongfully seized?

14     A. Correct.

15     Q. The neighbor on the left, what's the

16 neighbor's name?

17     A. I don't know his name.

18     Q. How do you know he knows your car was

19 seized?

20     A. Because he has talked to my father about

21 it.

22     Q. How do you know he has talked to your

23 father about it?

24     A. Because my father told me.

1     Q. Your dad never shared his name with you?

2     A. He said it. It's an Egyptian name. It's

3 really hard to remember.

4     Q. And how did the neighbor find out that

5 your car was seized?

6     A. Because the lights that were outside. I

7 don't know if he looked out the window, if he also

8 stepped out, but he said he seen what was going on.

9 He asked my father the next day what happened, and my

10 father explained.

11     Q. What's the name of the neighbor on the

12 right?

13     A. I don't know his name.

14     Q. You don't know either of your neighbors'

15 names?

16     A. I don't.

17     Q. Did you ever talk to them?

18     A. I talked to the neighbor you are

19 questioning right now, I talked to him one time

20 because I put up a fence and I removed the old fence,

21 and it was just a quick agreement. We didn't really

22 interact or get our names.

23     Q. So you don't really know them. You don't

24 know their names. Why do you care that they know your

**61**

1  car got seized?
2      **A. Because I live here. They are probably**
3  **thinking, Hey, my neighbor didn't pay his car. His**
4  **car got repo'd. I don't know.**
5      Q. Did anyone tell you that?
6      **A. My friends joke around --**
7      Q. I'm not talking about your friends. I'm
8  talking about your neighbors is what we're talking
9  about right now.
10     **A. No, no, no.**
11     Q. They never said that?
12     **A. No.**
13     Q. How did your friends find out that your
14 car got taken, seized?
15     **A. I explained to them what happened.**
16     Q. Do a lot of your friends know from you
17 telling them?
18     **A. Not from me telling them. I told a**
19 **couple of friends. Again, I'm looking for guidance.**
20 **Anything would help, and they just -- it gets around.**
21     Q. Who else knows about your car being
22 seized wrongfully?
23     **A. Do you need names?**
24     Q. If you got them.

**62**

1      **A. Sure. John Berrio.**
2      Q. Sean [sic] Berrio?
3      **A. Correct.**
4      Q. Who is Sean Berrio?
5      **A. John Berrio. He's a close friend.**
6      Q. How do you spell his last name?
7      **A. B-E-R-R-I-O.**
8      Q. Why did you tell Sean?
9      **A. John.**
10     Q. John. Why did you tell John?
11     **A. He is a friend. I told him what**
12 **happened. We usually go play some basketball**
13 **together. He picked me up a couple of times. I**
14 **wasn't able to meet up with him. So it was his**
15 **transportation, you know, "Come pick me up." So of**
16 **course I told him.**
17     Q. Who else, outside of your workplace, and
18 John, and your neighbors, and your girlfriend's
19 colleagues know that your car was seized?
20     **A. It's just a handful -- a lot of people.**
21 **I am like the friend with the bad time, the friend --**
22 **we always gather up in my house watching fights**
23 **together. We see boxing, and, of course, they come**
24 **here now. They know my car is not here. They don't**

**63**

1  see my car.
2      Q. I just want to be clear that this
3  embarrassing situation that is traumatic for you that
4  you are seeking emotional damages for, I just want to
5  be clear, you are telling people at work about it,
6  people that don't provide you transportation. Your
7  girlfriend is telling people at her work that don't
8  provide you transportation. You are telling your
9  friends about this situation. It seems to me like you
10 are telling an awful lot of people about what
11 happened.
12     **A. Yeah, and it doesn't make me not**
13 **embarrassed because of it. I did tell a helpful of**
14 **people at my job and I did get transportation out of**
15 **it, so it was a positive outcome.**
16     Q. If you experience an embarrassing
17 situation in your life, that's something that you
18 don't have any problems sharing with your coworkers if
19 they don't have to know?
20     **A. No, no. I think we all deal with**
21 **embarrassment differently.**
22     Q. I want to go back quickly to your
23 conversations with Judgment Acquisitions the day of
24 the seizure. Did Judgment Acquisitions offer you that

**64**

1  they would switch out your Mini Cooper for another one
2  of the vehicles owned by your dad?
3      **A. I'm sorry?**
4      Q. On the day your car was seized you had
5  conversation with Judgment Acquisitions, correct?
6      **A. Correct.**
7      Q. During those conversations, did Judgment
8  Acquisitions tell you that they would swap out -- they
9  would return the Mini Cooper and take one of your
10 dad's cars?
11     **A. No.**
12     Q. Was your dad present for any conversa-
13 tions between you and Judgment Acquisitions?
14     **A. He could have been. There was multiple**
15 **conversations.**
16     Q. They were phone conversations, though,
17 right?
18     **A. Correct.**
19     Q. And for any of them was he on the line
20 with you?
21     **A. No.**
22     Q. So if Judgment Acquisitions said
23 something to you, the only way he would learn about it
24 was from you?

**65**

1    A. I'll call my father and share the
2    information with him.
3    Q. You would tell him. He wouldn't hear it
4    firsthand. You would tell him.
5    A. Tell who?
6    Q. You would tell your father what Judgment
7    Acquisitions said.
8    A. Correct.
9    Q. From the point in time your Mini Cooper
10   was seized, during conversations you had with Judgment
11   Acquisitions, did your dad hear anything as to what
12   Judgment Acquisitions said to you? Did he hear it
13   directly?
14   A. Even if he did, he wouldn't really
15   understand it since he doesn't understand much
16   English, so I don't know. It could have been
17   conversations on speakerphone. I don't recall.
18   Q. Is it safe to say that if your dad has
19   knowledge about something Judgment Acquisitions said
20   to you, it came from you?
21   A. Yes.
22   Q. Did you ever contact Constable Brian
23   Abelli's office about the seizure of the Mini Cooper?
24   A. I think I tried.

**66**

1    Q. How did you try?
2    A. By just Googling constables nearby. I
3    don't think he ever left his name to locate the exact
4    gentleman.
5    Q. Other than Google, did you ever contact
6    Brian Abelli or his office, go to Brian Abelli's
7    office in person?
8    A. I don't think I have ever spoke to him
9    besides that night.
10   Q. So there were two people in your driveway
11   that were working to have your car seized on September
12   22nd, Export Towing and Brian Abelli's constable
13   office, correct?
14   A. If that's his name, yes.
15   Q. And you never contacted either place to
16   try and figure out how to get your car back, if they
17   could help get your car back, nothing?
18   A. No, because the Judgment Acquisitions guy
19   pretty much said it's his call. If the car is going
20   to be released, it's because of him, so I really had
21   no other options.
22   Q. Why would you believe him?
23   A. I did.
24   Q. You don't take any steps. You are just

**67**

1    going to believe Andrew Metcalf who you don't know
2    from Adam that you can't do anything else to get your
3    car back?
4    A. Correct.
5    Q. Was the reason you really weren't taking
6    too many steps to get your car back after what we had
7    discussed is because you had access to your
8    girlfriend's car?
9    A. No, because she had no car.
10   Q. It seems like you didn't have an issue
11   getting transportation during the time the Mini Cooper
12   was gone; is that fair to say?
13   A. No, it's not fair to say.
14   Q. What difficulty did you have in getting
15   transportation after your Mini Cooper was seized?
16   A. A colleague driving from Methuen to
17   Dracut to Dracut to Chelmsford roundtrip, that's not
18   cool.
19   Q. And how often did that happen?
20   A. I can't recall. It was a couple of
21   times, a few times.
22   Q. Other than the two times that Richie
23   Alfonso had to make the trip you just described,
24   what other difficulties did you have getting

**68**

1    transportation?
2    MR. ZELMAN: Objection, mischaracterizes
3    his testimony. He didn't say two times. You said
4    that.
5    MR. PITTS: A couple of times is what he
6    testified to.
7    A. And I followed up with several.
8    Q. What do you mean you followed up with
9    several?
10   A. I said a couple of times. Several times
11   is exactly what I said.
12   Q. I'm not following you.
13   A. I first said a couple of times, and then
14   I said several times when I thought about it.
15   Q. After I asked you the question?
16   A. Correct.
17   Q. Richie Alfonso is the only one that drove
18   you to and from work?
19   A. Yes.
20   Q. You never had to reach out to another
21   colleague to get transportation because Richie wasn't
22   available or didn't want to drive you?
23   A. My girlfriend drove me sometimes or I
24   used the car if she didn't need to use it.

**69**

1　　　Q. Well, it's fair to say you leased a car
2　for your girlfriend. I think she would probably make
3　it available to you; wouldn't that be fair?
4　　　A. **Not really. She is making the payments,**
5　**so, no, she can decline.**
6　　　Q. If your girlfriend is making the
7　payments, why do you have to lease the car?
8　　　A. **I did her a favor.**
9　　　Q. Why does she need the favor?
10　　　A. **I have been with her for like eight**
11　**years. I wouldn't say no to her --**
12　　　Q. My question is, why can't your girlfriend
13　go to the dealership and lease a car?
14　　　A. **Because I offered to do it under my name.**
15　　　Q. And why would you do that?
16　　　A. **Because I get a better interest rate than**
17　**she by a lot.**
18　　　Q. What does the interest rate have to do
19　with leasing a car?
20　　　A. **Depending on your credit score, you are**
21　**going to pay a lot of interest or low interest. My**
22　**name under it it would be less interest than hers.**
23　　　Q. I don't follow you. You paid interest on
24　a leased car?

**70**

1　　　A. **Correct. You get a lower rate if you**
2　**have good credit, and a lot of times if you have bad**
3　**credit, you wouldn't even be approved to get a leased**
4　**car.**
5　　　Q. I don't want to go too far down this
6　rabbit hole.
7　　　MR. ZELMAN: We're very far down it.
8　　　MR. PITTS: It just seems odd to me that
9　he would put the lease on his credit report.
10　　　MR. ZELMAN: Credit has nothing to do
11　with this case regarding the facts or allegations.
12　We should move on.
13　　　MR. PITTS: Respectfully that's not what
14　a deposition is about. I get to ask my questions.
15　　　MR. ZELMAN: Yes, within the scope of
16　discovery, which has to do with facts or defenses in
17　the case. We're so far down the rabbit hole I can
18　see Alice.
19　　　MR. PITTS: Okay.
20　　　Q. Judgment Acquisitions, it's your under-
21　standing they are a debt collector, right?
22　　　A. **Yes.**
23　　　Q. Can a debt collector seize a leased
24　vehicle?

**71**

1　　　A. **Repeat that.**
2　　　Q. I should preface this with Yitzchalk's
3　starting to sweat. I don't want you to disclose any
4　conversations that you had with Yitzchalk. Those are
5　out of bounds. I can't ask them. You can't tell me
6　about them. He is your attorney. I am asking you
7　whether a debt collector like Judgment Acquisitions,
8　can they seize a leased car?
9　　　A. **I know now they can't.**
10　　　Q. And how do you know that? Is it from a
11　source other than Yitzchalk?
12　　　A. **Yes.**
13　　　Q. And what source is that?
14　　　A. **Honda.**
15　　　Q. Who at Honda told you that?
16　　　A. **There was an attorney appointed there,**
17　**and I think -- let's not get to the attorney part, but**
18　**the representative when I called did say that, that**
19　**they can't do that.**
20　　　Q. Do you know where that attorney got that
21　information, that you can't seize a leased car?
22　　　A. **No.**
23　　　Q. In your interrogatories you say that
24　leased cars are, quote-unquote, not subject to

**72**

1　seizure. What do you base that interrogatory answer
2　statement on?
3　　　A. **Probably information I have gotten from**
4　**Honda.**
5　　　Q. Prior to your dad's Honda Accord being
6　seized, did you ever drive it?
7　　　A. **The Honda?**
8　　　Q. Yes.
9　　　A. **No.**
10　　　Q. At some point in time were you informed
11　that you would be able to pick up the Honda Accord?
12　　　A. **Yes.**
13　　　Q. When was that?
14　　　A. **I don't recall the exact date.**
15　　　Q. Was it in October of 2020?
16　　　A. **It could have been.**
17　　　Q. If you were told in October of 2020 to
18　pick up -- you could pick up the Honda Accord, why
19　didn't you?
20　　　A. **We tried.**
21　　　Q. And how did you try?
22　　　A. **By contacting my father and taking a**
23　**drive over there to pick up the vehicle.**
24　　　Q. And if you drove over there, how come you

**73**

1  couldn't pick up the vehicle?

2  　　A.　We were about -- I don't know what was

3  the exact commute, but it was about 40 minutes from

4  here, I believe, and about ten or five minutes away I

5  called the towing company and informed them that we

6  were instructed that the vehicle was released and we

7  were on our way to pick it up.

8  　　Q.　You were instructed what?

9  　　A.　That the vehicle has been released and

10  that we can pick it up.

11  　　Q.　You were instructed on the way there

12  that?

13  　　A.　No, no. During the conversation when I

14  called them, I explained to him that we were

15  instructed that the Honda Accord has been released.

16  　　Q.　Okay. So you go over there and try and

17  get it?

18  　　A.　I never got there.

19  　　Q.　Why not?

20  　　A.　Because during that conversation, there

21  were some storage fees involved. During the conversa-

22  tion with the Export representative, we were told that

23  there were some storage fees involved in order to get

24  access to the car.

**74**

1  　　Q.　Is that the same conversation where you

2  were told that it was available for pickup?

3  　　A.　No.

4  　　Q.　So you were told that the Honda Accord is

5  available for pickup, correct?

6  　　A.　Correct.

7  　　Q.　Do you then leave to go get the Honda

8  Accord?

9  　　A.　Yes.

10  　　Q.　And do you arrive at Export Towing?

11  　　A.　No.

12  　　Q.　Why don't you get to Export Towing?

13  　　A.　Because about ten or five minutes away

14  when I called Export Towing to let them know that I

15  and my father are on our way to pick up the car, that

16  that we were told that it had been released. They

17  said negative. There's some storage fees involved in

18  order to completely release the vehicle.

19  　　Q.　So it's about a 40-minute drive. You are

20  about five or ten minutes away from Export Honda. You

21  decide to call them. Why -- you are almost there.

22  Why would you call them?

23  　　A.　Just to get it ready. I don't know

24  what's the process at a towing company, but we called

**75**

1  them and said we're almost here.

2  　　Q.　Whose phone did you use to call them?

3  　　A.　It could have been mine. I think it was

4  mine.

5  　　Q.　Who else's phone could it have been?

6  　　A.　My father's.

7  　　Q.　Was there anybody else in the car whose

8  phone it could have been?

9  　　A.　I don't recall, but I think my stepsister

10  was with us, my dad's wife's daughter.

11  　　Q.　What time of the day was it?

12  　　A.　This is after my dad's work, so it was --

13  I think he gets out at 3. It was soon after he got

14  out of work.

15  　　Q.　Fair to say rush hour?

16  　　A.　3 o'clock is not rush hour.

17  　　Q.　It depends where you drive, I guess, but

18  so it's about -- your dad is getting out of work. You

19  are approaching rush hour it's fair to say?

20  　　A.　I don't know.

21  　　Q.　It seems like you have never driven in

22  Boston.

23  　　A.　I don't even remember exactly where the

24  place was.

**76**

1  　　Q.　Okay. You're about five or ten minutes

2  out from arriving at Export Towing and you make that

3  call?

4  　　A.　Yes.

5  　　Q.　And they tell you there's storage fees

6  involved?

7  　　A.　Correct.

8  　　Q.　And you are going to have to pay them?

9  　　A.　Yes.

10  　　Q.　Why wouldn't you go to Export and talk to

11  them? Why would you just turn around and give up?

12  　　A.　I didn't think they would release the

13  vehicle when there is pending storage fees.

14  　　Q.　You don't think given you have already

15  driven roughly 30 of the 40-minute trip that it's not

16  worth it to keep going and maybe talk to the person at

17  Export Towing? They've got your dad's car. You guys

18  have been dealing with this for months.

19  　　A.　Correct. We were instructed that the car

20  has been released, and, to my knowledge, we should not

21  have paid anything, so storage fees involved was a big

22  no. I explained it to my father. He said absolutely

23  not, and we turned around. Again, we're frustrated at

24  this time, so we just turned around and came back

**77**

1   **home.**

2        Q. But you're not frustrated enough to drive

3   the extra five or ten minutes to get to Export to

4   actually talk to someone to see if there was something

5   that could be done to get your car back that you want

6   so bad?

7        A. **They said we couldn't get it without the**

8   **storage fees being paid.**

9        Q. That wasn't my question.

10       A. **What's the question?**

11       Q. My question was, you want this car back.

12   Your dad has been deprived of it. They've had your

13   Mini Cooper. You guys are frustrated. You are so

14   frustrated. You are suing my guy because you are

15   frustrated. You don't think it's worth driving the

16   five or ten minutes to get to Export and maybe talk to

17   somebody there and see if you can work something out

18   and get the car back?

19       A. **No. If we talk to someone and not get it**

20   **back, that's more time wasted. The shorter route was**

21   **just turning back and coming home.**

22       Q. So I just want to be clear in your

23   testimony. It wasn't worth the five or ten minutes to

24   go to Export to talk to someone to see if something

**78**

1   can be worked out?

2        MR. ZELMAN: Objection. Asked and

3   answered. Can you badger this witness -- can you ask

4   the questions you need to ask?

5        MR. PITTS: I don't --

6        MR. ZELMAN: Really, this has been asked

7   like eight times in a row. At a certain point this

8   is getting abusive.

9        MR. PITTS: What question has been asked

10   eight times in a row?

11        MR. ZELMAN: Why or whether did he not

12   just keep driving instead of turning around after he

13   said he didn't want to pay the fee so he turned

14   around? And then you are going at him over and over

15   and over again for the same exact question. It's

16   silly, and it's harassing.

17        MR. PITTS: It seems like I might have

18   struck a nerve.

19        MR. ZELMAN: What? Really? I'm sitting

20   here quietly, but come on, at a certain point you are

21   abusing the witness.

22        MR. PITTS: I don't think any of my

23   questioning today has been abusive at all. I think

24   I've been very respectful to Mr. Espinosa, and I've

**79**

1   asked him questions, and he's answered them.

2        MR. ZELMAN: Yes, but repetitive

3   questioning on the same topic is abusive. I'm not

4   calling you an abuser. I'm just saying that when you

5   ask him to answer the same question over and over

6   again, it gets to a point where it becomes

7   objectionable, and I'm asking you to move on.

8        Q. Mr. Espinosa, did your dad ever tell

9   Export Towing that he didn't want the Honda Accord

10   back?

11       A. **No.**

12       Q. Did you ever attempt to go to Export

13   Towing and get the registration out of the glove

14   compartment?

15       A. **Now we are talking about the Mini Cooper?**

16       Q. I'm sorry, I want to go back to the Mini

17   Cooper. My apologies. I want to go back there for a

18   second. Did you ever go to the towing company and

19   attempt to get the registration out of the glove box?

20       A. **So now we are going back to the Mini**

21   **Cooper, correct?**

22       Q. I said that, yeah.

23       A. **No.**

24       Q. How come you wouldn't want to show

**80**

1   Judgment Acquisitions that registration that you

2   showed the constable the night they seized the car?

3       A. **He didn't request it.**

4       Q. But they have your car. They have your

5   Mini Cooper.

6       A. **Correct.**

7       Q. And the registration that you feel shows

8   your sole possession, the one that you showed the

9   constable, why wouldn't you want to show that to

10   Judgment Acquisitions?

11       A. **He didn't request it, and I did show it**

12   **to the constable and told the gentleman that night, it**

13   **didn't really change anything. I don't think the**

14   **registration was in my mind to kind of solve the**

15   **mystery that was going on.**

16       Q. When you went outside and they were

17   seizing your car, the first thing you testified you

18   said you did you was go get the registration.

19       A. **Correct.**

20       Q. Now, Judgment Acquisitions is saying that

21   your dad owns the car and you are not the sole owner,

22   correct? They said that to you in conversations?

23       A. **Correct.**

24       Q. And you don't think it's worth the trip

81

1  to the tow company to get the registration that you
2  were waving in the driveway to show Judgment
3  Acquisitions to show that you are the sole owner?
4      A.  I wasn't waving the registration --
5      Q.  Showing the registration.
6      A.  No, he didn't request for it.  If he
7  would have, I probably would not drive to the tow
8  place.  I'll make my way to the RMV.  That's about a
9  mile away and request a copy.
10     Q.  Even better, you could have -- the RMV is
11 a mile away from where you live.
12     A.  Correct.
13     Q.  So you could have gone to the RMV and got
14 a copy of the registration that you were showing the
15 constable the night they seized your car?
16     A.  Not necessarily.
17     Q.  Why not?
18     A.  Because I think during that time, that
19 they were shut down due to COVID, so, yeah, that's
20 actually impossible.
21     Q.  So you couldn't go to the -- the RMV was
22 closed because of COVID?
23     A.  Correct.
24     Q.  How did you learn that the RMV was closed

82

1  due to COVID?
2      A.  I don't recall.  I don't recall.
3      Q.  Is it fair to say that you never checked
4  that the RMV was never open or closed due to COVID?
5      A.  It's not fair to say because I did know
6  it was closed due to COVID.
7      Q.  I'm asking how you knew it was closed?
8      A.  I don't recall.
9      Q.  In this case you are claiming that you
10 were angry, embarrassed, and you are claiming
11 emotional damages that you have suffered as a result
12 of the seizure of the Mini Cooper and the Honda
13 Accord, correct?
14     A.  Correct.
15     Q.  Have you ever received any treatment from
16 any medical professionals related to those feelings?
17     A.  No medical treatment, no.
18     Q.  How much in terms of dollars are you
19 claiming you are owed in this lawsuit?
20     A.  I don't have a specific amount.  I feel
21 I'm innocent of whatever is going on, whatever the law
22 says I'm entitled to due to the damages and everything
23 that has happened.
24     Q.  You cannot provide me a dollar amount?

83

1      A.  I cannot provide you a dollar amount.
2      Q.  Have you had the opportunity to sit down
3  and try and figure out what amount you think you are
4  owed in this case?
5      A.  I have not.
6      MR. PITTS:  I'm almost done.
7      (Pause)
8      Q.  I'm going to show you what I'm going to
9  mark as Exhibit 5 to this deposition.  Can you see
10 that?  Can you see that on the screen?
11     A.  I do.
12     Q.  It's a docket report for a case Cacv of
13 Colorado LLC versus Sergio Espinosa; do you see that?
14     A.  I do.
15     Q.  Is the defendant there your father?
16     A.  It's our name, but yes, I know now that
17 it's my father.
18     Q.  Are you aware that there's a case Cacv of
19 Colorado that they brought against your dad in Lowell
20 District Court?
21     A.  Yeah, I'm aware of it.
22     Q.  Did you attempt to file a motion to
23 vacate the judgment that was entered into this case?
24     A.  I believe so, yes.  My father did, yes.

84

1      Q.  I'm going to show you on the docket -- do
2  you see that entry right there, "Motion to remove
3  default and vacate default judgment waived or
4  withdrawn by moving party"?  Did you move to withdraw
5  the motion to vacate?
6      A.  Yes.
7      Q.  Why did you withdraw it?
8      MR. ZELMAN:  Sergio, answer to the
9  extent that you can answer without discussing
10 attorney-client communications.
11     A.  We were instructed to.
12     MR. PITTS:  I'm almost done.  I just
13 want him to look at his interrogatory answers.
14     Q.  Mr. Espinosa, were you ever shown any
15 letters from either my client or letters on behalf of
16 any of the other parties in this case that offered you
17 a settlement in this matter?  I'm not asking you for
18 communications with you and Yitzchalk.  I'm asking if
19 you were shown any correspondence in which a party to
20 this case offered you a settlement?
21     A.  Yes.
22     MR. ZELMAN:  If you're asking if his
23 attorney showed it to him, I think that would be
24 stepping on the line.

85

1    MR. PITTS: I'm not asking that. I am
2  asking him if he saw it. It's not a communication.
3  I'm asking if he has seen a document that's in this
4  matter. They are in discovery.
5    MR. ZELMAN: To the extent that you
6  know, have you seen a document? Not have you
7  discussed or were shown, but have you seen a document
8  reflecting the letters that Mr. Pitts is asking you
9  about?
10    A. I don't recall.
11    MR. PITTS: I'm going to do a couple of
12  quick docs and then I'm done.
13    Q. I'm going to show you what's been marked
14  as Exhibit 3 in this case. Can you see that on the
15  screen?
16    A. Yes.
17    Q. Is that the Certificate of Registration
18  that you showed the constable the night your car was
19  taken?
20    A. A hard copy, correct.
21    Q. I'm going to pull up what's been marked
22  as Exhibit 1. Do you recognize this document?
23    A. Yes.
24    Q. And what is that?

86

1    A. My responses, the responses.
2    Q. To your interrogatories, right, questions
3  under oath?
4    A. Correct.
5    Q. I'll represent to you these are your
6  responses to my questions, again, marked as Exhibit 1.
7  Is that your signature?
8    A. Yes.
9    Q. And when you signed this document, did
10  you answer them truthfully and to the best of your
11  ability?
12    A. I did.
13    Q. One more. Are you familiar with this
14  document? Let me know if you want me to keep
15  scrolling.
16    A. Please pause.
17    (Pause)
18    A. Yeah, I'm familiar with that document.
19    Q. These are your answers to Export Towing's
20  interrogatories, correct?
21    A. Correct. You are just going a little
22  fast there.
23    Q. I didn't know you were reading. I was
24  getting to the end. If you want to read, I'm sure we

87

1  can provide you time, but I just want to know if this
2  is your signature at the end of the document?
3    A. Yes.
4    Q. And at the time that you were answering
5  these interrogatories, were you truthful in answering
6  them to the best of your ability?
7    A. Yes.
8    MR. PITTS: I don't have anything else.
9    MR. ZELMAN: Joe or Pam, who wants to go
10  first?
11    MS. SALPOGLOU: Brendan, can you just
12  pull up Exhibit 5?
13    (Discussion off the record.)
14    EXAMINATION BY MS. SALPOGLOU
15    Q. Hi, Mr. Espinosa. My name is Pam
16  Salpoglou, and I represent the defendant Export
17  Towing.
18    I would like to ask you looking at this
19  exhibit that's on the screen, a motion to withdraw
20  the motion was filed, and then it appears that on
21  December 16th of 2021 after a hearing held on
22  December 15th of 2021, a motion to remove the default
23  and vacate default was denied; do you see that?
24    A. What date am I looking at?

88

1    Q. 12/15/2021. On the third line -- the
2  third entry from the bottom, do you see that?
3    A. Can you just highlight the date?
4    Q. 12/15/2021, "event resulted."
5    A. I see that.
6    Q. "Motion to remove default and vacate
7  default judgment denied" is the next entry, correct?
8    A. I see that.
9    Q. And then the next line says, "Defendant,
10  Sergio Espinosa, 20 Chaple Street, Lowell." Do you
11  see that?
12    A. I do.
13    Q. Who lives at 20 Chaple Street?
14    A. My father lived there years ago.
15    Q. And who attended the motion to vacate the
16  default?
17    A. I'm sorry, who what?
18    Q. Who attended the motion?
19    A. What does that mean?
20    Q. Did you go to the Lowell court on this
21  case?
22    A. My father and I did.
23    Q. So did you file the motion to vacate the
24  defaults?

**89**

1      A. I believe we did, yes.

2      Q. And the motion was denied, correct?

3      A. Yeah, I see that.

4      Q. What was the basis of that motion to

5 remove the default?

6      A. What do you mean by "the basis?"

7      Q. What was the reason you gave the judge or

8 the clerk that you wanted this default lifted?

9      A. To my father's knowledge, I believe the

10 base reason was he was not living at this address I

11 think three years -- I don't know exact dates when he

12 was served or they went to serve him, but I think he

13 was already out of this address like three or four

14 years later -- before, sorry, so he wasn't at that

15 address at that time.

16      Q. And did you get notice that this motion

17 was denied?

18      A. I really don't remember.

19      Q. And what did you do to prepare for today?

20      A. Nothing. Just questions based on what I

21 remember.

22      Q. Did you consult any documents?

23      A. I went through the documents I had a

24 while ago. That's pretty much it.

**90**

1      Q. What documents that you had a while ago?

2      A. Just the documents I had of all the -- my

3 correspondence and all that stuff.

4      Q. The timeline that you were discussing

5 earlier, did you consult that?

6      A. No, I did not. I didn't have time to do

7 that.

8      Q. And you had mentioned earlier that you

9 were given a piece of paper by the constable on the

10 night that the Mini Cooper was seized. Did you

11 produce that document?

12      A. Produce?

13      Q. Yes. As part of this lawsuit, did you

14 turn it in?

15      A. I don't recall.

16      Q. Do you still have that piece of paper?

17      A. I do.

18      Q. And do you remember what it said?

19      A. I remember "Judgment Acquisitions" in big

20 letters. I don't know if it was the top right or top

21 left, but I don't recall what it said.

22      Q. Did it have my client's information?

23      A. I don't recall, no.

24      Q. You don't recall or no?

**91**

1      A. I don't recall.

2      Q. Did it have the constable's information?

3      A. I don't recall.

4      Q. Can you get me a copy of that?

5      MS. SALPOGLOU: And, Brendan, you can

6 stop sharing the screen.

7      MR. PITTS: Okay.

8      Q. Can you get me a copy of that document?

9      A. Sure.

10      Q. Now, I'd like to ask you a question:

11 Part of your lawsuit is alleging that my client,

12 Export, the tow company, is a debt collector. Are you

13 aware of that?

14      A. I'm sorry?

15      Q. Your lawsuit has alleged that Export

16 Towing is a debt collector.

17      MR. ZELMAN: Pamela, our first Complaint

18 doesn't allege that anywhere.

19      MS. SALPOGLOU: Well, you've still got

20 claims under the fair debt, so I don't believe -- I

21 think I need to --

22      MR. ZELMAN: Let's take a look. I

23 thought the Second Amended Complaint removes that,

24 but let's be sure. You can ask your questions.

**92**

1      MS. SALPOGLOU: You still have claims

2 under 15USC1692.

3      (Pause)

4      MR. ZELMAN: Okay. Go ahead.

5      Q. What evidence do you have, Mr. Espinosa,

6 that my client is a debt collector?

7      A. I don't know. I don't know how to answer

8 that question.

9      Q. Do you have any evidence today?

10      A. That what?

11      Q. That my client is a debt collector.

12      A. I don't.

13      Q. Did you ever have any conversations with

14 my client about your father's debt?

15      A. I don't recall.

16      Q. Did your father have any conversations

17 with my client?

18      A. I don't think so.

19      Q. Let's go back to the night that your Mini

20 Cooper was taken. You said when you woke up, you had

21 your phone and your keys when you went downstairs,

22 correct?

23      A. That's correct.

24      Q. And do you have a smartphone?

1      A.  I do.

2      Q.  And your phone has the ability to take

3  pictures and video, correct?

4      A.  Correct.

5      Q.  Did you take any photos or videos that

6  evening?

7      A.  No.

8      Q.  Why didn't you?

9      A.  It didn't cross my mind.  It didn't cross

10  my mind to take pictures.

11      Q.  As part of the discovery in this case,

12  there were some photos produced.  I'm sorry, I don't

13  have them marked as an exhibit, but do you recognize

14  this photo (indicating)?

15      A.  It's my car.

16      Q.  Did you take that photo?

17      A.  So that -- yes, that's after the car is

18  received.

19      Q.  That was after it was received?

20      A.  Correct.

21      Q.  And when you came downstairs, your father

22  was on the side of the house; is that what you had

23  said?

24      A.  Yes, side driveway.

1      Q.  And where was your car, the Mini Cooper?

2      A.  Side driveway.

3      Q.  Was your father in front, behind?  Where

4  was he in relation to the car?

5      A.  On the side of the car.

6      Q.  The left, the passenger or the driver's?

7      A.  Passenger.

8      Q.  And where were you when you came down in

9  relation to the vehicle?

10      A.  In between the front and the passenger

11  side of the vehicle.

12      Q.  And you said that you went into the car

13  to get the registration?

14      A.  Correct.

15      Q.  It's your testimony that the constable

16  let you into the vehicle?

17      A.  I didn't ask for permission.

18      Q.  You just went into the car?

19      A.  Correct.

20      Q.  And where did you enter the vehicle?  On

21  the passenger or the driver's side?

22      A.  Driver's side.

23      Q.  I thought you said you were on the

24  passenger side.

1      A.  I'm sorry, you're right, passenger.

2  Correct, passenger.

3      Q.  Okay.

4      A.  Where the glove compartment is located,

5  passenger.

6      Q.  Where the glove compartment is located?

7      A.  Correct.

8      Q.  And was the car locked at that time?

9      A.  It had to be.  I normally lock my car at

10  nighttime.

11      Q.  You don't remember?

12      A.  It's something I can't forget because it

13  does make a beep when I press the button.

14      Q.  So was the car locked or not?

15      A.  Yes.

16      Q.  It was locked.  So you had to unlock the

17  car, and how did you unlock the car?

18      A.  With my keys.

19      Q.  The key fob or did you actually put the

20  keys in?

21      A.  Key fob.

22      Q.  And you said earlier that you took out

23  the registration and showed it to the constable,

24  correct?

1      A.  Correct.

2      Q.  And you had said earlier that you did not

3  show it to my client, correct?  You were showing it to

4  the constable?

5      A.  I didn't say that.  I said that I was

6  showing it to the constable, and then your client kind

7  of approached, and I explained to both of them that

8  this is my car.

9      Q.  Right.  You said he approached and was

10  there, but did you actually show the registration to

11  the tow truck driver?

12      A.  I don't know how much he seen, but he was

13  right next to the constable.

14      Q.  My question is, did you show it to him?

15      A.  Yes, he was right there.

16      Q.  Now you are saying he actually saw -- you

17  gave the registration to my client, the tow truck

18  driver?

19      A.  It's not hard to show a piece of paper in

20  between two gentlemen and let him look at the paper.

21  That's what happened.

22      Q.  I'm not asking you if it's hard.  I'm

23  asking you specifically:  You had testified earlier

24  that you showed the constable, and that my client was

**97**

1  there. You weren't sure if he saw it. I'm asking you
2  specifically now did you show the registration to my
3  client's agent?
4         MR. ZELMAN: I'm just going to object to
5  that to the extent that it was asked and answered,
6  but, Sergio, you can answer.
7         A. I don't recall if I turned the paper to
8  him directly, but he did lean over. I don't know how
9  much of it he seen. My name does appear smaller. I
10 don't know how much he seen.
11        Q. And that was at 3 o'clock at night,
12 correct?
13        A. Correct.
14        Q. And are you aware that this lawsuit was
15 filed in April of 2021?
16        A. I don't know the exact date.
17        Q. If I tell you that it was filed in or
18 about April of 2021, and that there was no allegation
19 in that Complaint referencing you showing the
20 constable or the tow company the registration, would
21 you think that that's an omission?
22        A. A what, I'm sorry?
23        Q. An omission.
24        A. What's another term for that?

**98**

1         Q. That's something that is missing from the
2  Complaint.
3         A. Oh, okay. I don't know. I did explain
4  what I remembered at that time and kept explaining as
5  I kept remembering.
6         Q. And your memory in April of 2021 was
7  probably better than today, correct?
8         A. I don't know how to answer that.
9         Q. So tell me if this is a fair statement,
10 it's an important fact if you had shown the constable
11 the registration saying this is my car; would you
12 agree with that?
13        A. Yes.
14        Q. And if I told you there was an Amended
15 Complaint, that Amended Complaint filed on your behalf
16 did not mention that you told the constable this is my
17 registration, this is my car, would you also agree
18 that that's an omission?
19        MR. ZELMAN: Objection. It calls for a
20 legal conclusion. You can answer.
21        A. I'm sorry?
22        Q. Answer the question.
23        A. Can you repeat it?
24        Q. Sure. You would agree with me that it

**99**

1  would be an omission if your Amended Complaint also
2  didn't mention that you gave the registration to the
3  constable, correct?
4         A. Correct.
5         Q. And then if I told you on -- there was
6  another -- a Second Amended Complaint filed in this
7  case, and I'm going to read to you what paragraph
8  76 -- I'm sorry 73 says, "When Abelli and the MCO
9  arrived at the Plaintiff's property to seize the
10 property, Junior advised the constable that he was the
11 sole owner of the Mini Cooper and provided his
12 registration for the Mini Cooper reflecting that he
13 was the sole owner of the vehicle."
14        I'm going to stipulate that that's what the
15 Complaint says. Does that indicate in that paragraph
16 that you informed my client by showing my client the
17 registration?
18        A. In that paragraph, no.
19        Q. Why did you go to Lowell to the police
20 station?
21        A. I was instructed by the Dracut police to
22 do that. The reason why I stated earlier, I don't
23 know why. I don't know if it's because my vehicle is
24 registered in Lowell. I don't recall.

**100**

1         Q. Was your car in September of 2020
2  registered in Lowell?
3         A. I believe so.
4         Q. And how long had you lived in Dracut?
5         A. 2017.
6         Q. So why was your car registered in Lowell
7  if you lived in Dracut?
8         A. I don't think it was registered in
9  Lowell. I don't know if it's because the RMV is in
10 Lowell. I have no idea. That's something you have to
11 ask the Dracut Police Department.
12        Q. And you recalled answering discovery in
13 this case, correct? And, in fact, Brendan showed you
14 exhibits with your signature on them, correct?
15        A. Correct.
16        Q. And in one of the questions asked by
17 Brendan he asked for the names of the witnesses in
18 this case; do you recall that?
19        A. I don't.
20        Q. I'm sorry?
21        A. I don't.
22        Q. You don't recall?
23        A. Did he say that today?
24        Q. No --

---

**101**

1  MR. PITTS: Do you want me to pull it
2  up?
3  MS. SALPOGLOU: Brendan, it's
4  interrogatory number 9 on yours.
5  (Discussion off the record.)
6  Q. Right here, number 9. Do you see that,
7  Mr. Espinosa?
8  A. Yes.
9  Q. And the first witness is Perlina Ses.
10  A. I see that.
11  Q. And you write that she may have also
12  witnessed the seizure of the Mini Cooper.
13  A. Okay.
14  Q. So did she or did she not witness it?
15  A. I explained earlier that she came down
16  the stairs. I don't know how far she got down. She
17  was just being nosy. From what she said she had seen
18  it.
19  Q. So would you have written that as part of
20  your answer?
21  A. Written what?
22  Q. What she may have seen.
23  A. I mean, if I get into details with her,
24  she might provide some information.

---

**102**

1  Q. Did you have any conversations with her
2  about what she saw?
3  A. I don't recall.
4  Q. You don't recall whether you had a
5  conversation with your girlfriend about what she saw?
6  A. I don't recall what we spoke about.
7  Q. Do you recall her ever telling you what
8  she saw?
9  A. No, I don't.
10  Q. Have you ever had a car seized before?
11  A. No.
12  MS. SALPOGLOU: Brendan, can you scroll
13  down further so we can see the remaining?
14  Q. It says, Sonya, Sergio, Junior, and
15  Senior, and then the defendants and constables. Those
16  are the only parties you listed as being a witness in
17  this case; is that correct?
18  A. Yes.
19  Q. But today you testified that you had
20  conversations with the Dracut police, correct?
21  A. Correct.
22  Q. You testified today that you had
23  conversations with the Lowell police, correct?
24  A. Correct.

---

**103**

1  Q. You testified today that you had
2  conversations with Honda Lease Trust, correct?
3  A. Correct.
4  Q. You testified today that you had
5  conversations with Direct Federal Credit Union.
6  A. Correct.
7  Q. You testified today that you had
8  conversations with Attorney Zola.
9  A. Correct.
10  Q. Why aren't those people listed here?
11  A. It looks like the people that actually
12  witnessed the car getting seized. I don't think any
13  of the people you mentioned were there that night.
14  Q. It says, "Please identify all witnesses
15  that have knowledge of the facts alleged in the
16  Complaint, including their name, address, and a
17  description of their knowledge regarding the
18  allegations." Did I read that right?
19  MR. ZELMAN: Pam, we provided you the
20  witnesses to the event of the seizure. I'm pretty
21  sure that's what we understood you to be asking in
22  this case or Brendan.
23  MR. PITTS: I don't know what the
24  question was.

---

**104**

1  MR. ZELMAN: That's a separate question,
2  but I'm just telling you what we provided.
3  Q. And you don't have a copy of any police
4  report, correct?
5  A. Correct.
6  Q. You never went to get a police report,
7  correct?
8  A. Correct.
9  Q. And after the Mini Cooper was taken, did
10  you know where it was stored?
11  A. Yes.
12  Q. And how did you come to that information?
13  A. I don't recall. I don't recall.
14  Q. Did you contact Export after the Mini
15  Cooper was seized?
16  A. I don't recall.
17  Q. You don't recall whether you called the
18  tow company about your car?
19  A. There was a lot of back and forth phone
20  calls. I don't recall calling Export.
21  Q. Would the timeline that you prepared that
22  you haven't -- would the timeline that you produced
23  contain notations if you contacted my client?
24  A. It might.

---

**105**

1    Q. And did you ever find out how much the

2  storage and tow costs were going to be to release the

3  Mini Cooper?

4    A. **No.**

5    Q. Don't you think that would have been a

6  prudent step?

7    A. **That would have been what?**

8    Q. Don't you think it would have been

9  prudent to find out how much was owed so you could get

10  your vehicle back?

11    A. **No. At this point I believed my vehicle**

12  **was wrongfully taken, so I didn't get into storage**

13  **fees or what I was willing to pay for storage fees.**

14    Q. So it's fair to say that you didn't find

15  out from my client what the storage fees were in order

16  to get your vehicle back?

17    A. **I don't recall. I don't think so.**

18    Q. Well, didn't you testify earlier that

19  Judgment Acquisitions told you that you had to settle

20  with them in order for them to authorize the release

21  of the Mini Cooper?

22    A. **Correct, but that was towards the debt.**

23    Q. That's correct, towards the debt so that

24  the car could be released. So it's fair to say that

---

**106**

1  my client could not release the vehicle to you unless

2  Judgment Acquisitions released the vehicle?

3    A. **I believe so.**

4    Q. Now, when the Mini Cooper was returned,

5  were you present?

6    A. **Yes.**

7    Q. And tell me about that. What time of the

8  night was that?

9    A. **It could have been between 10 p.m. and**

10  **midnight.**

11    Q. And were you awake?

12    A. **I was.**

13    Q. And who was there at the time that the

14  Mini Cooper was dropped off?

15    A. **My dad's wife was present. My little**

16  **sister could have been here. She's always in her**

17  **room. I don't think she witnessed it, and my dad was**

18  **present.**

19    Q. Your dad was present at the time?

20    A. **Correct.**

21    Q. And at this point was the constable

22  there?

23    MR. ZELMAN: Which one are we talking

24  about? The first time or the second time?

---

**107**

1    MS. SALPGLOU: This is regarding the

2  Mini Cooper being dropped off.

3    MR. ZELMAN: Oh, the time when the Mini

4  Cooper was dropped off and the Honda Accord was

5  taken. Go ahead.

6    A. **I don't recall if the constable was here**

7  **again.**

8    Q. Did you have any conversation with

9  anybody?

10    A. **The Export tow rep.**

11    Q. What conversation did you have?

12    A. **He asked for the keys to the Honda.**

13    Q. And this was about three weeks later,

14  correct, after your Mini Cooper had been seized?

15    A. **It sounds right.**

16    Q. And you had done a lot of research you

17  had just testified to, correct?

18    A. **It was a lot of information.**

19    Q. Lawyers, correct?

20    A. **Correct.**

21    Q. You spoke to people at work asking for

22  guidance, correct?

23    A. **Correct.**

24    Q. You had spoken to the police, correct?

---

**108**

1    A. **Correct.**

2    Q. And you indicate in your answers to

3  interrogatories that you know that it's illegal to

4  take a leased vehicle, correct?

5    A. **Correct.**

6    Q. And did you tell the driver for Export

7  that they couldn't take a leased vehicle?

8    A. **I didn't find out about not being able to**

9  **take a leased vehicle until the leased vehicle was**

10  **taken.**

11    Q. And --

12    A. **So after the leased vehicle was taken.**

13    Q. Fair enough. Who -- describe to me what

14  my client's agent looked like that night.

15    A. **I'll have to look at an image to confirm**

16  **that.**

17    Q. You produced pictures of the vehicle, the

18  Honda Accord, when it was taken, correct?

19    A. **Correct.**

20    MS. SALPOGLOU: Brendan, can you stop

21  sharing the screen?

22    MR. PITTS: Sure.

23    Q. Did you take pictures that night?

24    A. **I believe those pictures were taken from**

---

1 my father's wife.

2     Q. And I'm going to show you this. I

3 haven't marked it as an exhibit. Do you recognize

4 that photo?

5     A. Yes.

6     Q. Does that look like a constable?

7     MR. ZELMAN: Would you like me to put

8 the real photo up on the screen?

9     MS. SALPOGLOU: If you've got it, that

10 would be great.

11     MR. ZELMAN: One second because I have

12 them here.

13     (Discussion off the record.)

14     Q. Does that picture refresh your memory?

15     A. Yes, it does.

16     Q. There was a constable there, correct?

17     A. I see that now.

18     Q. Do you see that he's holding what appears

19 to be a gun holster on his hip?

20     A. Can you zoom in, please?

21     MR. ZELMAN: Yes, I'm going to zoom in

22 for me.

23     A. Again, zooming in, I wasn't that close.

24     Q. Does it appear to look like there's a gun

1 holster on his hip?

2     A. Yes.

3     Q. Was that the same constable that came the

4 first night to take your Mini Cooper?

5     A. He will have to turn around for me to

6 confirm that.

7     Q. It appears this constable is bald. Is

8 that a fair depiction?

9     A. I don't recall.

10     Q. So it appears that there are two

11 individuals in this photo. One is what looks like he

12 is attempting to be working on the motor vehicle, the

13 Honda Accord, and the other is watching, correct?

14     A. Correct.

15     Q. Where were you when this photo was being

16 taken?

17     A. I'm probably right there with my father's

18 wife.

19     Q. And tell me again what conversations you

20 had with either my client or the constable.

21     A. Where your client was before this picture

22 was taken. He did approach the steps and asked for

23 the keys to not damage the vehicle.

24     Q. Did you provide him the keys?

1     A. No.

2     Q. Did your stepmother provide him the keys?

3     A. No.

4     Q. Did you have any conversation about why

5 they were taking the Honda Accord?

6     A. No.

7     Q. Did you have any conversations about why

8 they were returning the Mini Cooper?

9     A. I don't recall.

10     Q. Do you recall anything that happened that

11 night?

12     A. That's the first time I answered. I

13 don't recall.

14     Q. Well, you don't remember any conversa-

15 tions. Your car is coming back after it's been gone

16 for three weeks. You didn't have a single conversa-

17 tion with the constable or with Export?

18     A. No.

19     Q. After the Honda Accord was taken, did you

20 contact Export to arrange its return?

21     A. No.

22     Q. Did you contact Honda Lease Trust?

23     A. Yes.

24     Q. And did you tell them what was going on?

1     A. Yes.

2     Q. And they told you what?

3     A. They pretty much said that a leased

4 vehicle -- it's owned by Honda. It's their property

5 and it can't be taken for any kind of debt, and then I

6 think they appointed an attorney on their end.

7     Q. And did you have any conversations with

8 Honda about Honda paying the storage fees to release

9 the Honda Accord back to your father?

10     A. No. I don't think so.

11     Q. Do you know whether Honda contacted my

12 client to inquire about the storage and the tow costs?

13     A. I don't know that.

14     Q. You indicated that you left Dracut to go

15 to Export once you learned that the Honda Accord was

16 being released, correct?

17     A. Correct.

18     Q. Do you know where my client's facility

19 is?

20     A. I'm sorry?

21     Q. Do you know where my client's facility

22 is, the storage unit?

23     A. Off the top of my head I do not know.

24     Q. Do you know is it North Shore, South

**113**

1  Shore, Cape Cod, Worcester, any geographical
2  approximation?
3        A. **No, no, I don't know.**
4        Q. If I told you Medford, would that refresh
5  your memory?
6        A. **I think that sounds right.**
7        Q. Do you know how long it takes to drive
8  from Dracut to Medford?
9        A. **I guessed earlier about 40 minutes.**
10       Q. And you said about five or ten minutes
11  away from the destination you called my client,
12  correct?
13       A. **Correct.**
14       Q. How did you know that you were five to
15  ten minutes away?
16       A. **GPS. I wouldn't be able to get there
17  without it.**
18       Q. When you contacted Export, who did you
19  speak with?
20       A. **A gentleman.**
21       Q. Did you get his name?
22       A. **No.**
23       Q. Is there a reason why you didn't get his
24  name?

**114**

1        A. **I don't know. I don't think I asked for
2  it. He could have said it as an introduction and
3  that's it, but no, I didn't ask for it.**
4        Q. And what did you tell him?
5        A. **I explained who my father was. I
6  explained that there's a vehicle there that's been
7  released. I believe they asked for the description of
8  the vehicle, and they were able to locate it.**
9        Q. And what else did they say?
10       A. **They said there was storage fees
11  involved. It needs to be taken care of.**
12       MS. SALPOGLOU: Could you read back the
13  last question, I'm sorry.
14       (The reporter read the requested testimony.)
15       Q. Did you ask how much the storage fees
16  were?
17       A. **I don't recall. I could have. I don't
18  recall.**
19       Q. Could they have been a few hundred
20  dollars?
21       A. **I don't recall.**
22       Q. So I'm confused. Why wouldn't you ask
23  about the storage fees? Because you had just driven
24  from Dracut almost to Medford after 3 and you're five

**115**

1  minutes away, and you don't ask what the storage fees
2  are?
3        A. **I didn't say I didn't ask. I said I
4  don't recall.**
5        Q. You don't recall. Did you make any other
6  attempts to settle with my client to get the Honda
7  Accord back?
8        A. **No.**
9        Q. After you learned that it was allegedly
10  unlawful to seize a vehicle that is leased, did you
11  bring the lease agreement to my client's facility?
12       A. **I didn't, no.**
13       Q. Did you contact my client to inform it
14  that it was a leased vehicle?
15       A. **I didn't, no.**
16       Q. Is it fair to say that you and your
17  father did not contact Export at any time in the
18  months of November and December of 2020?
19       A. **Correct.**
20       Q. It's fair to say that you and your father
21  let the Honda Accord stay in my client's possession?
22       A. **We didn't let them. We had no choice.**
23       Q. Well, you did have a choice, didn't you?
24  You could have paid the storage fees, correct?

**116**

1        A. **I don't recall. What were the storage
2  fees?**
3        Q. I'm asking you if you could have at any
4  time in November or December contacted my client to
5  find out about the storage fees in order to get the
6  Honda back, and you didn't? Is that a fair statement?
7        A. **Correct.**
8        Q. So you didn't do anything to mitigate
9  your damages?
10       A. **At this point there was an attorney
11  involved, so --**
12       Q. I don't want to talk about your attorney
13  at all, but you did nothing to mitigate your damages
14  with reference to my client, correct?
15       A. **Correct.**
16       Q. Maybe you didn't. Let me ask you: My
17  client was there with a uniformed constable, correct?
18       A. **I'm sorry?**
19       Q. My client was there on the night that the
20  Mini Cooper was seized with a uniformed constable,
21  correct?
22       A. **Correct.**
23       Q. Was my client working at the direction of
24  the constable?

**117**

1      A.  **And this is what night, the Mini Cooper**
2   **or the --**
3      Q.  Yes, I'm sorry.
4      A.  **I believe he was.**
5      Q.  And are you aware that my client received
6   what's called a 93A demand letter dated January of
7   2021?
8      A.  **No.**
9      Q.  Are you aware that my client responded to
10  that letter with an offer of settlement?
11     MR. ZELMAN:  I'm going to object just
12  again to the extent that if anything that you are
13  aware of came from your attorneys, you can't talk
14  about that.
15     MS. SALPOGLOU:  I'm not asking if it
16  came from his attorneys.
17     MR. ZELMAN:  You can ask him if he saw
18  it like Brendan did, but if you are going to ask him
19  if he's aware -- if his awareness is something that
20  came from his attorney, he can't talk about that.
21     Q.  Have you ever seen a copy of my
22  client's --
23     MR. ZELMAN:  We lost a couple of words.
24     Q.  Are you aware -- let me say that again.

**118**

1      Have you seen a copy of my client's 93A
2   response letter as part of this lawsuit?
3      A.  **I don't remember.**
4      Q.  Do you remember whether my client said
5   that he -- sorry, that it would release your father
6   from the storage and tow fees associated with the
7   Honda Accord in exchange for a release from you and
8   your father?
9      A.  **I don't recall.**
10     Q.  Is there any reason why in February of
11  2021 before this lawsuit was filed that you didn't try
12  to settle with my client?
13     A.  **I don't know.**
14     Q.  Are you aware of the actual demand amount
15  you were seeking back in February of 2021?
16     A.  **I don't recall.**
17     MS. SALPOGLOU:  I don't think I have
18  anything further.
19     MR. ZELMAN:  Are you going to take a
20  crack at my client?
21     MR. SIMONS:  Yes.
22  __EXAMINATION BY MR. SIMONS__
23     Q.  Good afternoon, Mr. Espinosa, how are
24  you?

**119**

1      A.  **I'm good.  Thanks for asking.**
2      Q.  As you probably surmised, I represent Mr.
3   Abelli and the Mass. Constables Office.
4      MR. ZELMAN:  Before we get going, I
5   don't want to interrupt, we have been at this for two
6   and a half hours without a break.  Sergio, are you
7   okay?
8      THE WITNESS:  I wouldn't mind taking a
9   break.  I have been drinking a lot of water.
10     MR. ZELMAN:  I think that's fair, guys.
11  Let's give him five minutes.
12     (Short break was taken.)
13     Q.  Sergio, when you were showing the
14  registration to the Mini Cooper to the constable, do
15  you recall the conversation that you had, what you
16  told him specifically?
17     A.  **Specifically, no.  I didn't -- the reason**
18  **for the registration was to prove that that car is**
19  **mine, that it's registered under Sergio Espinosa,**
20  **Junior.  Somewhere in that conversation that was my**
21  **explanation.**
22     Q.  And what did the constable say back to
23  you, if you recall?
24     A.  **I don't recall what he said back.**

**120**

1      Q.  Did you have it in your hand the entire
2   time or did he take it from you?
3      A.  **I don't recall.**
4      Q.  How long was your explanation with the
5   constable?  How long were you engaged in conversation
6   with him?
7      A.  **I don't think no more than two minutes.**
8      Q.  And how far away were you from the
9   constable?
10     A.  **We were side by side.**
11     Q.  How far was your dad from you?
12     A.  **A few feet.**
13     Q.  When you say "a few" --
14     A.  **Probably like six feet away, seven feet**
15  **away.**
16     Q.  Earlier I think you had testified
17  regarding something else that your dad wouldn't
18  necessarily understand a conversation that was in
19  English because of his language barrier; is that
20  accurate?
21     A.  **Yeah, that's accurate.**
22     Q.  So is it fair to say that you're not sure
23  how much your father was able to hear and understand
24  the conversation between you and the constable?

**121**

1   A. It's fair, yeah.
2   Q. I think earlier you had testified that
3 you tried to Google the constable's information; is
4 that right?
5   A. That's right.
6   Q. What exactly did you search to try to
7 find either Mr. Abelli or Mass. Constables Office?
8   A. I think my main search, without knowing
9 what a constable was, was like a Middlesex sheriff
10 department. That's what I was searching. I really
11 didn't know where he was from or anything like that.
12 I just knew he wasn't a police officer that you will
13 see on your daily basis. His uniform was a little
14 off.
15   Q. Did it say "constable" anywhere on it?
16   A. I don't recall.
17   Q. Did you end up finding either Mass.
18 Constables Office or Brian Abelli during your Google
19 search?
20   A. I don't recall.
21   Q. You had mentioned that he gave you -- the
22 constable there gave you a piece of paper, right?
23   A. Correct.
24   Q. And do you recall whether or not the

**122**

1 constable's information was on that paper?
2   A. Yeah, I don't recall. I do recall the
3 Judgment Acquisitions logo somewhere on that paper.
4   Q. Do you remember the first time that you
5 heard of Massachusetts Constables Office?
6   A. No.
7   Q. Do you remember how you came to hear
8 about them?
9   A. No.
10   Q. And what about with Brian Abelli, do you
11 remember the first time you heard his name?
12   A. No, no.
13   Q. Do you remember how you came to learn his
14 name?
15   A. No.
16   Q. Do you recall if the constable at the
17 scene when the Mini Cooper was seized introduced
18 himself?
19   A. I don't recall. He could have. I don't
20 recall.
21   Q. Are you claiming now that Massachusetts
22 Constables Office or Brian Abelli are debt collectors?
23   A. Are you saying that they are or they are
24 not?

**123**

1   Q. Well, I'm asking you if you are claiming
2 that they are?
3   A. I don't know. I don't know.
4   Q. And I think you testified earlier that
5 you believe the night of the Mini Cooper seizure that
6 the tow truck driver was working under the direction
7 of the constable. If I'm right about that, what makes
8 you say that?
9   A. What makes me say that was when I believe
10 I was showing him the registration, it was -- in front
11 of the constable whether he was holding it or I was
12 holding the paper, I don't recall, the tow truck
13 driver kind of leaned in and looked. He obviously
14 heard me talking. He was right there, and then the
15 constable continued to instruct him to just take the
16 vehicle. This is the vehicle we came here for. If
17 you have any questions, call the number. He must have
18 pointed to the contact information in that letter.
19   Q. So you heard the constable directing the
20 tow truck driver to take that car?
21   A. Correct.
22   Q. Did you have any direct conversation with
23 the tow truck driver?
24   A. No.

**124**

1   Q. I believe that Attorney Pitts asked you
2 what amount you are looking to settle for, and you
3 said something along the lines of whatever the law
4 says; is that right?
5   A. Correct.
6   Q. And what do you mean by that?
7   A. This is going on for two years. As I
8 mentioned earlier, I feel like I'm innocent and this
9 should not affect me the way it did. I obviously
10 don't know the law. Whatever I'm entitled to for them
11 wrongfully taking my car.
12   Q. When you say whatever you are entitled
13 to, do you mean the maximum amount that you could
14 possibly get under the law?
15   A. I think that's fair.
16   Q. What if the maximum amount was $1
17 million, would you think that's fair?
18   A. I really don't know to be honest with
19 you.
20   Q. Well, if you were offered $1 million
21 right now to settle this case, would you?
22   MR. ZELMAN: Do you want to give me a
23 minute with my client?
24   Q. I'm not offering it. I'm asking you

**125**

1 were.

2     **A. That's up to my attorney, I believe.**

3     Q. What if it was up to you completely,

4 would you accept $1 million if you were offered? And

5 to be clear you are not being offered $1 million.

6     **A. But it's not up to me, so I can't answer**

7 **that.**

8     Q. Would you feel satisfied with a $1

9 million payment to let go of this lawsuit?

10     **A. I don't know to be honest with you.**

11     Q. So you feel like you have suffered

12 potentially more than $1 million worth for this whole

13 ordeal?

14     **A. No, no, I didn't say that. I'm saying I**

15 **don't know. I don't know what's fair. I don't know.**

16     Q. But I'm asking you if $1 million would be

17 fair to you or are you saying that's way too much?

18     **A. I'm saying I don't know.**

19     Q. So you have no idea if you are going to

20 be satisfied or not satisfied with an outcome of this

21 case because you have no idea if it's a good or bad

22 outcome at all? You're just going to not know?

23     **A. I will eventually find out. Right now I**

24 **don't know.**

**126**

1     Q. Are you going to find out if you are

2 happy or sad with the settlement or with the judgment

3 if you get anything?

4     **A. Correct.**

5     MR. SIMONS: Okay. Those are all the

6 questions I've got.

7     MR. ZELMAN: I have got a couple. I

8 want to clarify some things, and then we'll see if

9 anyone else has some and then we'll be done.

10     <u>EXAMINATION BY MR. ZELMAN</u>

11     Q. So you were asked a lot tonight -- almost

12 tonight. Sergio, you were asked a lot today about

13 what happened on the night of the Mini Cooper, right,

14 and the registration and who said what to who when,

15 correct?

16     **A. Correct.**

17     Q. Can you sit here and say with absolute

18 certainty that you showed your registration to the

19 constable on that night?

20     **A. Yes.**

21     Q. The tow truck driver, did he participate

22 in that conversation?

23     **A. He did participate.**

24     Q. So when you were showing the registration

**127**

1 to the constable, was the tow truck driver also

2 standing next to you guys?

3     **A. He was standing next to him.**

4     Q. Did you show it to him, as well?

5     **A. He looked at it. He definitely looked at**

6 **it.**

7     MS. SALPOGLOU: Objection. Asked and

8 answered.

9     Q. Now, after you showed it to him, you put

10 the registration back in the glove compartment?

11     **A. Correct.**

12     Q. And then let me put up what's on the

13 screen here one moment -- where did it go?

14     (Pause)

15     Q. Do you recall this e-mail you were

16 looking at earlier today, it's Bates stamped Espinosa

17 12?

18     **A. Is that a question to me?**

19     Q. Yes. Do you recall looking at this

20 e-mail earlier today?

21     **A. I was, yes.**

22     Q. And this e-mail you told Attorney Zola

23 that, "Please be advised that my car 2011 Mini Cooper

24 was wrongfully taking by your law office on behalf of

**128**

1 Judgment Acquisitions Unlimited;" is that what you

2 wrote?

3     **A. Yes. That's what I wrote.**

4     Q. And the last sentence of this paragraph

5 you wrote to them that this could also be verified on

6 the registration located inside the glove department

7 of my vehicle?

8     **A. Yes.**

9     Q. So the entire time that the Mini Cooper

10 was taken away from you, the registration was in the

11 glove compartment of your vehicle?

12     **A. Correct.**

13     Q. Now, you were asked earlier today about

14 who shared this information with at your work, and

15 weren't you embarrassing yourself by sharing this

16 information at your work, correct?

17     **A. Yes.**

18     Q. Were you just going around your work and

19 announcing that your car was taken to everyone there?

20     **A. No.**

21     Q. So who were you telling it to?

22     **A. I was telling it to my close friends.**

23 **They actually sit next to me and I shared it with**

24 **them. Word got around. I was mentioning it to**

**129**

1  management because I needed a couple of hours off, a
2  couple of days off just to get everything situated.
3  So, yeah, everyone found out.
4          Q.  So you told the people who needed to know
5  because you needed certain things; is that right?
6          A.  Correct.
7          Q.  Okay.  And then it just got out to
8  everyone else?
9          A.  Correct.
10         Q.  Last two questions:  We looked at that
11 photo earlier, and I'll put it back on the screen so
12 we can have it up in front of you, literally two
13 questions here.  One second.  Bates 62.
14         (Pause)
15         Q.  We looked at this photo earlier today of
16 the constable, and this is the night that the Honda
17 Accord was taken, correct?
18         A.  Yes.
19         Q.  You see how he's dressed in that uniform
20 with that gun?
21         A.  Yes.
22         Q.  Was that the same way that the constable
23 was dressed the night of the Mini Cooper?
24         A.  It looks like it, yeah.

**130**

1          Q.  Okay.  This document, which is Bates
2  stamped Espinosa 13, do you see that document?
3          A.  I do.
4          Q.  Do you recognize that document?
5          A.  I do.
6          Q.  Is that the document that the constable
7  gave you the night of the Mini Cooper seizure?
8          A.  Yes.
9          Q.  Last question:  Did Honda ever bill you
10 or your dad for the storage or constable fees?
11         A.  Yes.
12         Q.  How did they do that?
13         A.  It's still pending on my father's end.
14 There's still an outstanding balance.
15         Q.  So they put an outstanding balance for
16 the constable fees on his account?
17         A.  Correct.
18         Q.  Okay.
19         MR. ZELMAN:  All right, I'm done.
20 Anyone else?
21         MS. SALPOGLOU:  I have a follow-up on
22 that.
23         EXAMINATION BY MS. SALPOGLOU
24         Q.  Mr. Espinosa, you said that Honda is

**131**

1  pursuing constable fees from your father?
2          A.  There's pending fees due to the -- I
3  don't know exactly what it is.  I can get more
4  information from my father.
5          Q.  What amount are those fees,
6  approximately?
7          A.  I'll have to get that from my father.
8          Q.  And how did they notify you of these
9  fees?
10         A.  If I'm not mistaken, I believe it's on
11 his monthly lease pay stub or receipt, invoice.
12         Q.  Have you contacted Honda to discuss it
13 with them?
14         A.  That's something you have to ask my
15 father.
16         Q.  Well, I thought your father doesn't speak
17 English very well and you do these conversations for
18 him.
19         A.  There are Spanish-speaking representa-
20 tives at Honda.
21         Q.  And the constable fee, do those include
22 the storage fee?
23         A.  I don't know exactly what they include.
24 I will have to get some more information.

**132**

1          Q.  Do they --
2          A.  Again, this is my father's car here.
3          Q.  Do they include the tow fees?
4          A.  I don't know.  I will have to ask.
5          Q.  And when did you learn about these fees?
6          A.  Months ago.  Four or five months ago.
7          Q.  Is there any reason why that document or
8  that information hasn't been produced before today?
9          A.  I don't know.  I don't know why.
10         Q.  And so I just want to clarify one thing
11 and then I'm done.  I spent a lot of time with you
12 going through each and every Complaint that's been
13 filed in this case; do you recall that?
14         A.  I do.
15         Q.  I went through your answers to interroga-
16 tories.  We talked about the registration.  I asked
17 you specifically if you showed the registration to my
18 client, and you indicated that you didn't show the
19 registration to my client until after we took a break;
20 is that a fair statement?
21         A.  Until what after the break?
22         Q.  When your attorney just questioned you,
23 you said that the constable --
24         MR. ZELMAN:  We lost some of your words,

133

1 Pamela.

2 Q. You testified when your attorney
3 requested, that you showed the registration to the
4 constable and to the driver for Export; is that
5 correct?

6 A. **Correct.**

7 Q. And we had gone through the complaints
8 earlier, specifically paragraph 73, where you only
9 showed the registration to the constable, correct?

10 A. **Correct.**

11 Q. So why is it you changed your answer now
12 stating that you showed the registration to my client?

13 A. **I have always said that your client**
14 **looked at the paper, but your question really didn't**
15 **direct that, so I had to answer it differently.**

16 Q. Well, you said that my client was there
17 and was looking over. I specifically said it was 3
18 a.m., correct?

19 A. **You said a time, correct.**

20 Q. So are you testifying under oath at this
21 moment that you showed the registration to the vehicle
22 to my client on the night that the Mini Cooper was
23 taken? You are under oath.

24 A. **I don't know what that means, "under**

134

1 oath."

2 Q. "Under oath" means you have to tell the
3 truth, and if you are caught lying, you could be
4 charged with perjury.

5 A. **I showed the paper to the constable. I**
6 **don't know if whether he took it from my hands or not,**
7 **and then your client was there looking at the paper**
8 **with the constable.**

9 Q. Well, did you specifically give it to my
10 client, the registration to the Mini Cooper?

11 A. **Hand it over to your client? No.**

12 Q. And a copy of the registration that you
13 provided to the constable, is that what was produced
14 as part of this lawsuit or was there a different
15 registration in the car?

16 A. **What do you mean?**

17 Q. So your attorney produced a copy of the
18 Certificate of Registration for the vehicle, the Mini
19 Cooper. Is that what was taken from your car?

20 A. **I don't recall if he requested or if**
21 **that's the same exact one.**

22 Q. And when the constable -- I'm sorry, when
23 my client drove away with your vehicle, do you know
24 whether the car was locked?

135

1 A. **I don't know.**

2 Q. Did you lock the car with your key fob as
3 they drove away?

4 A. **I don't know that.**

5 Q. Did you give your keys to my client?

6 A. **No.**

7 Q. Well, if the car was locked and you had
8 the keys, then my client wouldn't be able to easily
9 access the registration; is that correct?

10 A. **If it was locked, correct.**

11 MS. SALPOGLOU: I don't have anything
12 further.

13 MR. ZELMAN: It's 5 o'clock. Are we all
14 done, guys?

15 MR. SIMONS: I'm done.

16 MR. ZELMAN: Brendan, you're done?

17 MR. PITTS: Yeah, I'm good.

18 MR. ZELMAN: We made it. Sergio, thank

19 you.

20 (Deposition of SERGIO ESPINOSA, JR., concluded
21 at 5:01 p.m.)

22

23

24

136

1 SIGNATURE PAGE

2 I hereby certify that I have read the
3 foregoing deposition transcript of my testimony, and
4 further certify that said transcript is a true and
5 accurate record of said testimony.

6

7

8

9 _____

SERGIO ESPINOSA, JR.

10

11

12 Signed under the pains and penalties of
13 perjury this _____ day of _____, 2022.

14

15

16

17

18

19

20

21

22

24

137

1    ERRATA SHEET

2        CHANGES TO THE DEPOSITION; INSTRUCTIONS TO THE
     WITNESS:  Please do not write in the transcript.
3    Note any desired corrections to your testimony by
     page and line number.  Enter text as it should appear
4
         Page  Line    Change/Corrections
5
6    ____ ____   _____

7    ____ ____   _____

8    ____ ____   _____

9    ____ ____   _____

10   ____ ____   _____

11   ____ ____   _____

12   ____ ____   _____

13   ____ ____   _____

14   ____ ____   _____

15   ____ ____   _____

16   ____ ____   _____

17   ____ ____   _____

18   ____ ____   _____

19   ____ ____   _____

20   ____ ____   _____

21   ____ ____   _____

22   ____ ____   _____

23   ____ ____   _____

24   ____ ____   _____

138

1        C E R T I F I C A T E

2        COMMONWEALTH OF MASSACHUSETTS

3        I, Janice A. Maggioli, a Registered

4    Professional Reporter and Notary Public in and for

5    the Commonwealth of Massachusetts, do hereby certify

6    that the witness whose deposition is hereinbefore set

7    forth was duly sworn by me on this 16th day of June,

8    2022, at 2:05 p.m., and that the foregoing transcript

9    is a true and accurate record of testimony given by

10   this witness.  I also certify that such testimony is

11   a true and accurate transcription of this deposition

12   as reported stenographically by me to the best of my

13   knowledge, skill, and ability.

14       I further certify that I am not related to

15   this witness, any of the parties, or counsel for the

16   parties in this action, nor do I have any interest in

17   the outcome of this matter.

18       IN WITNESS WHEREOF, I have hereunto set my

19   hand this 27th day of June, 2022.

20

              /s/ Janice A. Maggioli
21            Notary Public
              My Commission Expires:
22            February 02, 2029.

23

24

COPLEY COURT REPORTING,INC.  (617) 423-5841                35 of 48 sheets