UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| SERGIO ESPINOSA SR. and SERGIO ESPINOSA JR., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| ANDREW C. METCALF d/b/a JUDGMENT ACQUISITIONS UNLIMITED, et al., | ) ) ) ) ) |
| Defendants. | ) ) ) ) |

Case No. 21-cv-10356-DJC

MEMORANDUM OF DECISION

CASPER, J.                                                    June 23, 2023

I.    INTRODUCTION

The Court has previously granted summary judgment for Plaintiffs Sergio Espinosa Sr. ("Senior") and Sergio Espinosa Jr. ("Junior") (collectively, "Plaintiffs" or the "Espinosas") on their claims against Andrew C. Metcalf ("Metcalf") d/b/a Judgment Acquisitions Unlimited ("JAU") and Champion Funding, Inc. ("Champion") (collectively, "Defendants") under the Fair Debt Collection Practices Act ("FDCPA") codified at 15 U.S.C. § 1692 (Counts I, IV and VI), Mass. Gen. L. c. 93 and 93A (Counts V and IX) and for conversion (Count X) arising from an attempted debt collection.   D. 92.   After a one-day bench trial on damages, the Court now issues its findings of facts and conclusions of law on damages for the aforementioned claims against Metcalf, JAU and Champion and shall enter judgment for the Espinosas accordingly.

1

## II.      PROCEDURAL HISTORY

The Espinosas instituted this action against Metcalf, JAU, Champion, Export Enterprises Inc. ("Export"), Massachusetts Constable Inc. d/b/a Massachusetts Constables Office ("MCO") and Brian Abelli ("Abelli") (collectively, "Defendants"), asserting various claims.   D. 1, 41.   The Espinosas settled their claims with Export.   D. 89.   The Espinosas and Abelli and MCO filed cross motions for partial summary judgment, D. 63, D. 67.   Abelli and MCO also settled with the Espinosas, D. 90, and the Court accordingly denied their motion as moot, D. 67, and denied the Espinosas' motion for partial summary judgment, D. 63, to the extent that it concerned claims against Abelli and MCO.   D. 90, 92 at 1-2.   Accordingly, the only part of the motions for partial summary judgment that remained for the Court's consideration was the Espinosas' motion as to Counts I, IV, V, VI, IX, and X against Champion, Metcalf and JAU.   D. 63.   The Court allowed the Espinosas' motion for partial summary judgment as to these claims.   D. 92   at 2, 16-17. Following this ruling, the Espinosas withdrew their remaining claims against Champion, Metcalf and JAU.   D. 96 at 1-2.   Accordingly, the only question that remained for the bench trial was the measure of damages on the Espinosas' FDCPA (Counts I, IV and VI), Mass. Gen. L. c. 93 and 93A (Counts V and IX) and conversion (Count X) claims against Metcalf, Champion and JAU.

At the bench trial, D. 112, the Espinosas, Senior and Junior, testified.   D. 113.   The Espinosas also introduced four exhibits:   copies of their Chapter 93A letters to Metcalf, JAU and Champion and the Defendants' responses to the same.   D. 113; D. 107-1; D. 107-2; D. 107-3; D. 107-4.   Metcalf, JAU and Champion did not introduce additional evidence.   The Court took the matter under advisement.   D. 112.

### III.    FINDINGS OF FACT

On the question of liability, the Court incorporates the undisputed facts recited in its summary judgment ruling.   D. 92.   The undisputed facts established that Champion, Metcalf and JAU are debt collectors who seized a vehicle belonging to Junior and a vehicle leased by Senior, neither of which Champion, Metcalf and JAU had a legal right to possess.   Id. at 7–9. Accordingly, the Court's findings of fact are limited to those which pertain to damages.

1.       In 2006, a default judgment in Lowell District Court was entered against Senior for a credit card debt.   Id. at 3.

2.       Junior, a child in 2006, had nothing to do with this credit card debt, or with the resultant judgment obtained thereon.   Id.

3.       Fourteen years later, on September 22, 2020, Export and MCO seized Junior's Mini Cooper on behalf of Metcalf, JAU and Champion in an attempt to collect Senior's debt.   Id. at 4.

4.       On September 23, 2020, Junior called JAU and spoke with Metcalf, advising him that the Mini Cooper belonged to him, not Senior.   Id. at 5; Tr. at 22:5-23:8.[1]

5.       Metcalf responded by calling Junior a "liar" and mentioned that he "deals with liars all the time."   Tr. at 23:4-8.

6.       Metcalf and JAU told Junior that he would have to pay $4,000 and that Junior would need to pay that sum within twenty-four hours if he wanted to get his Mini Cooper back. Tr. at 24:3-11.

7.       On September 24, 2020, Junior emailed JAU's attorney, Michael Zola, advising

---

[1] "Tr." refers to the transcript of the March 27, 2023 bench trial on damages and "#:#" refers to the page and line of that transcript.

3

him that his vehicle was wrongfully taken.   Tr. at 23:20-25.

8.      With that email, Junior also enclosed copies of financing documentation showing that he owned the Mini Cooper.   Tr. at 23:20-25.

9.      Over the next sixteen days, until October 9, 2020, Champion, Metcalf, JAU and Export continued to hold Junior's Mini Cooper.   D. 92 at 5; Tr. at 32:22-25.

10.      On October 9, 2020, Export brought Junior's Mini Cooper back to the Espinosas' residence and immediately seized Senior's Honda Accord.   D. 92 at 5; Tr. at 48:15-17.

11.      Senior does not own this Honda Accord, which is leased from Honda and owned by Honda.   D. 92 at 5; Tr. at 33:6-17.

12.      On October 21, 2020, after being instructed by JAU that the Honda Accord was released, Junior and Senior drove to Export's tow yard to retrieve it.   D. 92 at 5; Tr. at 49:1-4.

13.      At that time, an Export representative advised the Espinosas that they would first have to pay the towing and storage fees sought by Export.   D. 92 at 5-6; Tr. at 49:1-6.

14.      Senior could not afford to pay the towing and storage fees that Export wanted, so he and Junior returned home without the Honda Accord.   D. 92 at 6; Tr. at 49:7-10.

15.      Metcalf, Champion, JAU and Export continued to hold onto Senior's vehicle for seven months until it was returned to the Espinosas' residence on May 1, 2021.   D. 92 at 6; Tr. at 39:15-16.

16.      More than thirty days before this lawsuit was filed on March 3, 2021, the Espinosas sent demand letters to Metcalf, JAU and Champion, setting forth their claim under Mass. Gen. c. L. 93A.   D. 107-1 (dated January 5, 2021); D. 107-2 (dated January 7, 2021).

17.      Metcalf, JAU and Champion received these letters, as evidenced by their responses.

4

D. 107-3; D. 107-4.

18.    In response to the Espinosas' demand letters, Metcalf, JAU and Champion each offered $10 for settlement of the claims.   D. 107-3 at 1; D. 107-4 at 1.

19.    Junior was deprived of his Mini Cooper for sixteen days**,** while he continued to pay his monthly loan payment in the amount of $138 plus car insurance.   Tr. at 19:16-25.

20.    The lowest amount Junior has ever rented a car was at a rate of approximately $80 per day.   Tr. at 25:9-14.

21.    During this period of time, Junior's girlfriend sometimes drove him in her car to and from work, which he found embarrassing.   Tr. at 18:17-21; see 21:5-17; 27:2-7.

22.    Junior was forced to reveal his father's indebtedness to some of his colleagues at work in having to ask those colleagues for rides to and from work, which exposed him to further embarrassment.   Tr. at 18:8-21.

23.    Junior was also forced to reveal his father's indebtedness to his friends whenever they planned get-togethers and he could not drive.   Tr. at 20:17-21:4; 24:18-25:3.

24.    Senior was deprived of his Honda Accord for 204 days, between October 9, 2020 and May 1, 2021.   D. 92 at 5-6; Tr. at 39:15-16.

25.    During this time, Senior was still forced to pay his monthly lease payments that he owed to Honda, even though he did not have access to it at this time.   Tr. at 46:7-10.

26.    Senior sometimes had to walk to work and other destinations during that time.   Tr. at 35:8-15.

27.    After Junior's Mini Cooper was returned on October 21, 2020, Senior would sometimes use it during the week to get to work, leaving Junior without use of a vehicle.   Tr. at

5

39:22-40:3.

28.     The lowest amount Senior has ever rented a car was at a rate of approximately $60 to $65 per day.   Tr. at 46:3-5.

29.     Senior further suffered shame, embarrassment and trouble sleeping because his Honda Accord was taken and because he had to reveal his indebtedness to his family and friends. Tr. at 46:11–47:9.

## IV.     CONCLUSIONS OF LAW

### A.     <u>Legal Standard</u>

1.     While damages do not need to be a mathematical certainty, they cannot be recovered if "remote, speculative, hypothetical, and not within the realm of reasonable certainty." <u>Kitner v. CTW Transport, Inc.</u>, 53 Mass. App. Ct. 741, 748 (2002) (quoting <u>Lowrie v. Castle</u>, 225 Mass. 37, 51 (1916)).

2.     The general rule with respect to mitigating damages is that the plaintiff may not recover damages that were avoidable by use of reasonable precautions.   <u>Glob. Invs. Agent Corp. v. Nat'l Fire Ins. Co. of Hartford</u>, 76 Mass. App. Ct. 812, 825 (2010) (citation omitted).   Such reasonable efforts are determined by what is "appropriate in the circumstances to avoid loss by making substitute arrangements or otherwise."   <u>Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.</u>, 68 Mass. App. Ct. 582, 612 (2007).   That is, the "appropriateness of efforts to mitigate damages must be evaluated under the totality of circumstances which pertain in each individual case."   <u>Performance Indicator, LLC v. Once Innovations, Inc.</u>, 56 F. Supp. 3d 99, 102 (D. Mass. 2014).

**B.**     **Damages Awarded Under the FDCPA**

3.     The Court has already concluded that Defendants violated the FDCPA as to Senior and Junior.   D. 92 at 13.   If a plaintiff is successful in establishing a claim under the FDCPA, the defendant is liable for actual damages sustained by the plaintiff "as a result of such failure [to comply with FDCPA]", statutory damages (i.e., "such additional damages as the [C]ourt may allow, but not exceeding $1,000"), and "the costs of the action, together with a reasonable attorney's fee as determined by the [C]ourt."   15 U.S.C. § 1692k(a)(1)-(3).

4.     "In determining the amount of liability" under the FDCPA, "the [C]ourt shall consider, among other relevant factors, . . . the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional."   15 U.S.C. § 1692k(b)(1).

5.     Recovery of actual damages under the FDCPA includes not only any out-of-pocket expenses, but also damages for personal humiliation, embarrassment, mental anguish or emotional distress.   Sweetland v. Stevens James, Inc., 563 F. Supp. 2d 300, 304 (D. Me. 2008); In re Hart, 246 B.R. 709, 732 (Bankr. D. Mass. 2000); In re Maxwell, 281 B.R. 101, 118 (Bankr. D. Mass. 2002).

6.     It is not necessary for an FDCPA plaintiff to seek medical treatment to recover emotional distress damages.   McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 911 F. Supp. 2d 1, 72 n.125 (D. Mass. 2012).

7.     "Statutory damages under the FDCPA are limited to $1,000 per lawsuit, not $1,000 per violation."   Gustafson v. Recovery Servs., No. 14-cv-305-JD, 2015 WL 5009108, at *6 (D.N.H. Aug. 21, 2015) (internal citation and quotation marks omitted).   That is true even where

a debt collector violated multiple provisions of the FDCPA with a single action.   Id. (awarding $1,000 in statutory damages where FDCPA claim was based on a single phone call, but "violated the FDCPA in at least three separate ways"); Kaylor-Trent v. John C. Bonewicz, P.C., 910 F. Supp. 2d 1112, 1115 (C.D. Ill. 2012) (awarding $1,000 in statutory damages even where the "message [to plaintiff] violated the FDCPA in two ways").

8.    As to actual damages, the purpose of same under the FDCPA is to fairly compensate the plaintiff, not punish or deter the defendant.   Sweetland, 563 F. Supp. 2d at 304 (citation omitted).   That is, it would be improper to grant the plaintiff such damages in an FDCPA matter in an amount "more than the evidence would justify."   Id.

9.    While emotional damages are recoverable under the FDCPA, the plaintiff cannot rely solely on their conclusory statements of emotional distress to support his claims "unless the 'facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action.'"   Wants v. Experian Info. Sols., 386 F.3d 829, 834 (7th Cir. 2004) (quoting Denius v. Dunlap, 330 F.3d 919, 929 (7th Cir. 2003)).

10.    A statutory violation of the FDCPA does not permit the Court "to offer the plaintiff a wink and a nod" regarding the concreteness of emotional damages simply upon plaintiff uttering that magic phrase.   Crowder v. Andreu, Palma, Lavin & Solis, PLLC, No. 2:19-cv-820-SPC-NPM, 2021 WL 1338767, at *5 (M.D. Fla. Apr. 9, 2021).   To be concrete, the plaintiff's emotional distress from a statutory violation must be real and actually exist.   Id.

11.    While expert testimony is not required for a claim of emotional damages under the FDCPA, a plaintiff must produce corroborating testimony about the manifestations of the mental

anguish or medical or psychological evidence.   Genschorck v. Suttell & Hammer, P.S., No. 12-cv-0615-TOR, 2013 WL 6118678, at *5 (E.D. Wash. Nov. 21, 2013) (citations omitted).

> *a.*     *Calculation of FDCPA Damages*

12.     Here, the Espinosas have shown by a reasonable degree of certainty that they suffered emotional distress due to Metcalf, JAU and Champion's wrongful taking of their vehicles to collect a debt.

13.     As to Junior, the evidence shows that being deprived of his Mini Cooper required him to reveal his father's indebtedness to his work colleagues and friends as he explained his need to be dropped off by his girlfriend, alter their meeting place to his residence or request rides from them.   Based on this evidence of emotional distress, the Court finds that $2,500 in actual damages under the FDCPA is appropriate.[2]   The Court concludes that statutory damages are also warranted here, having already determined that Metcalf, JAU and Champion violated multiple provisions of the FDCPA.   Given that Defendants' noncompliance including the unlawful retention of Junior's vehicle for more than two weeks followed by the wrongful retention of Senior's vehicle for an even longer period of time despite clear evidence, presented to them by Plaintiffs, that they did not have a legal basis to do same, the Court awards Junior $1,000 in statutory damages.

14.     As to Senior, the evidence shows that he suffered shame, embarrassment and trouble sleeping because his Honda Accord was wrongfully taken and held by Defendants for 204

---

[2] Because the Espinosas' actual damages under the FDCPA are duplicative of their damages under Chapter 93A, *infra*, the Court calculates, but does not award, their actual damages under the FDCPA, but only awards them under Chapter 93A.   Malone v. Hecker, 06-cv-10210-GAO, 2007 WL 4200951, at *1 (D. Mass. Nov. 27, 2007) (vacating an award of FDCPA damages that were duplicative of Chapter 93A damages).

days for an outstanding debt that Senior owed.   As a result of this wrongful retention in which Senior was without his leased vehicle, Senior suffered stress and embarrassment as he had to reveal the situation of his indebtedness to his family and friends.   Based on this evidence of emotional distress, the Court finds that $4,000 in actual damages under the FDCPA is appropriate.   The Court concludes that statutory damages are also warranted here, having already determined that Metcalf, JAU and Champion violated multiple provisions of the FDCPA.   Given that Defendants' noncompliance including the unlawful retention of Junior's vehicle for more than two weeks followed by the wrongful retention of Senior's vehicle for an even longer period of time despite clear evidence, presented to them by Plaintiffs, that they did not have a legal basis to do same, the Court awards Senior $1,000 in statutory damages.

## C.    Damages Awarded for Conversion

15.    A person who establishes a claim for conversion is entitled to damages, which are measured by the value of the converted goods at the time of the conversion, with interest from that time.   See, e.g., Welch v. Kosasky, 24 Mass. App. Ct. 402, 404 (1987).   If the owner of the converted property retakes the property, "he may recover as damages the difference between the value of the property when converted and when returned, plus damages for loss of use during the period of wrongful detention."   Turner v. Hubbard Sys., Inc., 153 F. Supp. 3d 493, 494 (D. Mass. 2015) (quoting George v. Coolidge Bank & Trust Co., 360 Mass. 635, 641 (1971)); see Restatement (Second) of Torts § 931 (1979) (noting "[i]f one is entitled to a judgment for the detention of, or for preventing the use of, land or chattels, the damages include compensation for (a) the value of the use during the period of detention or prevention or the value of the use of or the amount paid for a substitute . . .").

16.     In calculating damages for loss of use of wrongfully detained property, Massachusetts law instructs that if a plaintiff seeks damages for loss of use or lost rental value, the factfinder should calculate the fair rental value of the property during the time when the defendant possessed the property, and that fair rental value is the highest price that a willing buyer would pay to a willing seller for the property in a free and open market.   See Massachusetts Superior Court Civil Practice Jury Instructions, Conversion;[3]  see MCI, LLC v. Patriot Eng'g & Env't, Inc., 487 F. Supp. 2d 1029, 1034 (S.D. Ind. 2007) (noting that "[l]oss of use damages may be awarded even where the aggrieved party does not rent a replacement, or if she mitigates damages by substituting other property in her possession for the damaged property").

17.     Determining the rental value for loss of use purposes can be determined by considering the cost of renting a comparable replacement vehicle.   See Antokol v. Barber, 248 Mass. 393, 398 (1924) (affirming the trial court's award of damages where "the findings made by the judge rightly interpreted mean that the fair value of the loss of use of the plaintiff's automobile while being repaired was the hire paid for the one to take its place"); In re Adams, 516 B.R. 361, 370 (Bankr. S.D. Miss. 2014) (awarding the debtor $40.99 per day for each day after their Ford Expedition was wrongfully repossessed and before they had actually rented a replacement vehicle, based on the fact that the debtor ultimately rented a replacement vehicle at that daily rate); In re Henry Valencia, Inc., No. 20-10539-J11, 2023 WL 175198, at *10 (Bankr. D.N.M. Jan. 12, 2023) (noting that the "[l]oss-of-use damages may be measured by the reasonable rental value of a substitute vehicle, even in the absence of actual rental") (quoting Cress v. Scott, 868 P.2d 648, 651

---

[3] Available at https://www.mass.gov/doc/superior-court-model-civil-jury-instructions-conversion-pdf/download [https://perma.cc/XN78-MH9P] (last visited on June 22, 2023).

(N.M. 1994)).

### a.   *Calculation of Conversion Damages*

18.     Here, the Espinosas have shown by a reasonable degree of certainty that they suffered loss of use damages due to Metcalf, JAU and Champion's wrongful taking of their vehicles in an effort to collect a debt.

19.     As to Junior, the evidence shows that he was deprived of his Mini Cooper for sixteen days.

20.     As to Senior, the evidence shows that he was deprived of his leased Honda Accord for 204 days.   Both Junior and Senior took reasonable steps to mitigate their damages.   First, they immediately sought return of their wrongfully detained vehicles from Defendants.   As to the Honda Accord, after Defendants indicated that it was available for pickup, the Espinosas sought to retrieve it, but given that Defendants conditioned that return upon the payment of fees and costs for their own wrongful retention, Plaintiffs did not fail to mitigate by declining to pay same.   See Navratil v. Smart, 400 So.2d 268, 273 (Ct. App. La. 1981) (rejecting defendant's mitigation argument where plaintiff "was under no duty to pay for the return of his illegally seized automobile").   Second, both sought alternative means of transportation during the wrongful detention of their vehicles.   Although Senior was without his own vehicle for a longer period of time, he was able to use Junior's Mini Cooper, once it was returned from Defendants for some transportation, but still was left without transportation at other times.   Since these efforts did not meet all of his transportation needs (and then left his co-Plaintiff, Junior, without a vehicle when he did so), neither Plaintiff had any further duty to mitigate their damages.

21.     As to Junior, multiplying the number of detention of the Mini Cooper (sixteen days)

by the lowest substitute vehicle rental rate in the record, $60 per day, the Court finds that Junior's loss of use damages is $960.

22.     As to Senior, multiplying the number days of detention of the Honda Accord (204 days) by the lowest substitute vehicle rental rate in the record, $60 per day, the Court finds that Senior's loss of use damages is $12,240.

**D.     Damages Under Chapter 93A**

23.     The Court has already concluded that Metcalf, JAU and Champion violated Chapter 93A as to both Senior and Junior.   D. 92 at 15.   If a plaintiff is successful in bringing an action under Chapter 93A, "recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater."   Mass. Gen. L. c. 93A, § 9.   This amount can be tripled, but must be at least doubled, if the court finds the defendants' violations to be willful or knowing, or if "the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two."   Id.

24.     As with claims under the FDCPA, recovery of actual damages under Chapter 93A allows for recovery of emotional distress damages.   See McDermott, 911 F. Supp. 2d at 92–93 (noting "by enacting the 1979 amendments to chapter 93A, the Legislature clarified its intent 'to permit recovery when an unfair or deceptive act caused a personal injury loss such as emotional distress, even if the consumer lost no money or property'") (quoting Hershenow v. Enter. Rent-A-Car Co. Of Bos., Inc., 445 Mass. 790, 798 (2006)); Arthur D. Little, Inc. v. Dooyang Corp., 147 F.3d 47, 57 (1st Cir. 1998) (noting that the term "injury" with respect to § 9 of c. 93A "is a broader term" than "'loss of money or property' under § 11" "and includes, for example, emotional distress").

25.     Courts have considered damage awards for mental anguish "where the testimony has been limited to fairly generalized statements about anger and frustration. In these cases, plaintiffs have been awarded damages in sums ranging from $100.00 to $5,000.00."   In re Hart, 246 B.R. 709, 732 (Bankr. D. Mass. 2000) (awarding the FDCPA plaintiff $3,000 in emotional distress damages where the debtor testified that "he was angered, frustrated, and emotionally distressed by his dealings with [defendant]"); McDermott, 911 F. Supp. 2d at 97 (awarding $5,000 in emotional distress damages); Chiverton v. Fed. Fin. Grp., Inc., 399 F. Supp. 2d 96, 102 (D. Conn. 2005) (awarding $5,000 in emotional distress damages to FDCPA plaintiff where the plaintiff testified as to his anxiety, stress and frustration and to the fact that "he was unnerved and irritated by the defendant's repeated calls"); Howze v. Romano, No. 92-644-SLR, 1994 WL 827162, at *3 (D. Del. Dec. 9, 1994) (awarding $5,000 in actual damages to FDCPA plaintiff who suffered emotional distress, embarrassment, humiliation, irritation and anger, arising from the debt collector's offensive tenor and timing of phone conversation with plaintiff's daughter).

26.     Courts interpreting the multiple damages provisions of Chapter 93A have imposed such damages for "willful" or "knowing" violations, "equating the former with reckless conduct and the latter with intentional acts."   Still v. Comm'r of Emp. & Training, 423 Mass. 805, 812–13 (1996) (collecting cases).

a.     *Calculation of Chapter 93A Damages*

27.     An award of actual damages under both the FDCPA and Chapter 93A would be duplicative where the facts underlying both claims are not distinguishable.   Malone, 2007 WL 4200951, at *1.

28.     The Court finds that the facts underlying the Espinosas FDCPA and Chapter 93A

claims are indistinguishable.   Accordingly, Junior is entitled to $2,500 and Senior is entitled to $4,000 in actual damages under Chapter 93A.

29.    The Court assesses whether to award double or treble damages "[b]ased on the egregiousness of each defendant's conduct."  Smith v. Jenkins, 818 F. Supp. 2d 336, 345 (D. Mass. 2011) (internal quotation marks omitted) (quoting Int'l Fid. Ins. Co. v. Wilson, 387 Mass. 841, 853 (1983)).

30.    Here, the Espinosas have shown, by a reasonable degree of certainty through witness testimony and exhibits that Metcalf, JAU and Champion recklessly disregarded the truth about who owned the Mini Cooper and the Honda Accord before seizing them and, therefore, acted knowingly and willfully in retaining both for substantial periods of time.

31.    As to Junior, the evidence shows that he contacted Metcalf and JAU shortly after his Mini Cooper was seized and informed them that he owned the car.   Even after being advised that they had seized the wrong vehicle, Metcalf and JAU told Junior that they would "settle" for $4,000, and that Junior would need to pay that sum within twenty-four hours if he wanted to get his Mini Cooper back.   Metcalf, JAU and Champion also offered a nominal (and unreasonable) settlement of $10 in their responses to Junior's Chapter 93A demand letter, dated January 7, 2021. By this point, these Defendants knew or should have known that Senior did not own the Mini Cooper.   The Court, therefore, finds that this settlement offer was made in bad faith with the knowledge that their actions violated Chapter 93A.   Accordingly, the Court finds that these Defendants' violation of Chapter 93A was willful and doubles Junior's award to $5,000.

32.    As to Senior, the evidence shows that Metcalf, JAU and Champion informed him that his vehicle had been released twelve days after it was wrongfully seized but still required

15

Senior to pay Export's fees to retrieve his car.   By this time, Defendants knew or should have known that they had seized the wrong car, which is further evidenced by the fact that they released the vehicle to Export.   And with that knowledge, it was at least reckless not to ensure that Senior's car was returned without the need to pay any fees.   Moreover, the Court finds that these Defendants' settlement offer of $10 in response to Senior's Chapter 93A demand letter was also made in bad faith given their knowledge that they seized the wrong car.   Accordingly, the Court finds that these Defendants' violation of Chapter 93A was willful and doubles Senior's award to $8,000.

E.     **Prejudgment Interest**

33.     The Espinosas also seek prejudgment interest.   "[P]rejudgment interest is a substantive remedy governed by state law when state-law claims are brought in federal court." Tobin v. Liberty Mutual Insurance Co., 553 F.3d 121, 146 (1st Cir. 2009) (citations omitted). Mass. Gen. L. c. 231, § 6B imposes a twelve percent per annum prejudgment interest rate, in relevant part, "for pecuniary damages for personal injuries . . . or for damage to property."   Section 6H of that statute makes this interest rate a catch-all, providing that "[i]n any action in which damages are awarded, but in which interest on said damages is not otherwise provided by law, there shall be added by the clerk of court to the amount of damages interest thereon at the rate provided by section six B to be determined from the date of commencement of the action. . . ." Mass. Gen. L. c. 231, § 6H.

34.     Prejudgment interest applies to the damages award for conversion, see, e.g., Allied Home Mortg. Capital Corp. v. Belli, No. 07-cv-11597-NG, 2011 WL 13248374, at *11 (D. Mass. Mar. 3, 2011), and an award of prejudgment interest on the Chapter 93A actual damages award

16

(i.e., "not to the multiple punitive damage award") is also appropriate.   McDermott, 911 F. Supp. 2d at 102.   Prejudgment interest under section 6B ordinarily runs "from the date of commencement [of suit] to the date on which judgment is entered."   Tobin, 553 F.3d at 146 (alteration in original) (citation omitted).

35.      As to Junior, the Court finds that he is entitled to prejudgment interest, at a rate of twelve percent per annum, on his conversion award ($960) and Chapter 93A actual damages award ($2,500).   Governo L. Firm LLC v. Bergeron, 487 Mass. 188, 200 (2021) (noting "[p]rejudgment interest applies to awards of compensatory damages because both prejudgment interest and compensatory damages seek to make a plaintiff whole") (citations omitted).

36.      As to Senior, the Court finds that he is entitled to prejudgment interest, at a rate of twelve percent per annum, on his conversion award ($12,240) and Chapter 93A actual damages award ($4,000).   Id.

## V.      CONCLUSION

In light of these findings of fact and conclusions of law, as to Junior, the Court shall enter judgment in the total amount of $6,960 ($1,000 in FDCPA statutory damages, $960 for conversion and $5,000 under Chapter 93A) and twelve percent prejudgment interest on $3460 of this award. As to Senior, the Court shall enter judgment in the total amount of $21,240 ($1,000 in FDCPA statutory damages, $12,240 for conversion and $8,000 under Chapter 93A) and twelve percent prejudgment interest on $16,240 of this award.

In light of this ruling, Espinosas shall file a proposed Order of Judgment consistent with the Court's ruling on damages by July 14, 2023.   Also, by July 14, 2023, the Espinosas shall file any motion for the award of attorneys' fees and costs.   Defendants will then have until July 28,

2023 to file a response to the motion.

      **So Ordered.**

                                    /s/ Denise J. Casper
                                    United States District Judge